## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtor. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| vs. | |
| One World Services LLC and OWS Brasil Intermediacao LTDA, | Adv. No. **Refer to Summons** |
| Defendant. | |

### COMPLAINT TO AVOID AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550 AND TO DISALLOW CLAIMS PURSUANT TO 11 U.S.C. § 502

The PCT Litigation Trust ("PCT" or "Plaintiff"), by and through its undersigned counsel,

files this complaint (the "Complaint") to avoid and recover transfers against Defendants One

World Services LLC and OWS Brasil Intermediacao LTDA (together, the "Defendants" or "One

World Services" and, collectively with Plaintiff, the "Parties"), pursuant to Sections 547 and 550

of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking

to avoid and recover preferential transfers of property made by the Debtors to or for the benefit of

the Defendants, plus interest, attorneys' fees, and costs. To the extent that Defendants filed a proof

of claim or have a claim listed by the Debtors on their schedules as undisputed, liquidated, and not

contingent, or have otherwise requested payment from the Debtors or their estate (collectively, the

---

[1]   The Debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

"Claims"), Plaintiff seeks to disallow such Claims pursuant to section 502(d) of the Bankruptcy Code.[2] In support of this Complaint, Plaintiff alleges the following:

## INTRODUCTION

1.     Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter in August 2023. Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them. But, in a series of transactions between May 16, 2023 and Prime's bankruptcy filing on August 14, 2023 (the "Petition Date"), Prime transferred $163,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT to Defendants (the "Transfers").[3]  Accordingly, all of the Transfers are preference payments which are subject to avoidance.

2.     Plaintiff brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Defendants, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases (the "Preference Period").[4]  These transfers constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code. Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiff also seeks to disallow any claims filed or held by Defendants in these Chapter 11 Cases unless and until the Defendants have relinquished to Plaintiff all property owed to it.

---

[2]     Nothing herein shall constitute a waiver of Plaintiff's right to object to any of such Claims for any reason, including but not limited to, 11 U.S.C. § 502(a) through (j), and such rights are expressly reserved.

[3]     The Prime entity which made the Transfers was Prime Trust, LLC.

[4]     The Preference Period includes May 16, 2023 through August 14, 2023.

3.     Defendants operate a proprietary trading firm that provides liquidity and market making services to institutions and exchanges.

4.     To effectuate these services, One World Services engaged Prime for payment rails, liquidity, settlement, and compliance services including to serve as an "on-and-off ramp" and "payment rail". Specifically, One World Services transferred fiat and crypto to Prime (the "on ramp"). Prime then held and controlled the assets until either: (i) One World Services instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to One World Services's directions for a fee (the "payment rail"); or (ii) One World Services withdrew the value of certain fiat and crypto that it previously had transferred to Prime (the "off ramp").

5.     The agreements that governed Prime and One World Services' relationship during the Preference Period were the (i) Prime Trust Order Form, effective September 7, 2022 (the "Order Form");[5] (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "MSA");[6] and (iii) Services Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement" and, together with the MSA and Custodial Agreement, the "Agreements").[7]

6.     Although Prime was a Nevada state-chartered trust company, One World Services never sought or received any trust or fiduciary services from Prime. To the contrary, One World Services engaged Prime to provide API, payment rail, liquidity, and custodial services.

7.     The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***" Ex. B, MSA, § 14.1 (emphasis added).

---

[5]    A copy of the Order Form is attached as Exhibit A.

[6]    A copy of the MSA is attached as Exhibit B.

[7]    A copy of the Custodial Agreement is attached as Exhibit C.

8.      The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . .with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]***" <u>Ex. C</u>, Custodial Agreement, §2.7(b) (emphasis added).

9.      The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship and that no fiduciary relationship existed between the Parties.

10.     The fiat that One World Services transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name. These omnibus bank accounts commingled the fiat One World Services transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

11.     The crypto that One World Services transferred to Prime was held in commingled "omnibus" digital wallets (the "<u>Omnibus Digital Wallets</u>"), which also held crypto transferred to Prime by other customers and Prime's own crypto.

12.     Prime attempted to keep track of commingled fiat and crypto transferred by One World Services (and other customers) with an internal, omnibus ledger (the "<u>Internal Ledger</u>"). But the Internal Ledger was errantly and later intentionally corrupted by Prime.

13.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries. Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and crypto that One World Services transferred to Prime.

14.     The third-party expert retained by Plaintiff in this matter, James P. Brennan, also has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat and crypto that One World Services transferred to Prime from fiat and crypto provided by Prime's other

customers or from Prime's own fiat and crypto. *See* Declaration of James P. Brennan (the "Brennan Decl.").[8]

15.    Bank account statements and block chain data reflect that the fiat and crypto transferred from Prime to One World Services during the Preference Period was not the original fiat and crypto that One World Services had transferred to Prime. *See id.* at ¶¶ 135. Rather, these transfers consisted of fiat from the commingled, omnibus bank accounts in Prime's name and crypto from the commingled, Omnibus Digital Wallets.

16.    Moreover, in December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[9] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 103.

17.    Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customers' transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 112-116.

18.    Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

---

[8]    A copy of the Brennan Decl. is attached as Exhibit D.

[9]    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

Q:     When it says funds transfer. . . and it says "wire, wire, wire."  Do you see
       that?

A:     Yes.

Q:     ***There were no wire transfers; right***?

A:     ***Yes***.

Q:     ***Just to be clear.  Yes, there were not any wire transfers in connection with
       these [Liquidity Provider] purchases; right?***

A:     ***Yes, there were no wire transfers***.

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del.

Mar. 29, 2024) (the "████ Dep."), 164:22–165:10 (emphasis added).

       19.     Prime's use of its fiat transferred by other customers to purchase replacement ETH

left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled

fiat from One World Services and other Prime customers.

       20.     Prime's falsified wire transfer entries to cover its replacement ETH purchases,

coupled with Prime's failure to properly reconcile and record other transactions on its Internal

Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or

transfers that were made by any particular customer, including One World Services. *See* Ex. D,

Brennan Decl., ¶¶ 95-108, 112-127, 135.

       21.     Prime's Transfers to One World Services during the Preference Period exacerbated

Prime's already precarious financial position, accelerating the downward financial spiral that

culminated in Prime's Chapter 11 filing on the Petition Date.

       22.     Because the Parties' relationship was strictly a debtor-creditor relationship, the

Transfers to One World Services during the Preference Period must be returned to the Debtors'

estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and

costs.

23.     During the course of this Adversary Proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made to or obligations incurred by, One World Services that are avoidable and/or recoverable under the Bankruptcy Code. Plaintiff intends to avoid and/or recover all such transfers and obligations made to or for the benefit of One World Services and, accordingly, reserves the right to amend this Complaint.

## **PARTIES**

24.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644]. The Plan was consummated on January 5, 2024 (the "Effective Date").[10]

25.     On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust. *See* Plan, § 6.21. The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn. *See id*. at § 1.118.

26.     Defendant One World Services, LLC is a limited liability company organized under the laws of Delaware which maintains a principal address in Miami, Florida.

---

[10] *See* Docket No. 694.

7

27.     Defendant OWS Brasil Intermediacao LTDA is a foreign company which maintains a registered address in Florida and Sao Paulo, Brazil and is an affiliate of One World Services, LLC.

28.     On information and belief, Defendants share many of the same management, personnel, infrastructure, and business functions.  Employees using email domains associated with both entities were authorized to initiate and approve transactions at Prime for or on behalf of Defendants.

## JURISDICTION AND VENUE

29.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

30.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

31.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

32.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

33.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, 550 and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

34.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  BTC and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including BTC, ETH, Litecoin, and USDT.

35.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that

occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

36.     There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

37.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

38.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

39.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

40.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

41.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer

device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

42. A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



43. Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

44. Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future

to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.  Prime's Business Operations

45.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

46.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

47.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

48.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

49.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

50.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

51.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.     The Agreements Created a Strictly Debtor-Creditor Relationship Between Prime and Defendant

52.     One World Services offers trading and exchange services involving cryptocurrency and fiat.

53.     As part of its services, One World Services engaged Prime to provide API, payment rail, liquidity, and custodial services.

54.     One World Services did not engage Prime for any fiduciary or trust services.

55.     The Agreements governed the Parties' relationship during the Preference Period.

56.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

57.     Prime and One World Services executed the Order Form on September 7, 2022. *See* Ex. A, Order Form.

58.     The Order Form specifically incorporates both the MSA and the Custodial Agreement by reference.  *Id*.  ("This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

59.      The Order Form states that the "[MSA] and any of its incorporated documents, including the Service Schedule(s). . . shall supersede and replace any prior agreement(s) that may be in place between [One World Services] and Prime Trust with respect to Prime Trust's services." Ex. A, Order Form.

60.      The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and One World Services.

61.      The MSA explicitly states: "The Parties are independent contractors.    The Agreement does **not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties**" and that "**nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary**." Ex. B, MSA, § 14.1 (emphasis added).

62.      Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided by One World Services to Prime as well as retain the profits derived from the assets that One World Services transferred to Prime.

63.      For example, the Custodial Agreement permitted Prime to:

[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]

Ex. C, Custodial Agreement, § 2.7(b).

64. The Custodial Agreement also provided that One World Services expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

65. The Agreements established that the Parties, at all relevant times, maintained a strictly debtor-creditor relationship.

## III. Transfers From Prime to Defendants During the Preference Period Are Avoidable

66. Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

67. First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

68. Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

69. Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

70. Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4).

71. Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made. *See* 11 U.S.C. § 547(b)(5)(A)–(C).

72. In the weeks leading up to Nevada FID's decision to shut down Prime, rumors about Prime's deteriorating financial condition and potential need to file for bankruptcy spread among certain players in the crypto industry.

73.     During this period of escalating financial distress, One World Services had Prime make transfers to it.

74.     Specifically, Prime transferred $163,000.00 USD from Prime's BMO x3077 account, and 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT from Prime's Omnibus Digital Wallets, to or for the benefit of One World Services during the Preference Period.  *See* Ex. D, Brennan Decl., at ¶¶ 130-132.

75.     The API log audit data establishes that Defendant, through Adriano Froes using the email address adriano@oneworldservicesllc.com, directed each of the Transfers.  *See id*. at ¶ 133.

76.     The Transfers to One World Services were transfers of an interest of Prime's property to or for the benefit of One World Services during the Preference Period.

77.     Prime executed the Transfers during the Preference Period to satisfy the debt Prime owed to One World Services under the Agreements.  Specifically, during the Preference Period, Prime was indebted to One World Services for the amount of fiat and crypto Prime had received from One World Services

78.     The Transfers were made while Prime was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[11]  If not avoided, the Transfers will enable One World Services to receive more than One World Services would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers in satisfaction of Prime's antecedent debt to One World Services.  *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

---

[11]     *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

79.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period performed by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid many of the Transfers even after taking into account One World Services' alleged affirmative defenses.[12] Accordingly, certain of the Transfers to One World Services must be returned. *See* 11 U.S.C. §§ 547(b), 550.

80.    One World Services provided $86,000.00 of potential subsequent new value to Prime after receiving certain of the Transfers during the Preference Period. *See* Ex. D, Brennan Decl., at ¶ 134. Therefore, One World Services' preference exposure is no less than $77,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT. *See id.*

81.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to One World Services during the Preference Period. It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that was made to or for the benefit of One World Services or any other transferee. PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) additional defendants; and/or (iv) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

---

[12]    It is One World Services' obligation to establish all possible affirmative defenses, including subsequent new value.

**IV.    The Transfers Contained Commingled Fiat and Crypto Which Defendants Cannot Trace**

82.    The Transfers were comprised of commingled fiat and crypto, respectively, that Prime had not previously segregated into separate bank accounts or digital wallets.

83.    To complete the crypto transfers during the Preference Period, Prime transferred crypto from Omnibus Digital Wallets that held commingled crypto.  *See* Ex. D, Brennan Decl., ¶ 132.

84.    To complete the fiat transfers during the Preference Period, Prime transferred fiat from one of Prime's omnibus, commingled accounts at BMO Harris Bank, N.A. ("BMO") ending in 3077 ("BMO x3077").  *See id.*

85.    Prime's extensive commingling of fiat and crypto eliminates any hope of One World Services being able to attribute any transfer of fiat or crypto originally from One World Services to Prime with the Transfers.

86.    On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "Distribution Order").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "Distribution Opinion").

87.    In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors was property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "Objectors") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

88.     In overruling these objections, the Court made several findings pertinent to the instant matter.

89.     First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers.  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

90.     The agreements analyzed by the Court in the Distribution Order contain identical provisions to the Agreements at issue here and discussed above.  *See id.* at 24.

91.     Second, the Court held that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified" and that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets." *Id.* at 23–24.  The Court found that both "the fiat held by the Debtors is not traceable" and "the hopeless commingling would not allow the cryptocurrency to be traced." *Id.* at 27, 30.

92.     As set forth below, the fiat and/or crypto Transfers to One World Services cannot be traced to One World Services' fiat and crypto transfers to Prime.

### A.      Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

93.     The fiat that One World Services and other customers transferred to Prime was not segregated into separate bank accounts.  *See* Ex. D, Brennan Decl., at ¶¶ 80-94, 120.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id.*

94.     The fiat transfers from Prime to One World Services during the Preference Period were transferred from BMO x3077.  *See id*. at ¶ 131; *see also* Ex. E, Treasury Master Services

Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").[13]

95.     The BMO Agreement specifically provides that it "*is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder.*"  *See* Ex. E, BMO Agreement, § 15(e) (emphasis added).

96.     The BMO Agreement does not state that the fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. E, BMO Agreement.

97.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Ex. F, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[14]

98.     Prime regularly transferred fiat between its various bank accounts, further commingling funds.  *See* Ex. D, Brennan Decl., ¶¶ 80-94.

99.     For example, Prime used BMO x3077 primarily to make wire transfers.  *See id.* at ¶ 77.

100.    BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers.  *See id.* at ¶¶ 85-91.

101.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[15]  *See id.* at ¶¶ 87-88.

---

[13]    A copy of the BMO Agreement is attached as Exhibit E.

[14]    A copy of the BMO Certification is attached as Exhibit F.

[15]    BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit G, § 25.  Because Prime

102.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 88.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.*

103.    In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at Cross River Bank ("CRB") and Signature Bank ("Signature").  *See id.* at ¶ 81.

104.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶ 83.

105.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 93.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

106.    Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 85.

107.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.* at ¶¶ 81-83.

---

designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* Ex. F, BMO Certification.

108. ███████ ("██████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

109. However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult. *See* Ex. D, Brennan Decl., at ¶¶ 86, 93, 127.

**B.    Prime Commingled Crypto in Omnibus Digital Wallets in Vaults**

110. As was the case with Prime's commingling of fiat, Prime did not maintain separate or segregated digital wallets for crypto. *See id.* at ¶ 28. Instead, Prime had Omnibus Digital Wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes. *See id.*

111. Prime maintained its Omnibus Digital Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform. *See id.* at ¶ 29. Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the Omnibus Digital Wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id.* Vaults at Fireblocks were not separated or segregated by digital wallets. *See id.*

112. Customers were provided with deposit digital wallet addresses (the "Deposit Digital Addresses") for sending crypto to Prime. *See id.* at ¶ 30. From time to time, Prime would conduct "sweeps" of those different Deposit Digital Addresses to transfer crypto from those

Deposit Digital Addresses into one or more of the shared Omnibus Digital Wallets controlled by Prime. *See id.* at ¶ 31. This process commingled crypto transferred to Prime by different customers together in the Omnibus Digital Wallets. *See id.*

113.   Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id.* at ¶ 32–34. Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id.*

114.   Prime also regularly transferred crypto between its multiple Omnibus Digital Wallets, only further commingling the already commingled crypto contained in the Omnibus Digital Wallets. *See id.* at ¶ 33.

115.   In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to and from Prime on its Internal Ledger. *See id.* at ¶ 34. When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger. *See id.* at ¶ 35. The Internal Ledger, however, did not track to which Omnibus Digital Wallet(s) any specific crypto was transferred into when Prime swept Deposit Digital Address(es). *See id.*

116.   When a customer requested to transfer crypto from Prime, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the outgoing transfer amount. *See id.* at ¶ 40. If the customer had transferred sufficient crypto, Prime would then check its multiple Omnibus Digital Wallets to determine from which Omnibus Digital Wallet(s) it could transfer the requested amount of crypto to the customer. *See id.* In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Digital Address because Prime's Omnibus Digital Wallets did not segregate

crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer.  *See id.*

117.    To demonstrate the extent of Prime's commingling of crypto, the Brennan declaration discusses and illustrates several examples of commingling taken from transaction, blockchain, and other data.  *See id.* at ¶¶ 28–79.

118.    For example, Prime frequently swept crypto from the Deposit Digital Addresses into one of Prime's Omnibus Digital Wallets with a digital address ending in ~b2ea (the "~b2ea Wallet").  *See id*. at ¶ 42.

119.    The Brennan Declaration provides an example of how three separate Prime customers sent crypto to their respective, unique Deposit Digital Addresses which Prime subsequently swept into the ~b2ea Wallet:



*See id*. at ¶ 44.

120.    Just this one example illustrates how Prime commingled crypto transferred to it from three different customers into a single Omnibus Digital Wallet.  This type of transaction occurred multiple times with the ~b2ea Wallet and with other Omnibus Digital Wallets.  *See id*.

121.    The Brennan Declaration also discusses how the crypto that customers transferred to Prime became further commingled with crypto that Prime used for its own corporate operations. Again, using the ~b2ea Wallet as an example, Brennan describes how the ~b2ea Wallet received crypto from a Prime wallet that itself was funded from thousands of different wallets holding Prime's own crypto. *See id*. at ¶¶ 46–48. This resulted in Prime's crypto, which was used for its own corporate operations, becoming commingled with crypto that customers had transferred to Deposit Digital Addresses which Prime had already previously swept and commingled into this Omnibus Digital Wallet. *See id.*

122.    Prime's commingling of crypto was further compounded by Prime's movement of commingled crypto between multiple Omnibus Digital Wallets. Using the ~b2ea Wallet as an example, the Brennan declaration discusses and illustrates how Prime transferred already commingled crypto between multiple Omnibus Digital Wallets:



*See id.* at ¶¶ 49–51.

123.    The Brennan Declaration also discusses and illustrates how Prime's commingling of crypto in Omnibus Digital Wallets makes it practically impossible to determine if the crypto transferred from Prime to a customer to satisfy a withdrawal request included any of the original crypto that specific customer had originally transferred to Prime.  *See id.* at ¶ 52.

124.    The below illustration shows that while the ~b2ea Wallet received crypto swept from the Deposit Digital Address of one of Prime's customers ("Customer A") and from Prime's "PT Segregated Assets" digital wallet addresses that held corporate crypto (the "PT Segregated Assets Wallet"), Prime transferred crypto out of this ~b2ea Wallet to satisfy outgoing transfer requests from two completely different Prime customers.  *See id.* at ¶¶ 47–48.  These outgoing crypto transfers may have included some or none of the crypto originally transferred to Prime by Customer A or from Prime's other customers.  *See id.* at ¶ 49.



125.    Similarly, Prime often used the digital wallet with a digital address ending in ~73ck ("~73ck Wallet") for BTC transferred to Prime from numerous customers as well as BTC transferred from other Prime Omnibus Digital Wallets, which also held BTC transferred to Prime by multiple customers.  *See id.* at ¶¶ 53–55.  This resulted in extensive commingling of BTC.



*See id*. at ¶ 54.

126.    Prime also commingled USDT.  *See id*. at ¶¶ 56–59.

127.    The diagram below illustrates an example of a USDT transaction by a Prime customer ("Customer A") that transferred USDT to a Deposit Digital Address at Prime, which was then swept into one of Prime's Omnibus Digital Wallets with the digital address ending in ~df94 (the "~df94 Wallet") where it was immediately commingled with USDT that had been transferred to Prime by other customers. To cover the gas fees associated with the USDT transaction, Prime used ETH from the commingled ~df94 Wallet.  *See id*. at ¶ 57.



*See id.*

## C. Prime Pooled Crypto Together to Reduce Transaction Fees

128.    Prime generally swept crypto from the Deposit Digital Addresses into shared Omnibus Digital Wallets to pool crypto together for a number of reasons. *See id.* at ¶¶ 60–79.

129.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[16] that would otherwise be incurred by

---

[16]    "Transactions occurring on the blockchain incur fees. On the Ethereum blockchain, these are referred to as 'gas fees.' Gas fees refer to costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain. In other words, they are fees charged by the blockchain itself for successfully completing a transaction. However, on the Bitcoin blockchain, these are referred to simply as 'transaction fees.' Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block." In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain." *See* <u>Ex. D</u>, Brennan Decl., at ¶¶ 24–25. We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein, but only use the term "gas fees" to refer to transaction fees incurred for ETH and USDT on the Ethereum network.

conducting transactions on the blockchain. *See id.* at ¶¶ 60-63. Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise incur transaction fees. *See id.* at ¶¶ 61-62. When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested as illustrated in the below diagram.



*See id.* at ¶ 65.

130. By sweeping BTC together that had been transferred to Prime by multiple customers, including One World Services, Prime's commingling of BTC makes distinguishing the original digital wallet from which the BTC originated nearly impossible. *See id.* at ¶¶ 31-37.

131. To help account for the gas fees Prime incurred for transacting in ETH, USDT, or other cryptocurrencies on the Ethereum blockchain, Prime set up additional digital wallets it referred to collectively as the "Gas Stations." *See id.* at ¶¶ 68-78. Prime funded the Gas Stations from its various other wallets (including the Omnibus Digital Wallets) and used the Gas Stations

to pay gas fees when Prime conducted on-chain transactions. *See id.* Prime used a variety of sources to fund gas stations, which resulted in Prime further commingling crypto transferred to Prime by customers with Prime's own crypto. *See id.* at ¶ 79.

132. As demonstrated below, funding sources for the Gas Stations (represented by bright green nodes) included Prime's Omnibus Digital Wallets (represented by green nodes at the top), customers' external digital wallets (represented by the pink, blue, red and yellow nodes) and several external digital wallets that appear to be unattributable to Prime or its customers (represented by gray nodes):



*See id.* at ¶ 73.

133. Prime documents, as shown below, also reflect instances where Prime operations personnel used fiat from one of Prime's commingled omnibus bank accounts to purchase ETH to refill the Gas Stations. *See id.* at ¶¶ 73-76.



134.    Therefore, the Gas stations were funded by Prime's corporate fiat, crypto from commingled Omnibus Digital Wallets (including the ~b2ea Wallet described above), and crypto from external wallet addresses. *See id.* at ¶ 77.

135.    In sum, by sweeping and pooling crypto together, Prime was able to reduce transaction fees by commingling crypto transferred to Prime by customers with Prime's corporate crypto in several different ways throughout the process. *See id.* at ¶ 79.

**D.    Prime Did Not Reconcile Fiat or Crypto Transations**

136.    Prime did not conduct regular, timely or accurate reconciliations to compare the fiat and crypto recorded in its Internal Ledger with the fiat Prime actually held in omnibus bank accounts and crypto that Prime actually held in its Omnibus Digital Wallets. *See id.* at ¶ 39.

137.    None of the crypto held by Prime in Prime's Vaults with Fireblocks has clear ownership provenance. *See id.* at ¶¶ 29-35.

138.    Prime's own internal data also presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger.  *See id.*

139.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See id.* at ¶¶ 95-108.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id.*

140.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶ 95.

141.    Former Prime employees testified that Prime commingled fiat and crypto transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

142.    ████████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

143.    ████████████ ("████████"), Prime's former Chief Financial Officer, testified:

Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

144.    ████████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the

financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15-22.

145.    ▮▮▮▮▮▮ ("▮▮▮▮▮"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

Q:    When you say it was a problem, what do you mean?

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

▮▮▮ Dep., 19:23–20:5.

146.    ▮▮▮▮▮ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| 2  Finding and Response Summary Matrix | | | | | | |
|---|---|---|---|---|---|---|
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

147.    As described above and confirmed in the Brennan Declaration, Prime's repeated transfers of funds between omnibus bank accounts and crypto between Omnibus Digital Wallets, and Prime's failure to maintain proper tracking and reconciliation processes, further exacerbated the commingling of fiat and crypto transferred to Prime by One World Services with fiat and crypto transferred to Prime by Prime's other customers and fiat and crypto generated from Prime's own business operations.

### E.    Defendants Cannot Trace the Fiat and Crypto Transferred to Prime

148.    Because Prime held fiat and crypto transferred to it from customers in an omnibus, commingled manner, Prime's own employees were incapable of determining where any fiat or crypto transferred by a particular customer to Prime was located.  As ▓▓▓▓▓ testified:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could

have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

███ Dep., 205:19–207:3.

149.    Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



150.    ██████ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":



On Mon, Dec 19, 2022 at 9:28 AM ██████ ████████metrust.com> wrote:

Hey ██

Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

151.    ██████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat and crypto and that Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":

On Wed, Dec 28, 2022 at 10:56 AM ██████ ████████primetrust.com> wrote:

██████ nd I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

(Emphasis added).

152.    Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for PCT, One World Services, or anyone else to trace and specifically identify the fiat and crypto that One World Services originally had transferred to Prime. *See* Ex. D, Brennan Decl., ¶ 135.

## V.    The 98f Wallet

153.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer from Prime of 5,867.71 ETH (worth

approximately $24,000,000.00 at the time) from Prime. *See id.* at ¶ 110. Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time). *See id.* at ¶ 114.

154.    In attempting to satisfy Abra's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:



155.    Further investigation revealed that, for approximately eight months, Prime had been permitting Abra to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

156.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (approximately $45,000,000.00 at the time) to the 98f Wallet. *See* Ex. D, Brennan Decl., ¶ 111.

157.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet. *See id.* at ¶ 110.

158.    It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet. *See* ▇ Dep., 69:17–71:22. Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ▇ Dep., 181:6–8. Prime also did not possess and could not locate the passwords,

which are called "seed phrases," that were associated with these physical hardware devices.  *See id*.

159.    Because Prime had no way of obtaining the private keys necessary to access the 98f Wallet, Prime had no way of accessing that wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

160.    Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

161.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  *See* Ex. D, Brennan Decl., ¶¶ 112-113.

162.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider in an attempt to satisfy Abra's multiple outgoing transfer requests.  These purchases are summarized in the chart below.

| Date | USD Internal Ledger "Wire" Transfer[17] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

---

[17]    Prime did not actually execute any of these wire transfers.  *See* ▮ Dep, 164:22–165:10.

*See id*. at ¶ 114.

163.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers. *See id.* at ¶¶ 114-117.  The ETH purchased with those commingled funds was then transferred to Abra. *See id.*

164.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider was described by ████████, Prime's former Chief Operating Officer, at his deposition:

> Q:    So [Customer's] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ████ would know specifically.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

165.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  *See* Ex. D, Brennan Decl., at ¶ 117.

166.     Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Abra's outgoing transfer requests. *See id.* at ¶¶ 118-120, 127.

167.     ▮▮▮▮▮ confirmed in his deposition that Prime executives intentionally chose to settle and record ETH purchases from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to Liquidity Provider. *See* ▮▮ Dep., 153:8–13.

168.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* <u>Ex. D</u>, Brennan Decl., at ¶ 122.



▮▮▮▮netrust.com
2021-12-23 03:40:01.000 AM
If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank

▮▮▮▮imetrust.com
2021-12-23 03:42:16.000 AM
The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger

▮▮▮▮etrust.com
2021-12-23 03:44:15.000 AM
Whatever you think is easier to reconcile once we get access to the locked ETH

169.     ▮▮▮▮▮ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:     [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:     Correct.  Correct.

Q:     And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:     Correct . . .

Q:     I see.  But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:     Exactly.

Q:     That's ultimately what happened; right?

A:     Yeah, that's exactly what happened.

█████ Dep., 144:11–20; 146:7–15.

170.    Desperate to hide the hole in its balance sheet, Prime executives discussed how to hide these transactions from auditors at Nevada FID:



171.   As demonstrated by the illustrative chart below,[18] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

172.   None of these wire transfers appear on Prime's bank account statements because they did not actually occur.[19]  *See* Ex. D, Brennan Decl., at ¶¶ 124-126.

173.   Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See id*. at ¶ 135.

---

[18]   This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

[19]   The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit H.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit I.

## VI. Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

174.     In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

175.     At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing— were leaking to the crypto and financial markets.

176.     On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

177.     Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

178.     During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

179.     For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

180.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."  *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023),         https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

181.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

182.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.  The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

183.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

184.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its **omnibus customer accounts**."  *Id.* at 6 (emphasis added).

185.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

186.    On July 14, 2023, the Nevada Court placed Prime under receivership.

187.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers,
### 11  U.S.C. § 547(b)

188.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

189.    The Transfers were made on account of a demand by One World Services.

190.    Each of the Transfers was a transfer of an interest in property of Prime.

191.    Prime made the Transfers to or for the benefit of One World Services.

192.    At the time of the Transfers, One World Services was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  One World Services received the Transfers, or, alternatively, the Transfers were made for One World Services's benefit.

193.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

194.    Each of the Transfers was made within ninety days of the Petition Date.

195.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

196.    If not avoided, the Transfers would enable One World Services to receive more than One World Services would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

197.    One World Services has not repaid or returned any of the Transfers to PCT.

198.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that One World Services could assert, including One World Services's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

199.    Accordingly, PCT is entitled to recover from One World Services not less than $77,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

**Count II**
**Recovery of Avoided Transfers from the Defendant,**
**11  U.S.C. § 550**

200.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

201.     PCT is entitled to avoid preferential transfers described above pursuant to section 547(b) of the Bankruptcy Code.  One World Services was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

202.     Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from One World Services not less than $77,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**Count III**
**Claim Objection, 11 U.S.C. § 502**

203.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

204.     As alleged above, One World Services was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Section 547(b) of the Bankruptcy Code, which are recoverable from One World Services under Section 550 of the Bankruptcy Code.

205.     Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of One World Services that have been or will in the future be asserted in these Chapter 11 Cases (regardless of

whether or not the claim(s) were assigned) must be disallowed unless and until One World Servicespays PCT the value of the Transfers, for which and to the extent that the Court has determined One World Services is liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.     Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.     Award PCT: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to One World Services;

C.     Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by One World Services against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until One World Services relinquishes to PCT the amount ordered as an award for avoidable transfers;

D.     Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.     Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated: August 13, 2025

**WOMBLE BOND DICKINSON (US) LLP**

By: /s/ *Morgan L. Patterson*
Donald J. Detweiler (Del. Bar No. 3087)
Morgan L. Patterson (Del. Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: don.detweiler@wbd-us.com
            morgan.patterson@wbd-us.com

*-and-*

**ASK LLP**

By: /s/ *Joseph L. Steinfeld, Jr.*
Joseph L. Steinfeld, Jr., Esq., MN SBN 0266292
Nicholas C. Brown, Esq., VA SBN 99898
(admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (651) 289-3867
Fax: (651) 406-9676
Email: jsteinfeld@askllp.com
            nbrown@askllp.com

*-and-*

Edward E. Neiger, Esq.
60 East 42nd Street, 46th Fl.
New York, NY 10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

*Counsel for Plaintiff*



## PRIME TRUST ORDER FORM

Prime Trust
330 South Rampart Blvd Suite 260
Summerlin, NV 89145 USA
Created Date: 8/31/2022
Opportunity ID: 0065f00000BEzwKAAT

████   primetrust.com
8474091369

OWS Brasil Intermediacao LTDA

, FL USA
Billing Email:
Adriano Froes
adriano@oneworldservices.com

**Order Details:**
Payment Method:
Payment Terms: Due upon receipt of invoice
Currency:
Billing Frequency: Monthly
Invoice Schedule: 1st of the month

Order Start Date: 9/1/2022
Order End Date: 9/1/2023

**Selected Services:**

| Name | Period | Price |
|---|---|---|
| Custodial Services | 9/1/2022 - 8/31/2023 | $2,500.00 Monthly |

| | |
|---|---|
| Custodial Services Transaction Fees: | As set forth in attached Fee Schedule |
| Payment Rails: | As set forth in attached Fee Schedule |
| Payment Rails: ACH Services | As set forth in attached Fee Schedule |
| Payment Rails: Wire Services | As set forth in attached Fee Schedule |
| Payment Rails: Merchant Card Processing Services | As set forth in attached Fee Schedule |
| Settlement Services: | As set forth in attached Fee Schedule |
| Compliance Services: | As set forth in attached Fee Schedule |
| Compliance Services: Socure Services | As set forth in attached Fee Schedule |
| Liquidity Services: | As set forth in attached Fee Schedule |

| Selected Service | Required Initial Reserve Amount in each Reserve Account |
|---|---|
| Payment Rails: ACH Services | $25,000 |
| Payment Rails: Merchant Card Processing Services | TBD |
| Settlement Services | TBD |

DocuSign Envelope ID: D475B8BB-32C6-4B2B-8DB0-CE58A4B553C1



Upon expiration of this Order Form, the Agreement will automatically renew for additional one (1) year period, unless either Party provides the other Party with written notice of non-renewal at least thirty (30) days prior to the expiration of the then current Term.

**Customer Wire Information for Billing:**

Bank:

Bank Name

Account Number:

*For wire and non-wire payment instructions, please ask your Prime Trust Sales Contact.*



**Terms and Conditions:**

This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.

The Prime Trust Master Services Agreement and any of its incorporated documents, including the Service Schedule(s), Attachment(s), Fee Schedule, shall supersede and replace any prior agreement(s) that may be in place between Customer and Prime Trust with respect to Prime Trust's services.

The below signatories are authorized to sign on behalf of their respective Party(-ies) and agree to the terms of this Order Form and any documents incorporated herein as of later signature date below.

**CUSTOMER**                                    **PRIME TRUST**

DocuSigned by:

*Adriano Froes*

—4F1DD64082F24C0—

9/7/2022                                         9/7/2022

Manager                                              Officer
Adriano Froes                                        CFO



## FEE SCHEDULE

**API Services- End-User Custody Account Fees:**

| Number of End-User Custody Accounts Allowance* | Price Per Month |
|---|---|
| From 0 to | |
| From 1 to | Additional fees may apply, contact Prime Trust |

### Transactional Fees

**Custodial Services Transactional Fees:**

| Type of Custodial Property | Price |
|---|---|
| USD | No Fee |
| Digital Assets | No Fee |
| EUR, GBP, YEN, CAN, AUD | Additional fees may apply, contact Prime Trust |
| Other | Additional fees may apply, contact Prime Trust |

**Payment Rails Fees:**

| Funds Processing* | Price |
|---|---|
| Wires- domestic- in/out | $15.00 |
| Wires- international- in/out | $30.00 |
| Wires- recalls | $50.00 |
| ACH- in/out | $0.50 |
| ACH- chargebacks | $5.00/ nsf, $150/ fraud |
| Checks- incoming | $10.00 |
| Checks- outgoing | $25.00 |
| Credit/debit- Merchant Card Processing Services Fee | 3.00% |
| Card Chargebacks | $5.00 |

* Digital Asset transactions incur varying network costs that will be charged to Customer in addition to associate Prime Trust fees.

**Settlement Services Fees:**

| Settlement Service | Price |
|---|---|
| Settle securities buy/sell transactions for account | $7.50 per side |
| Settlement Services – per transaction | Asset & Volume dependent |

**Compliance Services Fees:**

| Compliance Service | Price |
|---|---|
| US Individual | $3.00 |
| Global Individual | $5.00 |
| Entity US | $25 |
| Entity Global | $75 |

DocuSign Envelope ID: D475B8BB-32C6-4B4B-8DB0-CF58A4B5536A



| KYC & AML Exemption | $5/minor, $75/denied |
|---|---|

\* All KYC fees are a one-time charge on initial account creation not per transaction. AML is run on all Fiat and Digital Asset transactions.

**Liquidity Services Fees:**

| Crypto Trading/Liquidity | Price Per Trade |
|---|---|
| Assets Available: BTC, ETH, LTC, USDC, USDT | 0.10% dollar of sales |

**DocuSign**

## Certificate Of Completion

Envelope Id: D475B8BB32C64B3B8DB0CE58A4D553C1                    Status: Completed
Subject: One World Services - Prime Trust - New MSA and Contract
Source Envelope:
Document Pages: 5                        Signatures: 2              Envelope Originator:
Certificate Pages: 5                     Initials: 0                ▮▮▮▮▮
AutoNav: Enabled                                                    330 S. Rampart Blvd., Suite 260
EnvelopeId Stamping: Enabled                                        Las Vegas,   89145
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                  ▮▮▮▮ @primetrust.com
                                                                   IP Address: 44.234.249.148

## Record Tracking

Status: Original                 Holder: ▮▮▮▮▮              Location: DocuSign
         8/31/2022 10:01:22 AM           ▮▮▮ @primetrust.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| ▮▮▮▮▮ @primetrust.com<br>Senior Vice President, Account Management<br>Prime Trust LLC<br>Signing Group: Account Managers<br>Security Level: Email, Account Authentication<br>(None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **Completed**<br><br>Using IP Address: 74.196.61.105 | Sent: 8/31/2022 10:02:16 AM<br>Viewed: 8/31/2022 10:15:37 AM<br>Signed: 8/31/2022 10:15:40 AM |
| Adriano Froes<br>adriano@oneworldservices.com<br>Manager<br>Security Level: Email, Account Authentication<br>(None)<br><br>**Electronic Record and Signature Disclosure:**<br>Accepted: 9/6/2022 5:20:41 PM<br>ID: b399ac96-a08b-4f97-9536-f387f04caec7 | DocuSigned by:<br>*Adriano Froes*<br>4F1D064082F24C0...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 189.1.164.203 | Sent: 8/31/2022 10:15:42 AM<br>Viewed: 9/6/2022 5:20:41 PM<br>Signed: 9/7/2022 11:00:51 AM |
| ▮▮▮▮ @primetrust.com<br>Chief Financial Officer<br>Prime Trust LLC<br>Security Level: Email, Account Authentication<br>(None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | ▮▮▮▮▮<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 72.203.12.231<br>Signed using mobile | Sent: 9/7/2022 11:00:53 AM<br>Viewed: 9/7/2022 11:14:45 AM<br>Signed: 9/7/2022 11:14:58 AM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Billing<br>billing@primetrust.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>  Accepted: 11/2/2021 2:54:01 PM<br>  ID: dfa99cb6-0fe4-43b6-97cc-ebd97e912dd7 | **COPIED** | Sent: 9/7/2022 11:15:00 AM |
| Legal<br>legalcopy@primetrust.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | **COPIED** | Sent: 9/7/2022 11:15:01 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/31/2022 10:02:16 AM |
| Certified Delivered | Security Checked | 9/7/2022 11:14:45 AM |
| Signing Complete | Security Checked | 9/7/2022 11:14:58 AM |
| Completed | Security Checked | 9/7/2022 11:15:01 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Prime Trust (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Prime Trust:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ███@primetrust.com

**To advise Prime Trust of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ███@primetrust.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Prime Trust**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ███@primetrust.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Prime Trust**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ████@primetrust.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Prime Trust as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Prime Trust during the course of your relationship with Prime Trust.



**PRIME TRUST**
**MASTER SERVICES AGREEMENT**

This Prime Trust Master Services Agreement ("**MSA**") is made between Prime Trust, LLC, a chartered Nevada trust company ("**Prime Trust**"), and the contracting party identified on the Order Form and/or SOW ("**Customer**"), together referred to as the "**Parties**" and each individually as a "**Party**." The Parties hereby agree to the terms and conditions of this MSA, including any specific services terms, product details and any applicable license and/or subscription terms will be set forth in applicable Prime Trust Service Schedules and Attachments (located at: https://www.primetrust.com/legal/msa-service-schedules), Order Form(s) and SOW(s), each of which become binding on the Parties and are incorporated into this MSA upon execution of an Order Form and/or SOW. Each Order Form and/or SOW is governed by and incorporates the following documents in effect as of the effective date of the applicable Order Form or SOW, collectively referred to as the "**Agreement**", that consists of:

1. the Order Form and/or Statement of Work;
2. any attachments, addenda, and/or appendix(ices) to this MSA or a Service Schedule;
3. Service Schedule(s); and
4. this MSA.

The applicable attachment(s), addenda, appendix(ices), and Service Schedule(s) is determined by the Prime Trust Service(s) purchased on the Order Form and/or SOW. In the event of a conflict, the order of precedence is as set out above in descending order of control.

**MSA revision date:** August 30, 2022

**TABLE OF CONTENTS**

1. Definitions
2. Registration
3. Access Rights
4. Ownership
5. Security and Customer Data
6. Payment of Fees
7. Taxes
8. Term and Termination
9. Warranties and Disclaimers
10. Third-Party Claims
11. Limitation of Liability
12. Confidentiality
13. Governing Law and Venue
14. General
15. Appendix 1



## 1. DEFINITIONS

"**Account(s)**" means a unique account established by Customer to enable its Authorized Users to access and use a Prime Trust Service. Customer may have more than one Account depending on the Prime Trust Services used by Customer.

"**Account Administrator**" is an Authorized User who is assigned and expressly authorized by Customer as its agent to manage Customer's Account, including, without limitation, to configure administration settings, assign access and use authorizations, request different or additional services. Customer may change its Account Administrator designation at any time through its Account.

"**Affiliate**" of a Party means any entity that the Party directly or indirectly owns or controls more than fifty percent (50%) of the voting interests of the subject entity. Any legal entity will be considered a Party's Affiliate as long as that interest is maintained.

"**AML/OFAC Policy**" means anti-money laundering ("AML") and OFAC compliance policy that will ensure the Offering and any use of Prime Trust Services by Customer or Investor, and/or any Program complies with Applicable Law, including any anti-money laundering and economic and trade sanctions requirements applicable to Prime Trust or Customer. The AML/OFAC Policy and any subsequent changes to it must be approved by Prime Trust.

"**API**" means one or more Application Programming Interfaces that support interoperation of applications with Prime Trust Services.

"**API Materials**" means any API libraries, integration keys, software, source files, sample code, reference documentation, how-to guides, and template materials.

"**API Services**" means the proprietary tools and technology, negotiated third-party integrations, and operational processes to provide certain back-end tools, technology and compliance services, which are accessible via the Prime Trust API.

"**Applicable Law**" means any federal, foreign, provincial, state and local laws, statutes, rules, regulations, executive orders, supervisory requirements or guidance, directives, interpretive letters, and other official releases of any Regulatory Authority, Supervisory Objection, judicial or administrative interpretations, Network Rules, including PCI DSS (to the extent any card is issued to a Customer or End-User in connection with a Prime Trust Service), and any, consents, permissions, authorizations, approvals, licenses, registrations, declaration, filings rules or requirements established by a Regulatory Authority or other organization having jurisdiction over a Party or a Party's Customer or End-User, in each case as amended, consolidated, supplemented or replaced from time to time, that are related to, or otherwise applicable, to the Agreement, the Prime Trust Services, any Program and/or the services to be provided by a Party hereunder.

"**Authorized User**" means one individual natural person, whether an employee, business partner, contractor, or agent of Customer or its Affiliates who is registered by Customer in Customer's Account to use the Prime Trust Services. An Authorized User must be identified by a unique email address and user name, and two or more persons may not use the Prime Trust Services as the same Authorized User. If the Authorized User is not an employee of Customer, use of the Prime Trust Services will be allowed only if such user is under confidentiality obligations with Customer at least as restrictive as those in the Agreement and is accessing or using the Prime Trust Services solely to support Customer's internal business purposes.

## Prime Trust

"**Confidential Information**" means: (a) for Prime Trust and its Affiliates, the Prime Trust Services, Documentation and other related technical information, security policies and processes, product roadmaps, and pricing; (b) for Customer and its Affiliates, Customer Data; (c) any other information of a Party or its Affiliates that is disclosed in writing or orally and is designated as confidential or proprietary at the time of disclosure to the Party, including its Affiliates, receiving Confidential Information ("**Recipient**") (and, in the case of oral disclosures, summarized in writing and delivered to the Recipient within thirty (30) days of the initial disclosure), or that due to the nature of the information the Recipient should reasonably understand it to be confidential information of the disclosing Party; and (d) the terms and conditions of the Agreement between the Parties. Confidential Information does not include any information that: (i) was or becomes generally known to the public through no fault or breach of the Agreement by the Recipient; (ii) was rightfully in the Recipient's possession at the time of disclosure without restriction on use or disclosure; (iii) was independently developed by the Recipient without use of or reference to the disclosing Party's Confidential Information; or (iv) was rightfully obtained by the Recipient from a third party not under a duty of confidentiality and without restriction on use or disclosure.

"**Customer Custody Account**" means a Prime Trust asset custody account for and in the name of the Customer.

"**Customer Data**" means any content, materials, data and information that Customer or its Authorized Users enter into the Prime Trust Services, including, but not limited to, any Customer or Authorized User personal data and information contained in Transactions entered into the Prime Trust Services by Customer or its Authorized Users.

"**Digital Assets**" means supported digital currencies and digital tokens which are a digital representation of value based on a cryptographic protocol of a computer network.

"**Documentation**" means Prime Trust's then-current technical and functional documentation for the Prime Trust Services as made generally available to Customer by Prime Trust, including those materials made available on Prime Trust's developer portal.

"**End-User(s)**" means Customer's clients that use the Prime Trust Services and have entered into the User Agreement.

"**End-User Custody Account**" means a Prime Trust asset custody account for and in the name of the End-User.

"**Fiat Currency**" means USD, Euros, Pounds Sterling, Canadian Dollars, Australian Dollars or Japanese Yen, or any other government-issued currencies supported by Prime Trust.

"**Network**" means, individually and collectively, Mastercard International Incorporated and its affiliates, Visa, Inc. and its affiliates, Cirrus, Plus, Pulse, MAC, NYCE, SHAZAM, STAR, Accel, SWIFT, National Automated Clearing House Association ("**NACHA**"), and any other payment network accepted by Prime Trust for Transactions.

"**Network Rules**" means any and all rules, bylaws, standards, protocols, operating regulations, guidelines, or procedures, and any amendment, interpretation, or modification of any such rule, bylaw, standard, protocol, operating regulation, guideline, or procedure, promulgated by a Network that govern or apply to Prime Trust Services, including, without limitation, PCI DSS and the rules, bylaws, standards, protocols, operating regulations, guidelines, and procedures of NACHA.

**Prime Trust**

"**Order Form**" means the order form provided by Prime Trust that sets forth the pricing and the Prime Trust Services selected by Customer.

"**Order Start Date**" means the start date of the applicable Order Form as defined in that Order Form.

"**Order End Date**" means the end date of the applicable Order Form as defined in that Order Form.

"**PCI DSS**" means the Payment Card Industry Data Security Standards administered by the PCI Standards Council that are in effect as of the Order Start Date of the applicable Order Form and as they may be amended from time to time.

"**Person**" means any natural or legal person, including any individual, corporation, partnership, limited liability company, trust or unincorporated association or other entity.

"**Prime Trust Service(s)**" means the business services provided by Prime Trust under an Order Form or SOW, and may include software, source code, or other technology licensed to Prime Trust from third parties and embedded into the services that Prime Trust provides to Customer. Notwithstanding the foregoing, Prime Trust Services do not include Third-Party Services (defined below).

"**Professional Services**" means any integration, consulting, architecture, training, transition, configuration, administration, and similar ancillary Prime Trust Services that are set forth in an Order Form or Statement of Work ("**SOW**").

"**Program**" means the program launched by the Parties, on or following the Order Start Date of the applicable Order Form, to offer End-User custodial accounts or certain other mutually agreed upon Prime Trust Services to End-Users, all subject to the terms herein and the End-User agreement between Prime Trust and End-User (such end-user agreement, the "**User Agreement**").

"**Regulatory Authority**" means any of the following Persons with actual or apparent administrative, executive, judicial, legislative, police, regulatory or taxing authority or power that asserts such authority over the Agreement, a Program, either Party or their Affiliates, or any of their respective subcontractors, Customers, Authorized Users or End-Users: (a) a country, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal governmental body; (c) any agency, branch, department, board, commission, court, tribunal or any other governmental or regulatory authority of any nature; (d) any official body or self-regulatory body that supervises or otherwise exercise control over any Party; and (e) the Nevada Financial Institutions Division.

"**Representative**" means the natural person or people submitting the registration application for a Prime Trust Account on behalf of Customer.

"**Service Schedule**" means the service-specific terms and conditions applicable to the Prime Trust Service(s).

"**Supervisory Objection**" means (a) an objection, criticism, or guidance, orally or in writing (including, but not limited to an interpretive letter or official release), raised by a Regulatory Authority having supervisory or regulatory authority over Prime Trust or any Program that expresses the Regulatory Authority's opinion that one or more provisions of: the Agreement; any Program terms, descriptions, advertising and/or marketing; and/or any terms of  the User Agreement are likely to constitute or result in a violation of Applicable Law or unsafe or unsound practices, (b) any cease-and-desist or other similar formal written order of a Regulatory Authority, or (c) a written directive or requirement by Regulatory Authority to cease or limit performance of material obligations under the Agreement.

**Prime Trust**

"**System**" means the software systems and programs, the communication and network facilities, and the hardware and equipment used by Prime Trust or its agents to make available the Prime Trust Services via the Internet.

"**Third-Party Services**" means services, software, products, applications, integrations and other features or offerings that are provided by Customer or obtained by Customer from a third party.

"**Transactions**" means any transactions that Customer facilitates using Prime Trust Services with End-Users, including using a Prime Trust Service to do any of the following: (a) to make a purchase of goods or services; (b) to obtain a credit for a previous purchase; (c) to contribute or disburse Digital Assets or Fiat Currency from or to the End-User Custody Account(s) or Customer Custody Account(s); (d) to make a transfer or other payment to a third party; or (e) to transfer value to another End-User Custody Account or Customer Custody Account.

"**USD**" means United States Dollars.

## 2.   REGISTRATION

**2.1    Account Registration**. Customer shall first register for an Account by providing Prime Trust with Customer's information that includes but is not limited to business or trade name, physical address, email, phone number, tax identification number, URL, the nature of Customer's business or activities, and certain other information about Customer that Prime Trust may require. Prime Trust may also collect personal information (including name, birthdate, and government-issued identification number) about Customer's beneficial owners, principals, and Customer's Account Administrator. Until Customer submits, and Prime Trust reviews and approves, all required information, Customer's Account will be available to Customer on a preliminary basis only, and Prime Trust may terminate it at any time and for any reason.

**2.2    Representative Authorization**. Customer and Representative individually affirm to Prime Trust that (a) Representative is authorized to provide the information described in Section 2.1 (Account Registration) on behalf of Customer and to bind Customer to the Agreement, and (b) Representative is an executive officer, senior manager or otherwise has significant responsibility for the control, management, or direction of Customer's business. Customer or Representative agrees to provide additional information or documentation demonstrating Representative's authority as requested by Prime Trust. Without the express written consent of Prime Trust, neither Customer nor Representative may register or attempt to register for an Account(s) on behalf of a user Prime Trust previously terminated from use of the Prime Trust Services. If Customer is a sole proprietor, Customer and Representative also affirm that Representative is personally responsible and liable for Customer's use of the Prime Trust Services and Customer's obligations to its customers, including payment of any amounts owed under the Agreement.

**2.3    Registration Information Updates**. Customer will keep its Account information current. Customer shall promptly update Prime Trust with any changes affecting Customer, the nature of its business activities, Representatives, beneficial owners, principals, or any other pertinent information. Prime Trust may suspend Customer's Account(s) or terminate the Agreement or applicable Service Schedule if Customer fails to keep this information current. Customer also shall promptly notify Prime Trust in writing no more than three (3) days after any of the following occurrences: (a) Customer is the subject of any voluntary or involuntary bankruptcy or insolvency application, petition or proceeding, receivership, or similar action (any of the foregoing, a "**Bankruptcy Proceeding**"); (b) there is an adverse change in Customer's financial condition; (c) there is a planned or anticipated liquidation or substantial change in the basic nature of Customer's business; (d) Customer transfers or sells 25% or more of Customer's total

 Prime Trust

assets, or there is any change in the control or ownership of Customer's business or parent entity; or (e) Customer receives a judgment, writ or warrant of attachment or execution, lien or levy against 25% or more of Customer's total assets.

## 3.   ACCESS RIGHTS

**3.1   Right to Use**. Prime Trust will provide the Prime Trust Services to Customer as set forth in the Order Form and/or SOW and applicable Service Schedule(s) and Attachment(s). Subject to the terms and conditions of the Agreement, Prime Trust grants to Customer a worldwide, limited, non-exclusive, non-transferable right and license during the Term, solely for its and its Affiliates' internal business purposes, and in accordance with the Documentation, to: (a) access and use the Prime Trust Services; (b) implement, configure, and through its Account Administrator, permit its Authorized Users to access and use the Prime Trust Services; and (c) access and use the Documentation. Customer will ensure that its Affiliates and all Authorized Users using the Prime Trust Services under its Account comply with all of Customer's obligations under the Agreement, and Customer is responsible for their acts and omissions relating to the Agreement as though they were those of Customer. A Customer Affiliate may enter into an Order Form or SOW directly with Prime Trust under this MSA by a mutually executed Order Form or SOW that references this MSA subject to such Customer Affiliate providing all information required to be provided pursuant to Section 2.1 (Account Registration) and approval by Prime Trust of such Customer Affiliate. In such event: (i) the Customer Affiliate will be bound by this MSA and will be fully responsible for its liabilities and obligations under the applicable Order Form or SOW; and (ii) all references to "**Customer**" in the Agreement will be deemed references to the Customer Affiliate set forth on the Order Form or SOW for purposes of defining the rights and obligations of the Parties hereunder.

**3.2   Restrictions**. Customer shall not, and shall not permit its Authorized Users,  End-Users or others under its control, to use, or allow the use of, the Prime Trust Services in violation of Section 14.7 (Trade Restrictions) or Prohibited Use, Prohibited Business and Conditional Use as set forth in Appendix 1.

**3.3   Suspension of Access and/or Use**. Prime Trust may suspend any access to and/or use of the Prime Trust Services or remove or disable any Account and/or Authorized User that Prime Trust reasonably and in good faith believes (a) violates the terms or intent of the Agreement, (b) is necessary to prevent or eliminate difficulties in the operation of the Prime Trust Services, (c) will harm Prime Trust's reputation, or (d) is necessary to prevent potential litigation or other controversies. Prime Trust will use commercially reasonable efforts to notify Customer prior to any such suspension or disablement, unless Prime Trust reasonably believes that: (i) it is prohibited from doing so under Applicable Laws or under legal process (such as court or government administrative agency processes, orders, mandates, and the like); or (ii) it is necessary to delay notice in order to prevent imminent harm to the Prime Trust Services or a third party. Under circumstances where notice is delayed, Prime Trust will provide notice if and when the related restrictions in the previous sentence no longer apply.

**3.4   Third-Party Services**. Customer may choose to obtain Third-Party Services from third parties ("**Third-Party Provider**") and/or Prime Trust (for example, through a reseller arrangement or otherwise). Any acquisition by Customer of Third-Party Services is solely between Customer and the applicable Third-Party Provider and Prime Trust does not warrant, support, or assume any liability or other obligation with respect to such Third-Party Services, unless expressly provided otherwise in the Order Form or the Agreement. In the event Customer chooses to integrate or interoperate Third-Party Services with Prime Trust Services in a manner that requires Prime Trust or the Prime Trust Services to exchange Customer Data with such Third-Party Service or Third-Party Provider, Customer: (a) grants Prime Trust permission to allow the Third-Party Service and Third-Party Provider to access Customer Data and information about Customer's usage of the Third-Party Services as appropriate and necessary to enable the interoperation of that Third-Party Service with the Prime Trust Services; (b) acknowledges that any

## Prime Trust

exchange of data between Customer and any Third-Party Service is solely between Customer and the Third-Party Provider and is subject to the Third-Party Provider's terms and conditions governing the use and provision of such Third-Party Service (the presentation and manner of acceptance of which is controlled solely by the Third-Party Provider); and (c) agrees that Prime Trust is not responsible for any disclosure, modification or deletion of Customer Data resulting from access to such data by Third-Party Services and Third-Party Providers.

**3.5.    Transactions**. Customer acknowledges and agrees that (a) Prime Trust is not responsible for the products or services that Customer publicizes or sells; (b) Customer is solely responsible for the nature and the quality of the products or services Customer provides, supports and for any other ancillary services Customer provides; and (c) Customer is solely responsible for any losses Customer or its End-Users incur due to erroneous or fraudulent Transactions in connection with Customer's use of the Prime Trust Services.

## 4.   OWNERSHIP

**4.1    Prime Trust Services**. Prime Trust, its Affiliates, or its licensors own all right, title, and interest in and to any and all copyrights, trade secrets, trademark rights, patent rights, database rights, and other intellectual property or other rights in and to the Prime Trust Services, Documentation, Usage Data, Derived Data, any improvements, design contributions, or derivative works thereto, and any knowledge or processes related thereto (including any machine learning algorithms output from the Prime Trust Services) and/or provided hereunder. Unless otherwise specified in the applicable SOW, all deliverables provided by or for Prime Trust in the performance of Professional Services, excluding Customer Data and Customer Confidential Information, are owned by Prime Trust and constitute part of the Prime Trust Service(s) under the Agreement.

**4.2    Feedback**. Prime Trust encourages Customer to provide suggestions, proposals, ideas, recommendations, or other feedback regarding improvements to Prime Trust Services and related resources ("**Feedback**"). To the extent Customer provides Feedback, Customer grants to Prime Trust and its Affiliates a royalty-free, fully paid, sub-licensable, transferable (notwithstanding Section 14.2 (Assignability)), non-exclusive, irrevocable, perpetual, worldwide right and license to make, use, sell, offer for sale, import, and otherwise exploit Feedback (including by incorporation of such feedback into the Prime Trust Services) without restriction. Customer shall ensure that: (a) Feedback does not identify Customer, its Affiliates, or Authorized Users, or include any Confidential Information; and (b) Customer has obtained requisite authorization from any Authorized User or other third party to grant the license described herein. For the avoidance of doubt, Feedback does not constitute Customer Confidential Information.

## 5.   SECURITY AND CUSTOMER DATA

**5.1    Information Security**. Prime Trust will use commercially reasonable security technologies in providing the Prime Trust Services. Prime Trust has implemented and will maintain appropriate technical and organizational measures, including information security policies and safeguards, designed to preserve the security, integrity, and confidentiality of Customer Data and to protect against unauthorized or unlawful disclosure or corruption of or access to such data (the "**Information Security Program**"). As part of the Information Security Program, (a) Prime Trust utilizes commercial-grade data center service providers in the provision of Prime Trust Services that maintain on-site security operation that is responsible for all physical data center security functions and formal physical access procedures in accordance with PCI DSS, ISO 27001 and SOC 2, or equivalent, standards, (b) Prime Trust maintains system security, vulnerability management, application backups, managed firewalls and DDoS mitigation, and (c) Prime Trust secures data through using AES-256 encryption for sensitive data and SSL encryption

## Prime Trust

for all database connections. However, no Information Security Program or security system is impenetrable and Prime Trust cannot guarantee that unauthorized parties will never be able to defeat Prime Trust's security measures or misuse any Customer Data in Prime Trust's possession. Customer provides Customer Data and Confidential Information to Prime Trust with the understanding that any security measures Prime Trust provides may not be appropriate or adequate for Customer's business, and Customer agrees to implement security controls and any additional controls that meet Customer's specific requirements. In Prime Trust's sole discretion, Prime Trust may take any action, including suspension of the Account(s) and/or access to Prime Trust Services, to maintain the integrity and security of the Prime Trust Services or Customer Data, or to prevent harm to Customer or others. Customer waives any right to make a claim against Prime Trust for losses Customer incurs that may result from such actions.

**5.2   Privacy Policy**. Customer acknowledges the most current, then in effect, Prime Trust Privacy Policy (located at: https://www.primetrust.com/legal/privacy-policy), which may be updated from time to time without prior notice or liability ("**Privacy Policy**"). In the event of any conflict between any terms or provisions of the Privacy Policy and the terms and provisions of the Agreement, the applicable terms and provisions of the Agreement shall control.

**5.3   Customer's Security**. Customer is responsible for the security of any data on its website, servers, in its possession, or that the Customer is otherwise authorized to access or handle. Customer is responsible for implementing access and use controls and configuring certain features and functionalities of the Prime Trust Services that Customer may elect to use in the manner that Customer deems adequate to maintain appropriate security, confidentiality, and integrity. Further, Customer must notify Prime Trust within twenty-four (24) hours after becoming aware of: (a) any suspected or actual data security breach; or (b) any noncompliance by Customer with the security requirements set forth herein. Customer shall, at its own expense, perform or cause to be performed (a) an independent investigation of any data security breach of card or Transaction data by an authorized assessor acceptable to Prime Trust; (b) take all such remedial actions recommended by such investigation, Prime Trust or Network; and (c) cooperate with Prime Trust in the investigation and resolution of any security breach.

**5.4   Customer Data**. Customer is responsible for Customer Data (including Customer personal data) as entered into, supplied or used by Customer and its Authorized Users in the Prime Trust Services. Further, Customer is solely responsible for determining the suitability of the Prime Trust Services for Customer's business and complying with any applicable data privacy and protection regulations, laws or conventions applicable to Customer Data and Customer's use of the Prime Trust Services. Customer grants to Prime Trust the non-exclusive right to process Customer Data (including personal data) for the sole purpose of and only to the extent necessary for Prime Trust: (a) to provide the Prime Trust Services; (b) to verify Customer's compliance with the restrictions set forth in Section 3.2 (Restrictions) if Prime Trust has a reasonable belief of Customer's non-compliance; and (c) as otherwise set forth in the Agreement.

**5.5   Usage Data**. Prime Trust may collect and use data, information, or insights generated or derived from the use of the Prime Trust Services ("**Usage Data**") for its business purposes, including industry analysis, benchmarking, analytics, marketing, and developing, training and improving its products and services. Customer consents to all actions taken by Prime Trust with respect to such Usage Data in compliance with Prime Trust's Privacy Policy. For the avoidance of doubt, Prime Trust may create derivative works of Customer Data to create aggregate statistical and database compilations ("**Derived Data**").

## 6.   PAYMENT OF FEES

**6.1   Fees**. Except as expressly set forth in the applicable Order Form or SOW, Customer will pay all fees without offset or deduction, payable as set forth in the Order Form or SOW ("**Fees**") in accordance with

the following: (a) Fees for setup are non-refundable; (b) Fees and other penalties, fines or other reimbursements under Section 6.2 (Penalties, Fines; Third-Party Fees) are due on the first of the month following the month in which the Fees are incurred by Customer; (c) for Professional Services the first invoice will coincide with the effective date of a SOW; (d) payment for Professional Services will be due within seven (7) days from the date of the invoice; (e) Prime Trust is hereby authorized, at its option, in its sole discretion, to electronically debit the Customer Custody Account(s) for payment of Fees and expenses, including charging any linked credit or debit card, pulling funds from any linked bank account, or liquidating any of the Custodial Property (as defined in the Service Schedule for Prime Trust Custodial Services); and (f) all amounts will be denominated and payable in the currency specified in the Order Form and/or SOW. Unless otherwise agreed to by the Parties and expressly noted in the Order Form and/or SOW, any invoices for Fees or penalties, fines or other reimbursements under Section 6.2 (Penalties, Fines; Third-Party Fees) will be sent to Customer via email. Upon execution by Customer and Prime Trust, each Order Form and/or SOW is non-cancellable and non-refundable except as provided in the Agreement, and the Term as set forth in the Order Form for Prime Trust Services is a continuous and non-divisible commitment for the full duration of the Term regardless of any invoice schedule. Prime Trust may revise the Fees at any time. However, the revisions will not affect any charges for prior periods and Prime Trust will provide Customer with notice before revisions become effective.

**6.2.    Penalties, Fines; Third-Party Fees**. In addition to the Fees, (a) Customer is responsible for any penalties or fines imposed in relation to the Account(s) resulting from Customer's or End-User's use of Prime Trust Services in a manner not permitted by the Agreement or applicable rules and regulations; and (b) Customer agrees to reimburse Prime Trust for any expenses by a third party in performing services on behalf of Customer that include but are not limited to transfer agent fees, legal fees, accounting fees, tax preparation fees, notary fees, exchange fees, brokerage fees, bank fees, blockchain settlement fees, at a cost plus 25% (excluding broker-dealer commissions) rate and that no prior approval is required from Customer in incurring such expense(s).

**6.3    Late Charges; Attorneys' Fees**. In addition to all other remedies that may be available, Prime Trust may assess late charges equal to the lesser of one and one-half percent (1.5%) of the unpaid balance per month calculated daily and compounded monthly or the highest rate permitted by applicable law and may be applied as a first lien on any Custodial Property (as defined in the Service Schedule for Prime Trust Custodial Services). Customer will be responsible for any reasonable attorneys' fees, costs, and expenses incurred by Prime Trust to collect any amounts that are not paid when due. If Customer fails to timely pay any amounts due under the Agreement, then without limitation of any of its other rights or remedies, Prime Trust may suspend performance of those Prime Trust Services until Prime Trust receives all past due amounts from Customer.

**7.    TAXES**

**7.1    Tax Responsibility.** All payments required by the Agreement are stated exclusive of all taxes, duties, levies, imposts, fines or similar governmental assessments, including sales and use taxes, value-added taxes ("**VAT**"), goods and services taxes ("**GST**"), excise, business, service, and similar transactional taxes imposed by any jurisdiction and the interest and penalties thereon (collectively, "**Taxes**"). Without limiting the foregoing, Customer shall be responsible for and bear Taxes associated with its purchase of, payment for, access to or use of the Prime Trust Services. Taxes shall not be deducted from the payments to Prime Trust, except as required by law, in which case Customer shall increase the amount payable as necessary so that after making all required deductions and withholdings, Prime Trust receives and retains (free from any Tax liability) an amount equal to the amount it would have received had no such deductions or withholdings been made. If Customer claims tax exempt status for amounts due under the Agreement, it shall provide Prime Trust with a valid tax exemption certificate (authorized by the applicable governmental authority) to avoid application of Taxes to Customer's



invoice. Each Party is responsible for and shall bear Taxes imposed on its net income. Customer hereby confirms that Prime Trust can rely on address set forth in the Order Form(s) or SOW Customer places directly with Prime Trust as being the place of supply for Tax purposes. The Parties' obligations under this Section 7.1 (Tax Responsibility) shall survive the termination or expiration of the Agreement.

**7.2    Substitute IRS Form W-9 Taxpayer Identification Number Certification, Backup Withholding Statement.**

(a) Prime Trust: Under penalties of perjury, Prime Trust hereby certifies that (i) the Prime Trust Taxpayer Identification Number shown below is correct, (ii) Prime Trust is not subject to backup withholding, and (iii) Prime Trust is a U.S. entity.

Company Name: Prime Trust, LLC
Attention: Chief Financial Officer
Address: 330 S. Rampart Blvd., Suite 260, Summerlin, NV 89145
Tax ID Number (EIN): 81-2236823
[X] We are exempt from backup withholding.

(b) Customer: Under penalties of perjury, Customer hereby certifies that (i) the tax identification number provided to Prime Trust by Customer, if Customer is a U.S. Person, is the correct taxpayer identification number, and (ii) Customer is not subject to backup withholding because**:** (x) Customer is exempt from backup withholding, or, (y) Customer has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding. Customer agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Customer is subject to backup withholding. Customer acknowledges and agrees that failing to provide accurate information may result in civil penalties.

**8.    TERM AND TERMINATION**

**8.1    Term**. The term of an Order Form and any associated Service Schedule(s) is the period of time, including all renewals thereto, that begins on the Order Start Date and, unless terminated sooner as provided herein, will continue until the Order End Date, both dates as specified on the Order Form (the "**Term**"). In the case of a SOW for Professional Services, if no end date is specified in the SOW, then the SOW shall expire upon completion of Professional Services or early termination as permitted by the Agreement. The term of this MSA shall continue as long as an Order Form or SOW referencing or incorporated into this MSA remains valid and in effect. Termination or expiration of any Order Form or SOW shall leave other Order Forms or SOWs unaffected.

**8.2    Termination for Breach; Termination for Insolvency**. If either Party commits a material breach or default in the performance of any of its obligations under the Agreement, then the other Party may terminate the Agreement in its entirety by giving the defaulting Party written notice of termination, unless the material breach or default in performance is by Prime Trust and not cured within thirty (30) days after Prime Trust receives notice thereof. If Customer commits numerous breaches of its duties or obligations, Prime Trust may terminate the Agreement in its entirety by giving the Customer written notice of termination. Prime Trust may terminate the Agreement in its entirety upon written notice if the Customer becomes the subject of a Bankruptcy Proceeding, in any jurisdiction.

**8.3    Termination for Harmful Activities**. Prime Trust may terminate the Agreement in its entirety if, at any time during the Term, Customer or any of its Authorized Users or End-users are conducting activities that Prime Trust reasonably determines are materially harmful to relationships with its federal or state supervisory or law enforcement agencies.

**Prime Trust**

**8.4    Termination for Regulatory Requirement**. Prime Trust may terminate the Agreement following direction from any Regulatory Authority or any other authority with regulatory supervision over Prime Trust or any Program, to cease or materially limit the exercise or performance of Prime Trust's rights or obligations under the Agreement.

**8.5    Agreement Subject to Applicable Law**. If (a) Prime Trust has been advised by legal counsel of a change in Applicable Law or any judicial decision of a court having jurisdiction over Prime Trust, Customer, Authorized Users or End-Users, or any interpretation of a Regulatory Authority that, in the view of such legal counsel, would have a materially adverse effect on a Program, the rights or obligations of Prime Trust under the Agreement or the financial condition of Prime Trust; (b) Prime Trust receives a Supervisory Objection or lawful written request of any Regulatory Authority having jurisdiction over Prime Trust, Customer, Authorized Users or End-Users, including any letter or directive of any kind from any such Regulatory Authority, that prohibits or restricts Prime Trust from carrying out its obligations under the Agreement; (c) Prime Trust has been advised by legal counsel that there is a material risk that Prime Trust's continued performance under the Agreement would violate Applicable Law or otherwise possess an unsafe or unsound practice; (d) any Regulatory Authority shall have determined and notified Prime Trust that the arrangement between the Parties contemplated by the Agreement constitutes an unsafe or unsound banking practice or is in violation of Applicable Law; or (e) a Regulatory Authority has commenced an investigation or action against a Party which Prime Trust, in its reasonable judgment, determines that it threatens such Party's ability to perform its obligations under the Agreement; then, in each case, the Parties shall meet and consider in good faith any modifications, changes or additions to the Program(s) and/or the Agreement that may be necessary to eliminate such result. Notwithstanding any other provision of the Agreement, if the Parties, after using commercially reasonable efforts, are unable to reach agreement regarding modifications, changes or additions to the Program or the Agreement after the Parties initially meet, Prime Trust may terminate the impacted Program or the Agreement upon written notice to Customer and without payment of a termination fee or other penalty. Prime Trust shall be able to suspend performance of its obligations under the Agreement, or require Customer to suspend its performance of its obligations under the Agreement, if (i) any event described in Section 8.5 (Agreement Subject to Applicable Law) above occurs and (ii) Prime Trust reasonably determines that continued performance hereunder may result in a fine, penalty or other sanction being imposed by the applicable Regulatory Authority, or in material civil liability. For the avoidance of doubt, nothing in this Section 8.5 (Agreement Subject to Applicable Law) shall obligate a Party to disclose, share, or discuss any information to the extent prohibited by Applicable Law or a Regulatory Authority.

**8.6    Post-Termination Obligations**. If the Agreement expires or is terminated for any reason: (a) Customer will pay to Prime Trust any amounts that have accrued before, and remain unpaid as of, the effective date of the expiration or termination; (b) any and all liabilities of either Party to the other Party that have accrued before the effective date of the expiration or termination will survive; (c) licenses and use rights granted to Customer with respect to the Prime Trust Services and related intellectual property will immediately terminate; (d) Prime Trust's obligation to provide any further Prime Trust Services to Customer under the Agreement will immediately terminate, except any such Prime Trust Services that are expressly to be provided following the expiration or termination of the Agreement; and (e) the Parties' rights and obligations under Sections 5.4, 7.1, 8.6, 9.3, and 11 through 14 will survive.

## 9.    WARRANTIES AND DISCLAIMERS

**9.1    Customer Warranties**. Customer represents and warrants that: (i) Customer, Authorized Users, and End-Users meet the requirements for the legal age of majority in the applicable jurisdiction(s); (ii) Customer, Authorized Users, and End-Users are not barred by the laws of the United States or the Applicable Laws of another country from accessing and using the Prime Trust Services; (iii) that

## Prime Trust

Customer shall provide (and keep up to date) information that is truthful, accurate and complete; (iv) if Customer is a business entity, then the Customer business entity is in good standing in its state, region or country of formation and has obtained or filed all requisite certifications, authorizations or licenses to offer its services in the jurisdictions where it does business; and Customer agrees to produce written evidence of such authority and good standing if requested by Prime Trust; (v) Customer will comply with all Applicable Laws to access and use the Prime Trust Services, and perform its obligations under this Agreement; and (vi) Customer, Authorized Users and End-Users will not use the Prime Trust Services, directly, or indirectly for any fraudulent or illegal undertaking, or in any manner that interferes with the normal operation of the Prime Trust Services.

**9.2    Mutual Warranties**. Each Party represents and warrants that: (a) the Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against it in accordance with the terms of the Agreement; and (b) no authorization or approval from any third party is required in connection with its execution of the Agreement.

**9.3    DISCLAIMER**. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THE AGREEMENT, PRIME TRUST SPECIFICALLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PRIME TRUST SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PRIME TRUST MAKES NO WARRANTY OF ANY KIND THAT THE PRIME TRUST SERVICES, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY OF CUSTOMER'S OR ANY THIRD PARTY'S SOFTWARE, SYSTEM OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR-FREE, OR THAT ANY ERRORS OR DEFECTS CAN OR WILL BE CORRECTED. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE PRIME TRUST SERVICES OR SOFTWARE OR AGAINST INFRINGEMENT. PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET. CUSTOMER WILL NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY. PRIME TRUST'S ACCESS TO AND USE OF THE PRIME TRUST SERVICES ARE AT CUSTOMER'S OWN RISK. CUSTOMER UNDERSTANDS AND AGREES THAT THE PRIME TRUST SERVICES ARE PROVIDED TO IT ON AN "AS IS" AND "AS AVAILABLE" BASIS. PRIME TRUST WILL NOT BE LIABLE TO CUSTOMER FOR ANY DAMAGES RESULTING FROM CUSTOMER'S RELIANCE ON OR USE OF THE PRIME TRUST SERVICES.

## 10.    THIRD-PARTY CLAIMS

**10.1    Indemnities**. Customer will defend, indemnify and hold harmless, in accordance with Section 10.2 (Procedures), Prime Trust, its Affiliates, employees, directors, officers, agents, members, shareholders, partners, vendors, successors and assigns and representatives (together, the "**Prime Trust Indemnified Parties**") from and against, any (a) third-party claim (including claims from Authorized Users or End-Users); (b) third-party legal action (including legal actions from Authorized Users or End-Users); or (c) administrative agency action or proceeding (each, a "**Claim**") to the extent arising from: (i) use or misuse of the Prime Trust Services by Customer, its Authorized Users or End-Users; (ii) any breach by Customer of its obligations under the Agreement; (iii) Customer's violation of any Applicable Laws or the rights of any third party; (iv) Customer's failure to provide true and accurate information in connection with the registration process or any failure to promptly update such information;  (v) the nature and content of all

🔷 **Prime Trust**

Customer Data processed by the Prime Trust Services; or (vi) gross negligence, willful misconduct or fraudulent acts or omissions of Customer or its Authorized Users or End-Users.

**10.2    Procedures**. Prime Trust will (a) give Customer prompt written notice of the Claim, except that the failure to provide prompt notice will only limit Customer's indemnification obligations to the extent the Customer is prejudiced by the delay or failure; (b) permit Customer to assume control over the defense and settlement of the Claim; and (c) provide assistance in connection with the defense and settlement of the Claim, as the Customer may reasonably request. Customer will indemnify the Prime Trust Indemnified Parties against: (i) all damages, costs, and attorneys' fees finally awarded against any of the Prime Trust Indemnified Parties with respect to any Claim; (ii) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by any of the Prime Trust Indemnified Parties in connection with the defense of the Claim (other than attorneys' fees and costs incurred without the Customer's consent after it has accepted defense of such Claim); and (iii) all amounts that the Customer agreed to pay to any third party in settlement of any Claims arising under this Section 10 (Third-Party Claims) and settled by the Customer or with its approval. Customer shall not, without Prime Trust's prior written consent, agree to any settlement on behalf of Prime Trust which includes either the obligation to pay any amounts, or any admissions of liability, whether civil or criminal, on the part of any of Prime Trust.

## 11.    LIMITATION OF LIABILITY

**11.1    Exclusion of Damages**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES, AND REGARDLESS OF THE NATURE OF THE CLAIM, SHALL PRIME TRUST (OR ITS AFFILIATES) BE LIABLE TO THE CUSTOMER FOR LOSS OF PROFITS, SALES OR BUSINESS, LOSS OF ANTICIPATED SAVINGS, LOSS OF USE OR CORRUPTION OF SOFTWARE, DATA OR INFORMATION, WORK STOPPAGE OR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, COVER, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE AGREEMENT, EVEN IF APPRISED OF THE LIKELIHOOD OF SUCH LOSSES. OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION. THIS INCLUDES ANY LOSSES OR PROBLEMS OF ANY TYPE RESULTING FROM INCIDENTS OUTSIDE OF PRIME TRUST'S DIRECT CONTROL, INCLUDING BUT NOT LIMITED TO ERRORS, HACKS, THEFT OR ACTIONS OF ISSUERS, TRANSFER AGENTS, SMART CONTRACTS, BLOCKCHAINS AND INTERMEDIARIES OF ALL TYPES.

**11.2    Limitation of Liability**. TO THE EXTENT PERMITTED BY LAW, THE TOTAL, CUMULATIVE LIABILITY OF PRIME TRUST (AND ITS AFFILIATES) ARISING OUT OF OR RELATING TO THE PRIME TRUST SERVICES PROVIDED PURSUANT TO THE AGREEMENT WILL BE LIMITED TO THE TOTAL AMOUNT PAID BY CUSTOMER FOR THE PRIME TRUST TECHNOLOGY LICENSE FEE UNDER THE APPLICABLE ORDER FORM OR SERVICES UNDER THE APPLICABLE SOW OUT OF WHICH LIABILITY AROSE, DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE FIRST EVENT GIVING RISE TO LIABILITY. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF STATUTORY DUTY, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

**11.3    Independent Allocations of Risk**. Each provision of the Agreement that provides for a limitation of liability, disclaimer of warranties, or exclusion of damages represents an agreed allocation of the risks of the Agreement between the Parties. This allocation is reflected in the pricing offered by Prime Trust to Customer and is an essential element of the basis of the bargain between the Parties. Each of these provisions is severable and independent of all other provisions of the Agreement, and each of these provisions will apply even if the warranties in the Agreement have failed of their essential purpose.

 Prime Trust

## 12.  CONFIDENTIALITY

**12.1    Restricted Use and Nondisclosure**. During and after the Term, Recipient will: (a) use the Confidential Information of the disclosing Party solely for the purpose for which it is provided; (b) not disclose such Confidential Information to a third party, except on a need-to-know basis to its Affiliates, attorneys, auditors, consultants, and service providers who are under confidentiality obligations at least as restrictive as those contained herein; and (c) protect such Confidential Information from unauthorized use and disclosure to the same extent (but using no less than a reasonable degree of care) that it protects its own Confidential Information of a similar nature.

**12.2    Required Disclosure**. If Recipient is required by law to disclose Confidential Information of the disclosing Party, Recipient will give prompt written notice to the disclosing Party before making the disclosure, unless prohibited from doing so by legal or administrative process, and cooperate with the disclosing Party to obtain where reasonably available an order protecting the Confidential Information from public disclosure.

**12.3    Ownership**. Recipient acknowledges that, as between the Parties, all Confidential Information it receives from the disclosing Party, including all copies thereof in Recipient's possession or control, in any media, is proprietary to and exclusively owned by the disclosing Party. Nothing in the Agreement grants Recipient any right, title or interest in or to any of the disclosing Party's Confidential Information. Recipient's incorporation of the disclosing Party's Confidential Information into any of its own materials will not render Confidential Information non-confidential.

**12.4    Remedies**. Recipient acknowledges that any actual or threatened breach of this Section 12 (Confidentiality) may cause irreparable, non-monetary injury to the disclosing Party, the extent of which may be difficult to ascertain. Accordingly, the disclosing Party is entitled to (but not required to) seek injunctive relief in addition to all remedies available to the disclosing Party at law and/or in equity, to prevent or mitigate any breaches of the Agreement or damages that may otherwise result from those breaches. Absent written consent of the disclosing Party to the disclosure, the Recipient, in the case of a breach of this Section 12 (Confidentiality), has the burden of proving that the disclosing Party's Confidential Information is not, or is no longer, confidential or a trade secret and that the disclosure does not otherwise violate this Section 12 (Confidentiality).

## 13.  GOVERNING LAW AND VENUE

**13.1    Binding Arbitration, Applicable Law and Venue, Attorneys Fees**. The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws. Any claim or dispute arising under the Agreement may only be brought in arbitration, with venue in Clark County, Nevada. Such action will be pursuant to the rules of the American Arbitration Association under its Commercial Arbitration Rules subject to one arbitrator. Customer and Prime Trust each agree to this method of dispute resolution, as well as jurisdiction, and to this being a convenient forum for any such claim or dispute and waives any right it may have to object to either the method or jurisdiction for such claim or dispute. In the event of any dispute among the Parties, the prevailing Party shall be entitled to recover damages plus reasonable costs and attorney's fees and the decision of the arbitrator shall be final, binding and enforceable in any court. Notwithstanding anything hereunder and/or whatever provided by the applicable laws, regulations and/or arbitration rules, both Parties expressly agree and confirm to exclude any confidentiality obligations on either Party during and/or in relation to the arbitration proceedings mentioned hereunder.



## 14.   GENERAL

**14.1   Relationship**. The Parties are independent contractors. The Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties. Except as set forth in the Agreement, nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary.

**14.2   Assignability**. Neither Party may assign its rights or obligations under the Agreement without the other Party's prior written consent. Notwithstanding the foregoing, either Party may assign its rights and obligations under the Agreement to an Affiliate as part of a reorganization, merger, consolidation or otherwise by operation of law, or to a purchaser of its business entity or substantially all of its assets or business to which rights and obligations pertain without the other Party's consent, provided that: (a) the purchaser is not insolvent or otherwise unable to pay its debts as they become due; (b) the purchaser is not a competitor of the other Party; (c) any assignee is bound hereby; and (d) if assigned by Customer, subject to such Customer assignee providing all information required to be provided pursuant to Section 2.1 (Account Registration) and approval by Prime Trust of such Customer assignee. Other than the foregoing, any attempt by either Party to transfer its rights or obligations under the Agreement will be void. The Agreement will be binding upon and will inure to the benefit of the proper successors and assigns.

**14.3   Notices**. Any notice required or permitted to be given in accordance with the Agreement will be effective only if it is in writing and sent using: (a) personal delivery; (b) certified or registered mail; (c) email; or (d) a nationally recognized overnight courier, to the appropriate Party at the address set forth on the Order Form, with a copy, in the case of Prime Trust, to Legal@primetrust.com. Each Party hereto expressly consents to service of process by registered mail. Either Party may change its address for receipt of notice by notice to the other Party through a notice provided in accordance with this Section 14.3 (Notices). Notices are deemed given upon receipt if delivered using personal delivery, two (2) business days following the date of mailing, or one (1) business day following delivery to a courier or email.

**14.4   Electronic Signature and Communications Notice and Consent**. Each Party hereby agrees that all current and future notices, confirmations and other communications regarding the Agreement specifically, and future communications in general between the Parties, may be made by email, sent to the email address of record, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the Parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipient's email service provider, or due to a recipients' change of address, or due to technology issues by the recipient's service provider, the Parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received. No physical, paper documents will be sent to Customer, and if Customer desires physical documents then it agrees to be satisfied by directly and personally printing, at Customer's own expense, either the electronically-sent communication(s) or the electronically available communications by logging on to Customer's Account and then maintaining such physical records in any manner or form that Customer desires.

**14.5   Counterparts; Email; Signatures**. The Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same

## Prime Trust

instrument, binding on each signatory thereto. The Agreement may be executed by signatures, electronically or otherwise, delivered by email, and a copy hereof that is properly executed and delivered by a Party will be binding upon that Party to the same extent as an original executed version hereof.

**14.6   Force Majeure**. In the event that either Party is prevented from performing, or is unable to perform, any of its obligations under the Agreement due to any cause beyond the reasonable control of the Party invoking this provision (including, without limitation, for causes due to war, fire, earthquake, flood, hurricane, riots, pandemic, acts of God, telecommunications outage not caused by the obligated Party, or other similar causes) ("**Force Majeure Event**"), the affected Party's performance will be excused and the time for performance will be extended for the period of delay or inability to perform due to such occurrence; provided that the affected Party: (a) provides the other Party with prompt notice of the nature and expected duration of the Force Majeure Event; (b) uses commercially reasonable efforts to address and mitigate the cause and effect of such Force Majeure Event; (c) provides periodic notice of relevant developments; and (d) provides prompt notice of the end of such Force Majeure Event. Delays in fulfilling the obligations to pay hereunder are excused only to the extent that payments are entirely prevented by the Force Majeure Event. However, nothing in this Section 14.6 (Force Majeure) will affect or excuse a Party's liabilities or a Party's obligation to pay Fees, fines, disputes, refunds, reversals, or returns under the Agreement.

**14.7   Trade Restrictions**. The Prime Trust Services, Documentation, and the provision and any derivatives thereof are subject to the export control and sanctions laws and regulations of the United States and other countries that may prohibit or restrict access by certain Persons or from certain countries or territories ("**Trade Restrictions**").

(a) Each Party shall comply with all applicable Trade Restrictions in performance of the Agreement. For the avoidance of doubt, nothing in the Agreement is intended to induce or require either Party to act in any manner which is penalized or prohibited under any applicable laws, rules, regulations or decrees.

(b) Customer represents that it is not a Restricted Party. "**Restricted Party**" means any Person that is: (i) located or organized in a country or territory subject to comprehensive U.S. sanctions (currently including Cuba, Crimea, Iran, North Korea, Syria) ("**Sanctioned Territory**"); (ii) owned or controlled by or acting on behalf of the government of a Sanctioned Territory; (iii) an entity organized in or a resident of a Sanctioned Territory; (iv) identified on any list of restricted parties targeted under U.S., EU or multilateral sanctions, including, but not limited to, the U.S. Department of the Treasury, Office of Foreign Assets Control's ("**OFAC**" ) List of Specially Designated Nationals and Other Blocked Persons, the OFAC Sectoral Sanctions List, the U.S. State Department's Nonproliferation Sanctions and other lists, the U.S. Commerce Department's Entity List or Denied Persons List located at https://www.export.gov/article?id=Consolidated-Screening-List, the consolidated list of persons, groups and entities subject to EU financial sanctions from time to time; or (v) owned or controlled by, or acting on behalf of, any of the foregoing.

(c) Customer acknowledges and agrees that it is solely responsible for complying with, and shall comply with, Trade Restrictions applicable to any of its own or its Affiliates' or Authorized Users' or End-Users or customers' content or Customer Data transmitted through the Prime Trust Services. Customer shall not and shall not permit any Authorized User or End-User to access, use, or make the Prime Trust Services available to or by any Restricted Party or to or from within any Sanctioned Territory.

**14.8   Anti-Corruption**. In connection with the Prime Trust Services performed under the Agreement and Customer's or Authorized Users' or End-Users' use of the Prime Trust Services, the Parties agree to comply with all applicable anti-corruption and anti-bribery related laws, statutes, and regulations.

**Prime Trust**

**14.9   U.S. Government Rights**. All Prime Trust Services, including Documentation, and any software as may be provided under an applicable Service Schedule, are deemed to be "commercial computer software" and "commercial computer software documentation". "Commercial computer software" has the meaning set forth in Federal Acquisition Regulation ("**FAR**") 2.101 for civilian agency purchases and the Department of Defense ("**DOD**") FAR Supplement ("**DFARS**") 252.227-7014(a)(1) for defense agency purchases. If the software is licensed or the Prime Trust Services are acquired by or on behalf of a civilian agency, Prime Trust provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of the Agreement as required in FAR 12.212 (Computer Software) and FAR 12.211 (Technical Data) and their successors. If the software is licensed or the Prime Trust Services are acquired by or on behalf of any agency within the DOD, Prime Trust provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of the Agreement as specified in DFARS 227.7202-3 and its successors. Only if this is a DOD prime contract or DOD subcontract, the Government acquires additional rights in technical data as set forth in DFARS 252.227-7015. Except as otherwise set forth in an applicable Service Schedule, this Section 14.9 (U.S. Government Rights) is in lieu of, and supersedes, any other FAR, DFARS or other clause or provision that addresses U.S. Government rights in computer software or technical data.

**14.10   Publicity**. Neither Party shall refer to the identity of the other Party in promotional material, publications, public statements or press releases or other forms of publicity relating to the Prime Trust Services unless the prior written consent of the other Party has been obtained, provided, however, that Prime Trust may use Customer's name and logo for the limited purpose of identifying Customer as a customer of the Prime Trust Services.

**14.11   No Legal, Tax or Accounting Advice**. Customer acknowledges and agrees without reservation that Prime Trust is not providing any legal, tax or accounting advice in any way, nor on any matter, regardless of the tone or content of any communication (oral, written or otherwise). Customer unconditionally agrees to rely solely on its legal, tax and accounting professionals for any such advice and on all matters.

**14.12   No Investment Advice, Underwriting or Recommendations**. Customer acknowledges and agrees that Prime Trust does not provide any investment advice, nor does Prime Trust make any recommendations to any issuer of, or investor in, any offering. Prime Trust does not provide any brokerage, underwriting or other advice in the structuring of any offering. Customer agrees that any communications from Prime Trust, whether written, oral or otherwise, regardless of content, will never be interpreted or relied upon as investment advice or securities recommendations; Customer agrees that it will only rely on the advice of its attorneys, accountants and other professional advisors, including any registered broker-dealers acting as an underwriter of an offering, if any.

**14.13   Waiver**. The waiver by either Party of any breach of any provision of the Agreement does not waive any other breach. The failure of any Party to insist on strict performance of any covenant or obligation in accordance with the Agreement will not be a waiver of such Party's right to demand strict compliance in the future, nor will the same be construed as a novation of the Agreement.

**14.14   Interpretation**. Each Party to the Agreement has been represented by or had adequate time to obtain the advice and input of independent legal counsel with respect to the Agreement and has contributed equally to the drafting of the Agreement. Therefore, the Agreement shall not be construed against either Party as the drafting Party. All pronouns and any variation thereof will be deemed to refer to all persons, and to the singular or plural as the identity of the person or persons may require for proper interpretation of the Agreement. And it is the express will of the Parties that the Agreement is written in English and uses the font styles and sizes contained herein.

**Prime Trust**

**14.15   Severability**. If any part of the Agreement is found to be illegal, unenforceable, or invalid, the remaining portions of the Agreement will remain in full force and effect.

**14.16   Entire Agreement**. The Agreement is the final, complete, and exclusive expression of the agreement between the Parties regarding the Prime Trust Services provided under the Agreement. The Agreement supersedes and replaces, and the Parties disclaim any reliance on, all previous oral and written communications (including any confidentiality agreements pertaining to the Prime Trust Services under the Agreement), representations, proposals, understandings, undertakings, and negotiations with respect to the subject matter hereof and apply to the exclusion of any other terms that Customer seeks to impose or incorporate, or which are implied by trade, custom, practice, or course of dealing. The Agreement may be changed only by a written agreement signed by an authorized agent of both Parties. The Agreement will prevail over terms and conditions of any Customer-issued purchase order or other ordering documents, which will have no force and effect, even if Prime Trust accepts or does not otherwise reject the purchase order or other ordering document.



---

## APPENDIX 1
## PROHIBITED USE, PROHIBITED BUSINESSES AND CONDITIONAL USE

Revision date: November 12, 2021.

### 1.  PROHIBITED USE

**1.1**    Customer shall not use a Customer Custody Account(s) or any Prime Trust Services, and shall ensure that no Authorized User or End-User uses the Customer Custody Account, End-User Custody Account or any other Prime Trust Services, to engage in the categories of activity set forth herein or otherwise disclosed to Customer from time to time ("**Prohibited Uses**"), and Prime Trust may add modify or amend the list of Prohibited Uses at any time. The Prohibited Uses apply to any third-party accessing the Customer Custody Account(s), End-User Custody Account(s) or Prime Trust Services, regardless of whether such third party was authorized by Customer, Authorized User or End-User to use the Prime Trust Services associated with such custody account(s). The list of Prohibited Uses below are representative, but not exhaustive. Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s), End-User Custody Account(s) or any Prime Trust Service to do any of the following:

(a) **Unlawful Activity**. Activity which would violate, or assist in violation of, any law, statute, ordinance, or regulation, or sanctions programs administered in the countries where Prime Trust conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information.

(b) **Abusive Activity**. Actions which impose an unreasonable or disproportionately large load on Prime Trust's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to the Prime Trust Services that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to the Prime Trust Services, other customer Custody Account(s) or End-User Custody Account(s), computer systems or networks connected to the Prime Trust Services through password mining or any other means; use  account information of another party to access or use the Prime Trust Services; or transfer Customer Custody Account or End-User Custody Account access or rights to such account to a third party, unless by operation of law or with the express permission of Prime Trust.

(c) **Abuse of Other Users**. Interfere with another individual's or entity's access to or use of any Prime Trust Services; defame, abuse, extort, harass, stalk, threaten or otherwise violate or infringe the legal rights (such as, but not limited to, rights of privacy, publicity and intellectual property) of others; harvest or otherwise collect information from the Prime Trust Services about others, including without limitation email addresses, without proper consent.

(d) **Fraud.** Activity which operates to defraud Prime Trust, Prime Trust users, or any other Person; provide any false, inaccurate, or misleading information to Prime Trust.

(e) **Unlawful Gambling**. Lotteries; bidding fee auctions; sports forecasting or odds making; fantasy sports leagues with cash prizes; internet gaming; contests; sweepstakes; or games of chance that are not sanctioned by a governmental body or regulatory authority.

## Prime Trust

(f) **Intellectual Property Infringement**. Engage in transactions involving items that infringe or violate any copyright, trademark, right of publicity or privacy or any other proprietary right under the law, including but not limited to sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder; use of Prime Trust intellectual property, name, or logo, including use of Prime Trust trade or service marks, without express consent from Prime Trust or in a manner that otherwise harms Prime Trust or the Prime Trust brand; any action that implies an untrue endorsement by or affiliation with Prime Trust.

(g) **Policies and Documentation**. Activity that would violate, or assist in violation of, or is otherwise inconsistent with, any operating instructions promulgated by Prime Trust.

## 2.   PROHIBITED BUSINESSES

**2.1**   The following categories of businesses, business practices, and sale items are barred from the Prime Trust Services ("**Prohibited Businesses**"). The specific types of use listed below are representative, but not exhaustive, and Prime Trust may add, modify or amend the list of Prohibited Businesses at any time. Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s) or End-User Custody Account(s) or any service of Prime Trust in connection with any of the following businesses, activities, practices or items:

(a) **Investment and Credit Services:** Securities brokers; mortgage consulting or debt reduction services; credit counseling or repair; real estate opportunities; investment schemes.

(b) **Restricted Financial Services:** Check cashing, bail bonds; collections agencies.

(c) **Intellectual Property or Proprietary Rights Infringement:** Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder.

(d) **Counterfeit or Unauthorized Goods:** Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen.

(e) **Regulated Products and Services:**  Sale of tobacco, e-cigarettes, and e-liquid; online prescription or pharmaceutical services; age restricted goods or services; weapons and munitions; gunpowder and other explosives; fireworks and related goods; toxic, flammable, and radioactive materials; products and services with varying legal status on a state-by-state basis.

(f) **Drugs and Drug Paraphernalia:** Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs.

(g) **Pseudo-Pharmaceuticals:** Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local and/or national regulatory body.

(h) **Substances designed to mimic illegal drugs:** Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom).

(i) **Adult Content and Services:** Pornography and other obscene materials (including literature, imagery and other media); sites offering any sexually-related services such as prostitution, escorts, pay-per view, adult live chat features.

(j) **Multi-level Marketing:** Pyramid schemes, network marketing, and referral marketing programs.

**Prime Trust**

(k) **Unfair, Predatory or Deceptive Practices:** Investment opportunities or other services that promise high rewards; sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that we determine in our sole discretion to be unfair, deceptive, or predatory towards consumers.

(l) **High Risk Businesses:** Any businesses that Prime Trust believes poses elevated financial risk, legal liability, or violates card network or bank policies.

**2.2**    Customer will establish controls for preventing Digital Assets or Fiat Currency being transferred to or from individuals or entities operating as or in connection with, the specific types of individuals or entities listed below are representative, but not exhaustive, and Prime Trust may add modify or amend the list at any time:

- Entities or jurisdictions on the Prime Trust's prohibited list, which will be provided to Customer prior to program go-live and on an ongoing basis as changes to the list are made.
- Adult content, including, but not limited to, pornographic services and goods, adult entertainment related activities, or escort services
- Alcoholic beverages, including the facilitation, sale, or distribution of alcoholic beverages
- Bearer share corporations
- Chemicals, including the facilitation, sale, or distribution of chemicals
- Dietary supplements, including the facilitation, sale or distribution of dietary supplements
- Embassies and foreign consulates
- Financial institutions, where Prime Trust does not maintain a direct relationship with the financial institution or bank and a nested relationship is established.
- Foreign bulk shipment of currency
- Foreign casinos/gambling establishments/internet gambling or other betting related services
- Foreign governments
- Foreign offshore shell companies
- Foreign shell banks
- Jewels, precious metals, or stones, including the facilitation, sale, distribution, or exchange of jewels, precious metals or stones
- Medical devices and medications, including the facilitation, sale or distribution of drugs, prescription medications, or medical devices
- Online dating services
- Online payday lenders
- Stocks and other security interests, including the sale of stocks and other security interests
- Telemarketing activities
- Tobaccos goods, including the facilitation, sale or distribution of tobacco goods
- Unlawful or illegal activities, including, without limitation:
  - the creation, facilitation, sale or distribution of any prohibited or illegal good or service or an activity that requires a governmental license where the customer lacks such a license
  - the creation, facilitation, sale or distribution of goods or services that violate the intellectual property rights of a third party
  - any Ponzi-scheme or pyramid selling
- Violence related activities, including the creation, facilitation, sale, or distribution of any material that promotes violence or hatred
- Weapons, including the facilitation, sale or distribution of firearms or other weapons, military or semi-military goods, military software, or technologies

 **Prime Trust**

## 3.  CONDITIONAL USE

**3.1**    Express written consent and approval from Prime Trust must be obtained prior to using Prime Trust Services for the following categories of business and/or use ("**Conditional Uses**"). Consent may be requested by contacting Prime Trust. Prime Trust may provide such consent in its sole and absolute discretion and may reject any such request for any reason. Customer acknowledges and agrees that Prime Trust may also require Customer to agree to additional conditions, make supplemental representations and warranties, complete enhanced on-boarding procedures, and operate subject to restrictions if Customer uses Prime Trust Services in connection with any of following businesses, activities, or practices:

(a) **Money Services:** Money transmitters, Digital Asset transmitters; currency or Digital Asset exchanges or dealers; gift cards; prepaid cards; sale of in-game currency unless the merchant is the operator of the virtual world; act as a payment intermediary or aggregator or otherwise resell any of the services of a financial institution.

(b) **Charities:** Acceptance of donations for nonprofit enterprise.

(c) **Games of Skill:** Games which are not defined as gambling under the Agreement or by law, but which require an entry fee and award a prize.

(d) **Religious/Spiritual Organizations:** Operation of a for-profit religious or spiritual organization.

(e) **Regulated Products and Services:** Marijuana dispensaries and related businesses.

## 4.  RESTRICTED USE

**4.1**    The following activities are barred from the Prime Trust Services ("**Restricted Use**"). The specific types of use listed below are representative, but not exhaustive, and Prime Trust may add modify or amend the list of Restricted Use at any time. Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s) or End-User Custody Account(s) or any service of Prime Trust in connection with any of the following businesses, activities, practices or items:

(a) **Circumvention:** Use the Prime Trust Services, or allow access to it, in a manner that circumvents contractual usage restrictions or that exceeds Customer's authorized use or usage metrics set forth in the Agreement, including the applicable Order Form or SOW.

(b) **Sublicense:** License, sub-license, sell, re-sell, rent, lease, transfer, distribute, time share, lend, convert, assign, exploit or otherwise make any portion of the Prime Trust Services or Documentation available for access by third parties except as otherwise expressly provided in the Agreement.

(c) **Competing Product:** Access or use the Prime Trust Services or Documentation for the purpose of: (i) developing or operating products or services intended to be offered to third parties in competition with the Prime Trust Services, (ii) monitoring availability, performance or functionality, or for any other benchmarking or competitive purposes or (iii) allowing access to its Account by a direct competitor of Prime Trust.

(d) **Reverse Engineer:** Reverse engineer, decompile, disassemble, or copy any of the Prime Trust Services or technologies, or otherwise attempt to derive source code or other trade secrets or create any derivative works from or about any of the Prime Trust Services or technologies, or use the machine-

**Prime Trust**

learning algorithm output generated from the Prime Trust Services to train, calibrate, or validate, in whole or in part, any other systems, programs or platforms, or for benchmarking, software-development, or other competitive purposes, except pursuant to Customer's non-waivable rights under applicable law, without Prime Trust's written consent.

(e) **Interference:** Fail to use commercially reasonable efforts to avoid interference with or disruption to the integrity, operation, performance, or use or enjoyment by others of the Prime Trust Services.

## Prime Trust

If you started a subscription before the revision date below, your use of Prime Trust Services is governed by the terms here: https://www.primetrust.com/legal/legacy.

**SERVICE SCHEDULE FOR**
**PRIME TRUST CUSTODIAL SERVICES**

Service Schedule revision date: May 13, 2022

Customer hereby requests and directs that Prime Trust establish and maintain a Customer Custody Account for and in the name of Customer in connection with the Custodial Services, and hold as custodian all property deposited to, or collected with respect to, the Customer Custody Account, upon the terms and conditions of this Service Schedule. Unless otherwise defined in this Service Schedule, capitalized terms will have the meaning given to them in the Agreement.

## 1.  DEFINITIONS

"**Authorized Person**" means each Authorized User or person authorized to provide instructions (an "**Agent**") with respect to the Customer Custody Account designated upon acceptance of Customer as determined by Prime Trust. Authorized person may be one or more persons.

"**Custodial Property**" means any property delivered by Customer into the possession or control of Prime Trust.

"**Custodial Services**" means the Fiat Services, On-Chain Services, and any other services, including the holding, processing and acting as custodian of all Custodial Property, provided from time to time by Prime Trust in accordance with this Service Schedule. Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all Custodial Property while this Service Schedule is in effect.

"**Custody Transaction**" means a contribution of supported Digital Assets from a public Blockchain address Customer controls to the Customer Custody Account, and/or a disbursement of supported Digital Assets from Customer Custody Account to a public blockchain address Customer controls.

"**Fiat Services**" means the custody of Fiat Currencies and foreign exchange transactions in Fiat Currencies.

"**Fork**" means: (a) that a Digital Asset network has been changed in a way that makes it incompatible with the unchanged version of the Digital Asset network; (b) the changes have been widely accepted by users of the Digital Asset network; and (c) that the two resulting Digital Asset networks have not been merged together at the time of any action to be taken by Prime Trust. A Fork may create two separate Digital Asset networks (each, a "**Forked Network**"), and may result in Prime Trust holding an identical amount of Digital Assets associated with each Forked Network.

"**On-Chain Services**" means additional Services involving on-chain transactions (other than deposits and withdrawals) included in Prime Trust's basic Custodial Services, which may include staking, voting, inflation, signaling, and other activities requiring interaction with the applicable Blockchain.

## 2.  CUSTOMER CUSTODY ACCOUNT ACCEPTANCE AND AUTHORIZED SERVICES

**2.1  Appointment**. Customer hereby appoints and authorizes Prime Trust to provide Custodial Services in accordance with this Service Schedule, and Prime Trust hereby accepts such appointment subject to the

Prime Trust

Customer Custody Account acceptance process in accordance with 2.10 below. Prime Trust through the Custodial Services enables Customer to create one or more Customer Custody Accounts.

**2.2**    In its sole discretion, Prime Trust may custody Custodial Property on Customer's behalf. For the avoidance of doubt, Custodial Property that Prime Trust may agree to accept and hold on Customer's behalf in accordance with this Service Schedule is limited to the following: (a) Digital Assets, (b) Fiat Currencies; (c) title to real estate; (d) private securities and public securities listed on any U.S. securities exchange or alternative trading system; and (e) traditional and Roth individual retirement accounts (subject to applicable documentation in Prime Trust's sole discretion). Securities that have been issued in accordance with the regulations of countries other than the U.S. or which are listed on non-U.S. trading systems may be accepted for custody on a case-by-case basis.

**2.3    Provision of the Custodial Services.**

(a) Subject to Customer's completion of the Customer Custody Account acceptance process in accordance with Section 2.10 and so long as Customer is in compliance with this Service Schedule and the Agreement, Prime Trust will provide the Custodial Services.

(b) In providing the Custodial Services, Prime Trust will act only upon receipt of any direction, instruction, or request submitted by an Authorized Person or through the Customer's platform (an "**Authorized Instruction**").

(c) Prime Trust, in its sole discretion, will determine whether the provision of the Custodial Services or an Authorized Instruction complies with all Applicable Law and may decline any Authorized Instruction, including if: (i) Customer is not in compliance with this Service Schedule and the Agreement; (ii) such Authorized Instruction may violate Applicable Law; or (iii) Customer has insufficient unencumbered, cleared Custodial Property in the Customer Custody Account available for executing such Authorized Instruction.

(d) Prime Trust is entitled to rely upon any information, data, and documents provided in connection with the Custodial Services. Customer acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any information, data, or documents provided to Prime Trust in connection with the Custodial Services.

(e) Prime Trust is entitled to rely upon any Authorized Instruction provided in connection with the Custodial Services and Customer acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any Authorized Instruction. Prime Trust will only act upon an Authorized Instruction and is released and held harmless by Customer for acting upon the Authorized Instruction, including acting upon conflicting, superseded, or otherwise varying Authorized Instructions from multiple Authorized Persons.

(f) Customer acknowledges that Prime Trust will not monitor Digital Assets for actions taken by the issuer of such Digital Asset, if any. Such actions may include an issuer instruction requiring the holder of a Digital Asset to transfer it to a certain location. For the avoidance of doubt, Customer is solely responsible for satisfying or responding to any such actions of an issuer.

(g) Prime Trust will collect and hold all funds when Custodial Property may mature, be redeemed, or sold. Prime Trust will hold the proceeds of such transaction(s) until receipt of an Authorized Instruction.

## Prime Trust

(h) Funds received in any currency other than USD may, pursuant to an Authorized Instruction or as needed for Prime Trust to carry out an Authorized Instruction or pay Fees, be converted to USD at exchange rates set in Prime Trust's sole discretion.

(i) Prime Trust shall process the investment and reinvestment of Custodial Property in accordance with Authorized Instructions only so long as, in the sole discretion of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment).

**2.4   Storage of Digital Assets.**  Prime Trust will receive Digital Assets for storage by generating Private Keys and their Public Key pairs, with Prime Trust retaining custody of such Private Keys. "**Private Key**" means an alphanumeric string known only to the holder of a Digital Asset, which must be used to transact the Digital Asset represented by the corresponding Public Key. "**Public Key**" means an alphanumeric string on a Blockchain that indicates ownership/possession of a specific amount of a Digital Asset by a specific network participant and is visible to all participants in a Blockchain's network. Upon receipt, Prime Trust will custody the Digital Assets in Customer's name or Customer Custody Accounts established for the benefit of Customer, unless otherwise specified in an Authorized Instruction. Prime Trust will be deemed to have received a Digital Asset after the Digital Asset's receipt has been confirmed on the relevant Blockchain or otherwise ledgered to Prime Trust's satisfaction. "**Blockchain**" means a software operating a distributed ledger which is maintained by a network of computers, and that records all transactions in a Digital Asset in theoretically unchangeable data packages known as blocks, each of which are timestamped to reference the previous block so that the blocks are linked in a chain that evidences the entire history of transactions in the Digital Asset.

**2.5   Forks, Airdrops.**

(a) Should a Fork occur: (i) Prime Trust retains the right, in its sole discretion, to determine whether or not to support either Forked Network; (ii) in connection with determining to support or not to support a Forked Network, Prime Trust may suspend certain operations, in whole or in part (with or without advance notice), for however long Prime Trust deems reasonably necessary, in order to take the necessary steps, as determined in its sole discretion, to perform obligations hereunder with respect to supporting or not supporting a Forked Network; (iii) Customer hereby agrees that Prime Trust will determine, in its sole discretion, whether or not to support such Forked Network and that Customer will have no right or claim against Prime Trust related to value represented by any change in the value of any Digital Asset (whether on a Forked Network or otherwise), including with respect to any period of time during which Prime Trust exercises its rights described herein with respect to Forks and Forked Networks; (iv) Prime Trust will select, in its sole discretion, at least one of the Forked Networks to support and will identify such selection in a notice; (v) with respect to a Forked Network that Prime Trust chooses not to support, it may, in its sole discretion, elect to (A) abandon or otherwise not pursue obtaining the Digital Assets from that Forked Network, or (B) deliver the Digital Assets from that Forked Network to Customer within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Digital Assets to Customer); (vi) with respect to Forked Networks that Prime Trust chooses to support, Customer may be responsible for Fees to be negotiated; and (vii) Customer acknowledges and agrees that Prime Trust assumes no responsibility or obligations with respect to any Forked Network and related Digital Assets that it chooses not to support.

Prime Trust

(b) In the event that a Digital Asset network attempts to or does contribute (sometimes called "airdropping" or "bootstrapping") its Digital Assets (collectively, "**Airdropped Digital Assets**") to holders of Digital Assets on an existing Digital Asset network and Customer notifies Prime Trust in writing of such event, Prime Trust may, in its sole discretion, elect to: (i) subject to an airdrop fee to be determined, support the Airdropped Digital Asset for custody and, if appropriate, reconcile Customer Custody Account; (ii) abandon or otherwise not pursue obtaining the Airdropped Digital Asset; or (iii) deliver the Airdropped Digital Assets from that Digital Asset network to Customer within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Airdropped Digital Assets to Customer). Airdropped Digital Assets do not create any relationship between the sender and/or Digital Asset network and Prime Trust and do not subject Prime Trust to any responsibilities or obligations as it relates to the sender and/or Digital Asset network.

**2.6    On-Chain Services.** Subject to any documentation requested by Prime Trust in its sole discretion, from time to time, Prime Trust may offer Customer On-Chain Services. Customer may be required to accept additional terms as a condition to receiving any On-Chain Services. Prime Trust may discontinue an On-Chain Service at any time without notice for any reason. If Prime Trust decides to discontinue an On-Chain Service, Prime Trust will endeavor to provide as much notice to Customer as reasonably possible.

**2.7    Fiat Currency Instructions and Acknowledgements; Disclosures**. Prime Trust may, in its sole discretion, offer Fiat Services to Customer. If Prime Trust offers Fiat Services, and Customer accepts Fiat Services, Prime Trust may:

(a) subject to subsection (b), deposit any cash or Fiat Currency funds deposited by Customer with Prime Trust, for which Customer has not already provided Authorized Instructions, into deposit accounts at Federal Deposit Insurance Corporation ("**FDIC**")-insured, regulated depository institutions selected by Prime Trust, which accounts will be held for the benefit of Prime Trust customers ("**Deposit Accounts**") and maintain the Deposit Accounts as omnibus accounts, which will not be segregated by Customer; enter into such sub-accounting agreements as may be required by such depository institutions; and initiate wire or other transfer requests from time to time for the withdrawal of Customer funds from the Deposit Accounts, which requests are to be honored by the depository institution for withdrawal of Customer's funds from such Deposit Accounts for distributions, investments, Fees, and other disbursements pursuant to an Authorized Instruction. All applicable wire or other transfer Fees will be paid by Customer,

(b) otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Customer in accordance with this Service Schedule. Prime Trust may receive earnings or compensation for an omnibus account either in the form of services provided at a reduced rate, the payment of any shareholder service fees, or similar compensation, and Prime Trust may receive earnings or income from using or investing cash or Fiat Currency as described herein. Customer agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for Customer. Customer acknowledges and agrees that Prime Trust may hold some or any portion of Fiat Currency in accounts, including but not limited to money market deposit accounts, that may or may not receive interest or earnings attributable to such Fiat Currency. Customer

Prime Trust

hereby agrees that the amount of such interest or earnings attributable to Fiat Currency may be retained by Prime Trust as additional consideration for its services.

(c) Prime Trust will keep records for the purpose of obtaining pass-through FDIC insurance with respect to any sub-account held for Customer that is part of the Custodial Property held in Deposit Accounts by Prime Trust to the extent provided by Applicable Law. Customer acknowledges and accepts that Prime Trust does not guarantee that pass-through FDIC coverage will be available for any such sub-account..

(d) if Customer elects to provide a card payment method to transfer funds into the Customer Custody Account, Customer hereby authorizes Prime Trust to debit the card payment method for the purpose of transferring the funds. Further, Customer hereby authorizes Prime Trust to store and file the card payment method and charge the card payment method on file in connection with any future transfers of funds by the Customer.

**2.8    Limitations on Services.** Customer agrees that Prime Trust will only perform the Custodial Services in accordance with this Service Schedule, and no additional duties or obligations will be implied. In particular, Prime Trust will not exercise any legal, investment, tax, or accounting planning, advice, discretion, or recommendation whatsoever regarding Customer's Customer Custody Account. In providing the Custodial Services, Prime Trust has no duty to inquire as to the provisions of or application of any agreement or document other than this Service Schedule, notwithstanding Prime Trust's receipt of such agreement or document.

**2.9    Ownership of Custodial Property.** Customer owns all Custodial Property held by Prime Trust on behalf of Customer in accordance with this Service Schedule. Customer's Custodial Property will not be reflected on Prime Trust's balance sheet as assets of Prime Trust. Prime Trust may, for convenience, take and hold title to Custodial Property or any part thereof in its own name with Customer's ownership of Custodial Property segregated on Prime Trust's books and records.

**2.10    Customer Custody Account Acceptance.** Custodial Services will be provided only upon the date of Customer's successful completion of the Customer Custody Account acceptance process, as determined in Prime Trust's sole discretion and in accordance with this Section 2.10. To complete the acceptance process, Customer will provide Prime Trust with information and documents, which includes information necessary for Prime Trust's compliance with the Bank Secrecy Act ("**BSA**"), and other Applicable Law relating to anti-money laundering ("**AML**"), Know-Your-Customer ("**KYC**"), counter-terrorist financing, sanctions screening requirements, or any other similar legal obligations, in each case, as determined by Prime Trust in its sole discretion.

**2.11    Authorized Persons.**

(a) Customer is solely responsible for designating to Prime Trust all Authorized Persons, for advising Prime Trust of the removal of any Authorized Persons, and for all actions of Authorized Persons.

(b) Customer agrees that Prime Trust may rely on an Authorized Person's email address currently on file with Prime Trust for the purposes of acting on an Authorized Instruction from an Authorized Person.

**2.12    Joint Customer Custody Accounts.** In the case of a joint Customer Custody Account, each person with an interest in the Customer Custody Account, who is a Party to the Agreement, is considered a Customer. The obligations and agreements applicable to each part to a joint Customer Custody Account under this Service Schedule shall be deemed to be joint and several.

**3.    CUSTOMER RESPONSIBILITIES**



**3.1**    Customer acknowledges that:

(a) Customer is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of, the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law ("**UCC**"). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.

(b) Customer is solely responsible for, and Prime Trust has no involvement in, determining whether any investment, investment strategy, or related transaction is appropriate for Customer. Prime Trust will have no duty or responsibility to review or perform due diligence on any investments or transactions and will make no recommendation of investments or transactions, nor supervise any such investments or transactions. Customer will perform its own due diligence on all investments and take sole responsibility for all decisions made for its Customer Custody Account.

(c) Prime Trust does not provide any valuation or appraisals of Custodial Property, nor does it hire or seek valuations or appraisals on any Custodial Property; provided, however, that Prime Trust may, at its option and with no obligation or liability, to the extent reasonably available for any particular asset, make available recent price quotes or value estimates from various third-party sources, including stock exchanges and alternative trading systems registered with the Securities and Exchange Commission, digital asset exchanges, and real estate websites. Prime Trust will not attempt to verify the validity, accuracy or reliability of any such third-party valuation, valuation estimates or price quotes (collectively, "**Valuation Data**") and Customer agrees that Prime Trust will have no liability in connection with any such Valuation Data, including for any unreliable, inaccurate, or misleading information. Any Valuation Data provided to Customer is furnished for general information purposes only, and should not be relied upon as a definitive determination of the market value of any Custodial Property, nor should such Valuation Data be used for tax reporting purposes. Customer understands and agrees that Customer should engage an independent financial advisor, appraiser, or valuation firm in order to obtain a formal opinion or financial advice regarding the value of any Custodial Property.

(d) Prime Trust has no control over, and is not responsible or liable for, any services or technology supporting or used in connection with any Custodial Property, Service Provider (defined below), Customer's platform, or the markets in which Custodial Property is purchased, sold or otherwise traded, and any Custodial Property, Service Provider, Customer's platform, or such markets, and any such services or technology, may be susceptible to, or limited or compromised by, errors, technology flaws or defects, viruses or other malicious code, manipulations, hacks, other attacks, outages, and other interruptions and limitations. For the purposes of this Service Schedule, "**Service Provider**" means any unaffiliated third-party entity retained by Prime Trust to provide any of the Custodial Services on behalf of Prime Trust to the Customer.

(e) The custody of Digital Assets is generally subject to a high degree of risk, and the nature of Digital Assets may lead to an increased risk of technology flaws, fraud or attacks.

(f) Prime Trust does not control and makes no guarantee as to the functionality of any Blockchain's decentralized governance, which could, among other things, lead to delays, conflicts of interest, or operational decisions that may impact Customer and/or its Custodial Property.

(g) Advancements in cryptography could render current cryptography algorithms utilized by a Blockchain supporting a specific Digital Asset inoperative.

## Prime Trust

(h) The supply of Digital Assets available as a result of a Forked Network and Prime Trust's ability to deliver Digital Assets resulting from a Forked Network may depend on Service Providers and other third-party providers that are outside Prime Trust's control. Prime Trust does not own or control any of the protocols that are used in connection with Digital Assets and their related Digital Asset networks, including those resulting from a Forked Network. Accordingly, Prime Trust disclaims all liability relating to such protocols and any change in the value of any Digital Assets (whether on a Forked Network or otherwise), and makes no guarantees regarding the security, functionality, or availability of such protocols or Digital Asset networks. Customer accept all risks associated with the use of the Custodial Services to conduct transactions.

(i) The price and liquidity of Digital Assets have fluctuated substantially in the past and may fluctuate substantially in the future, and such fluctuation may affect the value of Customer's Customer Custody Account, including a total loss of the value of Digital Assets. The value of Customer's Customer Custody Account will be solely dependent upon the performance of Custodial Property.

(j) Digital Assets held in Customer Custody Accounts are not entitled to deposit insurance protection by the FDIC. Digital Assets held in Customer Custody Accounts are not insured by Prime Trust insurance policies and are not entitled to protection afforded to customers under the Securities Investor Protection Act of 1970, as amended.

(k) Subject to Applicable Law, Digital Assets are not legal tender and are not backed by any government.

(l) Changes in Applicable Law may adversely affect the use, transfer, exchange, and value of Custodial Property.

(m) Transactions in Custodial Property may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(n) Some Digital Asset transactions will be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction was initiated.

(o) The value of Digital Assets may be derived from the continued willingness of market participants to exchange Fiat Currencies or Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

(p) There is no assurance that a Person who accepts Digital Assets as payment today will continue to do so in the future.

(q) Due to the volatility and unpredictability of the price of Digital Assets relative to Fiat Currencies, trading and owning Digital Assets may result in significant loss over a short period of time.

(r) The nature of Digital Assets means that technological difficulties experienced by Prime Trust may prevent the access to or use of Customer's Digital Assets. In addition, access to or transfers of Digital Assets may be delayed due to security protocols, time-zone differences, communication technology delays or fails, and/or enhanced internal compliance reviews.

(s) All instructions for the purchase and sale of securities and/or Digital Assets will be executed through one or more broker-dealers or exchanges selected by either Customer or another Authorized Person, or by Prime Trust, as an accommodation (and not in any capacity as a broker-dealer), and Prime Trust is hereby

## Prime Trust

authorized to debit Customer's Customer Custody Account for any Fees associated with such transaction(s) and remit those to the executing party.

(t) With respect to Custodial Assets that are not securities, Customer acknowledges and agrees that: (i) Prime Trust does not have access to every market or exchange which a particular product or financial instrument may be traded and Prime Trust makes no representation regarding the best price execution of any instructions; (ii) other orders may trade ahead of Customer's order and exhaust available volume at a posted price; (iii) exchanges, market makers or other types of sellers or purchasers may fail to honor posted or otherwise agreed-upon prices; (iv) exchanges may reroute customer orders out of automated execution systems for manual handling (in which case, execution may be substantially delayed); (v) system delays by exchanges or third parties executing instructions may prevent Customer's order from being executed, may cause a delay in execution or not to be executed at the best posted price or at all; and (vi) Prime Trust may not promptly or in a timely manner execute Customer order(s) due to internal delays, and Prime Trust makes no representation that its Custodial Services are in any way suitable for active trading or any activity requiring prompt or exact execution. The Customer Custody Account is not a brokerage account. Transactions may be subject to additional Fees and charges by Prime Trust or any Service Provider or exchange.

(u) As between Customer and Prime Trust, Prime Trust owns the Custodial Services and any improvements or modifications to the Custodial Services, and all intellectual property rights therein. All suggestions, comments, feedback, data (including metadata), insights, ideas or know-how, in any form, regarding the Custodial Service (including any of its functionality), including those derived from our monitoring and analysis of Customer's use of the Custodial Service will be the sole property of Prime Trust. To the extent Customer has or obtains any right, title or interest in such feedback, Customer hereby assign to Prime Trust all right, title and interest to such feedback (including any intellectual property rights therein) and agree to perform such further acts as may be reasonably necessary to evidence such assignment.

**3.2**    Customer represents, warrants, and covenants at all times while this Service Schedule is in effect:

(a) if an entity, Customer is validly organized or formed, as applicable, and in good standing in accordance with Applicable Law and has all requisite authority to enter into this Service Schedule and perform its obligations hereunder;

(b) it has all rights, power, and, if an entity, authority necessary to enter into this Service Schedule and perform its obligations hereunder;

(c) its entry into, and performance of its obligations under, this Service Schedule, and Prime Trust's exercise of its rights in accordance with this Service Schedule, will not conflict with, or result in a breach or violation of, any term or provision, or constitute a default under, any agreement by which it is bound or any Applicable Law;

(d) it will comply with all Applicable Law including the BSA and all other Applicable Laws related to AML, KYC, counter-terrorist financing, sanctions requirements, in performing its obligations in accordance with this Service Schedule;

(e) it will: (i) fully satisfy Prime Trust's information requests and other requirements, including those relating to Authorized Persons or Custodial Property, and keep current any provided information; (ii) notify Prime Trust if the Customer  becomes a target of any action, investigation or prosecution related to this Service Schedule, the Custodial Services, or Custodial Property; and (iii) provide Prime Trust full cooperation in connection with any inquiry or investigation of Prime Trust made or conducted by any

## Prime Trust

Regulatory Authority. Prime Trust shall have no obligation to provide the Custodial Services if Customer or any Authorized Person(s) fail to comply with the foregoing to Prime Trust's satisfaction;

(f) the appointment of Prime Trust and the execution of the terms outlined in this Service Schedule by Customer will not violate any Applicable Law;

(g) Customer owns, and will at all times own, all Custodial Property, free and clear of all liens and encumbrances (other than those granted to Prime Trust in accordance with this Service Schedule or as otherwise created by applicable U.S. federal or state securities laws);

(h) neither Customer nor any other Authorized Person is, nor is directly or indirectly owned or controlled by, any person or entity (A) included on the Specially Designated Nationals and Blocked Persons or the Consolidated Sanctions List maintained by OFAC or any similar list maintained by any government entity from time to time, or (B) located, organized, or resident in a country or territory that is the target of sanctions imposed by OFAC or any government entity;

(i) Customer will not, and will not direct or permit its Authorized Persons to, direct the purchase, sale, or transfer of any Custodial Property which is (A) prohibited by Applicable Law, or (B) prohibited by Section 4975 of the Internal Revenue Code;

(j) if an individual, Customer is over the age of 18 and has all personal power or capacity to enter into this Service Schedule and perform its obligations hereunder; and

(k) that all information provided to Prime Trust in accordance with this Service Schedule and Agreement is and will be complete, correct, current, and accurate in all respects. Customer will notify Prime Trust immediately in accordance with the Agreement if any such information, including Customer's email address on file with Prime Trust, is no longer complete, correct, current, and accurate in all respects.

## 4.   ELECTRONIC STATEMENTS

**4.1   Customer Custody Account Statements.** Customer agrees that Prime Trust will make current and prior Customer Custody Account statements available in electronic form only. Customer further agrees to access statements on the websites or applications of third party API integrators that Customer selects and uses. Customer understands and agrees that Prime Trust will not provide Customer hard-copy statements.

**4.2   Customer Custody Account Monitoring**. Customer is responsible for monitoring its Customer Custody Account, including transaction confirmations and Customer Custody Account statements, and reviewing these documents to see that information about Customer's Customer Custody Account is accurate. Customer agrees to review its monthly statements and promptly notify Prime Trust of any unusual or unauthorized activity. Customer will remain responsible for monitoring its Customer Custody Account and reconciling all balances, statements, and activity. Customer agrees to notify Prime Trust immediately in accordance with the Agreement if there is any type of discrepancy or suspicious or unexplained occurrence relating to Customer's Customer Custody Account, including any unauthorized transaction. If Customer fails to notify Prime Trust immediately, Prime Trust will not be liable for any consequences. If, through any error, Customer has received property that is not rightfully the Customer's, Customer agrees to notify Prime Trust and return the property immediately. If Prime Trust identifies an error in connection with property Customer has received from or through Prime Trust and determine it is not rightfully Customer's, Customer agrees that Prime Trust may take action to correct the error, which may include returning such property to the rightful owner.

## 5.   AUTHORITY TO PLEDGE; RIGHT TO SET OFF; LIEN



Except as otherwise provided in this Section 5, Customer may not loan, hypothecate, pledge, or otherwise encumber any Custodial Property. Customer grants Prime Trust a right of set-off against, and lien on and security interest in the Custodial Property for the payment of any Fees and any other amounts due to Prime Trust under and in accordance with this Service Schedule.

## 6.  APPLICATION OF UCC

Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Customer is governed by Article 8 of the UCC and that for the purposes of this Service Schedule: Customer is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes ("**NRS**") 104.8102(h) and (j).

## 7.  BOOKS AND RECORDS

Prime Trust will record on its books and records (including records of receipts, disbursements, and other transactions) all Custodial Property and will segregate Customer's Custodial Property from the Custodial Property of any other Customer, person, or entity, unless otherwise specified in an Authorized Instruction. Prime Trust will hold such records in accordance with Applicable Law. Upon commercially reasonable notice by Customer, Prime Trust will provide Customer copies of the books and records pertaining to Customer that are in the possession or under the control of Prime Trust.

## 8.  FEES

**8.1**   Customer will pay Prime Trust the Fees, if any, in connection with the Custodial Services as set forth in the applicable Order Form.

## 9.  TERM AND TERMINATION

**9.1**   This Service Schedule is effective as of the revision date set forth above and may be amended or modified only by Prime Trust, or with the written agreement from the Prime Trust. Such amendments or modifications shall be effective on the 30th day after Customer receives notice of such revision electronically via the email address on the records of Prime Trust.

**9.2**   **Obligations and Rights upon Termination or Expiration.**

(a) **Return of Custodial Property**. Upon termination or expiration of this Service Schedule or the Agreement, Customer will provide Authorized Instructions regarding the disbursement of Customer's Custodial Property and Prime Trust will, subject to Applicable Law, deliver Customer's Custodial Property in accordance with the Authorized Instructions. A Digital Asset will be deemed to have been delivered to Customer when a transfer of the Digital Asset initiated by Prime Trust has received a reasonable number of confirmations on the relevant Blockchain, or an alternative method has been mutually agreed between Prime Trust and Customer. To the extent Customer is unable to transfer Digital Assets out of the Customer Custody Account due to insufficient gas or network fees necessary for the transfer, Customer agrees to and abandons and forfeits any claims to such Digital Assets upon closure of the Customer Custody Account. Upon termination or expiration of this Service Schedule or the Agreement, Prime Trust will deliver other Custodial Property to Customer as soon as practicable or, at Customer's request, to a successor custodian. Customer acknowledges that Custodial Property, if any, held in Prime Trust's name requires a reasonable amount of time to be delivered. Upon delivery of Custodial Property, Prime Trust's responsibility under this Service Schedule ceases.

Prime Trust

(b) **Death or Incompetency of Customer**. Upon the death or incompetency of Customer, Prime Trust will continue to hold Custodial Property until such time Prime Trust receives instructions from Customer's executor, trustee, administrator, guardian, or person holding a valid power of attorney in accordance with the probate process or otherwise in accordance with Applicable Law and has received advice of its legal counsel to transfer such Custodial Property (which costs will be borne by Customer). In the event that no beneficiaries claim the Customer Custody Account, then the assets may be preserved in the Customer Custody Account for so long as possible, until a beneficiary makes itself known or until the Custodial Property may be subject to escheat, as set forth in Section 9.2(c) below.

(c) **Escheat**. Customer acknowledges that, in accordance with Applicable Law, Custodial Property that is presumed abandoned, including following termination or expiration of this Service Schedule, may under certain circumstances escheat to the government of the applicable jurisdiction. Prime Trust will have no liability to Customer, its heirs, legal representatives, or successors and assigns, or any other person in connection with any Custodial Property that escheats by operation of law.

## 10.  TAXES

**10.1    Responsibility for Taxes**. Customer will be liable for any Taxes relating to any Custodial Property held on behalf of Customer or any transaction related thereto, which are Customer's sole obligation to remit, unless otherwise mandated by Applicable Law. Customer will remit to Prime Trust the amount of any Taxes that Prime Trust is required by Applicable Laws (whether by assessment or otherwise) to pay on behalf of Customer, or in respect of activity in the Customer Custody Account of Customer. In the event that Prime Trust is required by Applicable Law to pay any Taxes on behalf of Customer, Customer will promptly transfer to Prime Trust the amount necessary to pay the Taxes.

**10.2    Substitute Internal Revenue Service of the U.S. Department of the Treasury ("IRS") Form W-9.** Under penalties of perjury, Customer certifies that: (i) the tax identification number provided to Prime Trust by Customer is the correct and current taxpayer identification number for Customer; and (ii) Customer is not subject to backup withholding because: (a) Customer is exempt from backup withholding; or (b) Customer has not been notified by the IRS that it is subject to backup withholding. Customer agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Customer is subject to backup withholding. Customer acknowledges that failing to provide accurate information may result in civil penalties.

## 11.  DISCLAIMERS

**11.1    **The Parties acknowledge and agree that Prime Trust has no obligation to inquire into, and will not be liable for any damages or other liabilities or harm to any person or entity relating to: (a) the ownership, validity or genuineness of any Custodial Property; (b) the authority of any Authorized Person to act on behalf of Customer with respect to Custodial Property; (c) the accuracy or completeness of any information provided by Customer or any other Authorized Person with respect to a Custodial Property or an Authorized Instruction; or (d) the collectability, insurability, effectiveness, marketability, or suitability of any Custodial Property. Customer additionally understands and agrees that Prime Trust must follow the directions of Customer, and is considered by this Service Schedule to be a "directed fiduciary" in accordance with NRS 163.5548 and will be released and held harmless for following the directions of Customer in accordance with NRS 163.5549.  Customer understands and agrees that Customer is considered by this Service Schedule to be a "Directing Trust Adviser" in accordance with NRS 163.5536 and has the authority to give directives to Prime Trust that must be followed by Prime Trust.

## 12.  LIMITATION OF LIABILITY



**12.1    Exception to Limitations of Liability for Custodial Services**. THE LIMITATION OF LIABILITY IN SECTION 11.2 OF THE MSA SHALL APPLY TO LIABILITY ARISING OUT OF ANY ACTION TAKEN OR OMITTED BY PRIME TRUST IN GOOD FAITH UNLESS THE LIABILITY IS A RESULT OF PRIME TRUST'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN EACH CASE AS DETERMINED BY A COURT OF COMPETENT JURISDICTION, AND IN SUCH EVENT PRIME TRUST'S SOLE RESPONSIBILITY SHALL BE FOR THE HOLDING AND DISBURSEMENT OF THE CUSTODIAL PROPERTY IN ACCORDANCE WITH THE TERMS OF THIS SERVICE SCHEDULE.

## 13.    INDEMNIFICATION

**13.1**    In addition to the indemnification obligations set forth in the Agreement, Customer hereby agrees to defend, indemnify and hold harmless the Prime Trust Indemnified Parties from and against any and all claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and attorneys' fees, costs, and expenses), which Prime Trust may suffer arising out of or relating to: (a) this Service Schedule; (b) any breach, action, or regulatory investigation arising from Customer's failure to comply with Applicable Law and/or arising out of any alleged misrepresentation, misstatement, omission of fact, or inaccuracy in the representations and warranties and/or in Customer's interactions with Prime Trust, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Customer contained in this Service Schedule or in any certificate or document delivered by Customer or any Authorized Person(s) or other agent(s) or in any Authorized Instruction in accordance with any of the provisions of this Service Schedule; (c) any breach, action or regulatory investigation arising from Customer's failure to comply with any state blue sky laws or other applicable securities laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Customer's offering memoranda, general solicitation, advertisements and/or other offering documents; (d) any obligation which is expressly the responsibility of Customer in accordance with this Service Schedule; (e) any loss or damage to any third party, direct or consequential, arising out of or in any way related to acts or omissions of Prime Trust relating to the Custodial Services; (f) any damages or claims resulting from equipment, software, or network malfunctions or interruptions outside of any Prime Trust's control; or (g) any misuse of the Custodial Services by an Authorized Person or through an Authorized Instruction.

**13.2    Limitation on Prime Trust's Duty to Litigate**. Without limiting the foregoing, Prime Trust will not be under any obligation to defend any legal action or engage in any other legal proceedings with respect to the Customer Custody Account or any property of the Customer Custody Account unless Prime Trust is indemnified to Prime Trust's satisfaction. Notwithstanding anything in this Service Schedule, Prime Trust is authorized and empowered to consult with its counsel of its choice in reference to the Customer Custody Account and to retain counsel and appear in any action, suit, or other proceeding affecting the Customer Custody Account or any of the property of the Customer Custody Account. All fees and expenses so incurred will be for the Customer Custody Account and shall be charged to the Customer Custody Account.

**13.2    Third-Party Claims**.  Customer agrees to bear sole responsibility for the prosecution, defense, or enforcement of any judgment, including the employment of legal counsel, of any and all legal actions or suits involving the Customer Custody Account, which may arise or become necessary for the protection of the investments in that Customer Custody Account, including any actions lodged against the Prime Trust Indemnified Parties. However, Prime Trust, in its sole discretion, may, upon notice to Customer, participate in, or assume and control, the prosecution or defense, or enforcement of any judgment of such legal actions or suits, at Customer's expense.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust,[2] | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-      (JKS) |
| One World Services LLC and OWS Brasil Intermediacao LTDA, | |
| Defendants. | |

## DECLARATION OF JAMES P. BRENNAN

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

I.    **My Background**

1.    I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes, and asset-tracing and recovery. I have experience in forensic accounting and investigations in fiat and cryptocurrency.

---

[1]  The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]  PCT Litigation Trust ("Plaintiff" or "PCT") was established for the primary purpose of pursuing litigation and distributing assets. PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

2.      I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3.      Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4.      I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.      A copy of my resume is attached hereto as **Exhibit 1**.

6.      I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.      I am routinely retained to perform analyses of information related to financial crimes, which include forensic investigations and flow-of-funds analyses related to crypto digital wallet addresses and fiat bank accounts.

8.      I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9.      I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. Bankruptcy Courts.

-2-

10.     I submit this Declaration in support of PCT's complaint against One World Services LLC and OWS Brasil Intermediacao LTDA ("One World").

11.     In connection with this Declaration, I reviewed testimony from former Prime executives and employees.

12.     I also reviewed Prime's bank account information at various financial institutions, including BMO Harris ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"), Prime's Internal Ledger (the "Internal Ledger"), API Log audit data, bank statement data, and blockchain data.

13.     Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and employees, Wind-Down Debtor, the Plan Administrator, and/or the Plan Administrator's professionals; or (ii) my review of relevant documents.

14.     Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

15.     The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after this Declaration is executed, including, among other things, additional data, facts, and information that becomes available in the public domain or that is made available by the Wind-Down Debtor, the Plan Administrator, or other parties during discovery or otherwise.

## II.    Background on Crypto

16.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

17.    All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

18.    There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

19.    Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique Ethereum digital addresses, which are derived from public keys. These Ethereum digital addresses are 40-character

-4-

hexadecimal strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these digital addresses, including any time crypto is traded or any time a smart contract is used.

20.     Similarly, on the Bitcoin blockchain, digital wallets and their respective holdings are identifiable to the public by unique Bitcoin digital addresses, which are derived from public keys. Bitcoin digital addresses are shorter, hashed versions of public keys, which are digital addresses with long alphanumeric strings.

21.     "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain wallet.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used simply to identify a digital address—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

22.     Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

23.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures" to access and transact with the crypto stored on the digital wallet.

24.     Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain.  The exact amount of gas fees for a particular transaction can fluctuate based on factors

such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

25.     However, on the Bitcoin blockchain, these are referred to simply as "transaction fees." Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."[3]  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain.  Similar to gas fees in the case of ETH, the exact price of the transaction fee for a particular Bitcoin transaction can fluctuate based on factors such as the size of the transaction (in terms of bytes), supply, demand, and network activity at the time the transaction is made.

26.     Furthermore, a key distinction in how transaction fees are determined on the Bitcoin network compared to other blockchains is the protocol's Unspent Transaction Output ("UTXO") model.[4]  While other blockchains such as Ethereum utilize an account-based system, where digital wallet balances are adjusted based on transaction activity, Bitcoin's system is often compared to physical cash because the "input"[5] for a Bitcoin transaction is typically compiled of various UTXOs (representing various amounts of BTC) that it previously received.  If the value of the UTXO is not the exact equivalent of the desired amount, "change" is then sent back to the sender in the form of a new UTXO.[6]

---

[3]  *See* FIDELITY DIGITAL ASSETS, "Bitcoin and Ethereum Fees Explained," *available at*: https://www.fidelitydigitalassets.com/research-and-insights/bitcoin-and-ethereum-fees-explained.

[4]  A UTXO is the "unspent" amount of BTC or "change" that is left over from a digital wallet sending BTC to another digital wallet.

[5]  An "input" is the amount of BTC being sent from a digital wallet to another digital wallet.

[6]  *See* KRAKEN, "What is a Bitcoin unspent transaction output (UTXO)?", *available at*: https://www.kraken.com/learn/what-is-bitcoin-unspent-transaction-output-utxo.



27.     The number of UTXOs (representing various amounts of BTC) in a transaction impacts its data size, and this in turn is reflected in the transaction fee.  The more UTXOs (representing various amounts of BTC) required to complete the transaction, the higher the cost of processing it will be.[7]  This is because transaction fees are calculated by a certain number of satoshis[8] (0.00000001 BTC) per byte of data.[9]  Oftentimes, sophisticated traders or entities will consolidate their UTXOs (representing various amounts of BTC) by sending funds to themselves during off-peak hours, to reduce the transaction fee for when they send the funds outward in the future.

## III.    Prime's Crypto Commingling

28.     Prime did not maintain separate or segregated digital wallets for crypto that its customers transferred to Prime.  Rather, Prime held and commingled the crypto transferred by its

---

[7]     *See* RIVER, "Bitcoin's UTXO Model: What Is It and How to Manage UTXOs", *available at*: https://river.com/learn/bitcoins-utxo-model/.

[8]     A satoshi is the smallest unit of Bitcoin and essentially measures the size of the transaction.

[9]     *See* BITSTAMP, "How are BTC transaction fees determined?", *available at*: https://www.bitstamp.net/learn/blockchain/how-are-btc-transaction-fees-determined/.

various customers in omnibus digital wallets ("Omnibus Digital Wallets"), where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

29.     The shared Omnibus Digital Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[10]  Prime used Vaults within its Fireblocks infrastructure to organize digital wallets (including the Omnibus Digital Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

30.     Each Prime customer was provided with its own unique deposit digital wallet address ("Deposit Digital Address") in order to transfer crypto to Prime.

31.     Prime would periodically "sweep," in other words, collect, all of the crypto that had been transferred to Deposit Digital Addresses and then transfer that crypto to one or more of the shared Omnibus Digital Wallets controlled by Prime.   This "sweeping" or collection process commingled the crypto that various customers transferred to Prime.

32.     Prime utilized inconsistent methods for sweeping Deposit Digital Addresses.  Prime maintained an application that could trigger a sweep based on certain events occurring such as a withdrawal request.  A Prime employee also could manually perform a sweep at any given time.

33.     Prime regularly transferred crypto between its Omnibus Digital Wallets, further commingling the crypto that customers transferred to Prime.  It does not appear that Prime used a consistent or defined process for transfers between its Omnibus Digital Wallets.

---

[10]   Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto.  Prime used Fireblocks to hold and manage its crypto.  "Vaults" are storage solutions for crypto that group multiple digital wallets in a single, central location.  "Vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within a Vault.

34.    Since Prime did not maintain segregated digital wallets for each of its customers and the crypto at Prime was commingled (similar to fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers.

35.    Prime would credit a customer's balance on its Internal Ledger for any crypto that a customer sent to Prime through its unique Deposit Digital Address.  The Internal Ledger did not (and could not) track which of the Omnibus Digital Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto other customers had transferred to Prime as well as with Prime's own crypto within and across multiple Omnibus Digital Wallets.

36.    Prime implemented various mechanisms to minimize transaction fees paid on crypto transfers.  For example, Prime implemented a Gas Station mechanism to reduce the payment of gas fees on the Ethereum blockchain by consolidating ETH, USD Coin ("USDC"), or Tether ("USDT") transactions, respectively.   In doing so, the transfer of ETH, USDC, or USDT between various Deposit Digital Addresses, Prime Omnibus Digital Wallets, and Prime Gas Station Wallets further commingled the crypto held at Prime.

37.    Likewise, for BTC transactions, Prime minimized transaction fees by sweeping UTXOs (representing various amounts of BTC) into the transaction, also resulting in further commingling crypto when Prime transferred BTC between various Deposit Digital Addresses and Prime Omnibus Digital Wallets.

38.    Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and deficient record keeping are red flags of potential fraud.   At a minimum, it demonstrates poor asset management and suggests that Prime was moving crypto around

to manage customers' outgoing transfer requests or Prime's own needs without consideration of the ultimate negative impact such management had on the business overall.

39.     Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Digital Wallets.

40.     When a customer requested to transfer crypto from Prime, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the transfer request.  Prime then checked its multiple Omnibus Digital Wallets to determine which one(s) held sufficient crypto to satisfy the customer's transfer request.  Prime would then transfer crypto from an Omnibus Digital Wallet(s) with sufficient crypto to the customer. Prime did not transfer crypto to the customer from the original Deposit Digital Address the customer had used to transfer crypto to Prime, or even necessarily from the original Omnibus Digital Wallet(s) where that customer's crypto had initially been swept.  In other words, the crypto Prime would send to a customer to satisfy an outgoing transfer request was not the same crypto that the customer had originally sent to Prime.

41.     Based on my review of Prime's company records, such as the Internal Ledger, and blockchain data, I have identified several illustrative examples of the crypto commingling that occurred at Prime.  The diagrams in this Declaration feature specific relevant examples to illustrate the concepts discussed in the Declaration and do not reflect the full scope of all of the blockchain activity in each diagram.  These examples are described below.

### A.     Prime Omnibus Digital Wallet ~b2ea (ETH Example)

42.     One Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~b2ea (the "~b2ea Wallet").

43.     Like Prime's other Omnibus Digital Wallets, the ~b2ea Wallet received crypto from Deposit Digital Addresses through the periodic sweeps that Prime conducted.

44.     The diagram[11] below (based on blockchain data) depicts three different Prime customers transferring crypto into different Deposit Digital Addresses at Prime, and Prime sweeping the crypto from the Deposit Digital Addresses into its omnibus ~b2ea Wallet:



45.     Thus, as demonstrated above, the ~b2ea Wallet (like all of Prime's Omnibus Digital Wallets) contained commingled crypto transferred to Prime by various customers.

46.     Another example of incoming transfers that the ~b2ea Wallet received were transfers from a different Prime digital wallet that Prime referred to as the "PT Segregated Assets" wallet ("PT Segregated Assets Wallet").

47.     The PT Segregated Assets Wallet was intended to keep Prime's corporate crypto separated from the crypto transferred to Prime by its customers, which would have been proper practice.  However, in practice, this segregation did not actually occur.  The PT Segregated Assets

---

11     In the diagrams in the ▮▮▮▮▮▮▮▮, all digital wallets and Deposit Digital Addresses are referred to by the last four digits of their digital addresses.

Wallet contained crypto transferred from a Prime Omnibus Digital Wallet, which itself contained crypto transferred to Prime by thousands of customers via Deposit Digital Addresses.

48.     Despite its internal label "PT Segregated Assets", I observed that ETH was transferred from the PT Segregated Assets Wallet to the omnibus ~b2ea Wallet which contained commingled crypto transferred to Prime by various customers.  For example, in March 2022, the PT Segregated Assets Wallet transferred 194 ETH to the ~b2ea Wallet.

49.     The diagram below illustrates how crypto transferred to Prime by Customer A was subsequently commingled in the ~b2ea Wallet with crypto from the PT Segregated Assets Wallet. The same ~b2ea Wallet was then used to satisfy outgoing transfer requests of other Prime customers, including Customer B and Customer C.  Therefore, in this example, the outgoing crypto transfers to Customer B and Customer C may have included some of the crypto transferred by Customer A along with crypto from other customers who had transferred crypto to the ~b2ea Wallet.



50.     Similarly, the diagram below provides an example of how five different Prime Omnibus Digital Wallets transferred crypto amongst one another in a manner that appears entirely arbitrary and haphazard.



51.     In my experience, it is uncommon for such a high volume of transfers to occur amongst digital wallets controlled by a single entity.  I have been unable to ascertain a business purpose or rationale for the frequent transfers of crypto that Prime conducted between its different Omnibus Digital Wallets.

52.     The extensive commingling of crypto in Omnibus Digital Wallets at Prime makes it impossible to specifically attribute any crypto to a particular customer.

**B.     Prime Omnibus Digital Wallet ~73ck Illustration (BTC Example)**

53.     Another Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~73ck (the "~73ck Wallet").

54.     This omnibus ~73ck Wallet was used for BTC transactions and held BTC transferred to Prime from numerous customers as well as BTC transferred into the ~73ck Wallet from other Prime Omnibus Digital Wallets, which in turn also held BTC transferred to Prime by multiple

customers and BTC transferred from other Prime Omnibus Digital Wallets.  This resulted in extensive

commingling of BTC within Prime's Omnibus Digital Wallets, as reflected in the diagram below.



55.    I have been unable to ascertain a business purpose or rationale for the frequent

transfers of BTC between Prime's different Omnibus Digital Wallets.

### C.    Prime Omnibus Digital Wallet – ~df94 (USDT Example)

56.    ETH is also used to pay gas fees associated with USDT transactions, which were other

types of crypto transactions that caused further commingling of crypto transferred to Prime by

customers.

57.    The diagram below illustrates a customer transaction involving USDT.  The customer

("Customer A") purchased USDT on a crypto exchange and then transferred USDT to a Deposit

Digital Address at Prime.  The USDT was then swept into one of Prime's Omnibus Digital Wallets with the digital address ending in ~df94 (the "~df94 Wallet") where it was immediately commingled with USDT that had been transferred to Prime by other customers.  Since USDT transactions occur on the Ethereum blockchain, ETH is needed to pay the gas fee to transfer the USDT from the Deposit Digital Address into the Omnibus Digital Wallet.  In this scenario, ETH from Prime's Omnibus Digital Wallet is used to cover the gas fees.  Since Customer A is only transacting in USDT, the ETH required for the transaction must be supplied from other ETH already held in the ~df94 Wallet.



58.     As a result, in this example, not only is the USDT that Customer A transferred to Prime commingled in the ~df94 Wallet, but also the ETH that was used to pay for the gas fees was commingled ETH, which further commingled the crypto at Prime.

59.     This example demonstrates how transactions involving USDT resulted in commingled USDT as well as further commingled ETH, making it practically impossible to differentiate between USDT transferred to Prime by one customer as compared to another Prime customer.

### D.     Prime's Crypto Transaction Fees

60.     Based on my experience, Prime likely performed sweeps of each crypto type from the Deposit Digital Addresses into Omnibus Digital Wallets to pool crypto together to create certain efficiencies.

61.     Crypto transfers between different Prime's Vaults within Fireblocks occur on-chain, meaning that Prime would have to incur transaction fees when transferring crypto between Vaults at Fireblocks.

62.     To avoid transaction fees, Prime could simply adjust crypto entries on its Internal Ledger to avoid conducting any actual transactions on the blockchain, which would have otherwise incurred transaction fees.  By doing this, the crypto would technically remain in the same original Omnibus Digital Wallet, but the Internal Ledger would now attribute a new value to the customer.

63.     To reduce transaction fees that could not be avoided entirely through Internal Ledger entries, Prime could pool transactions and perform them during off-peak hours when the blockchain network was less congested and thus less expensive.  Thus, by pooling and commingling crypto into Omnibus Digital Wallets, Prime was able to reduce transaction fees.

### i.    *BTC Transaction Fees*

64.    When a customer requested a transfer of BTC from Prime, a fee would be incurred since the transaction would occur on-chain.  Prime minimized these fees by sweeping UTXOs (representing various remaining amounts of BTC) from other customer Deposit Digital Addresses into the same transaction.  Therefore, Prime satisfied a BTC transfer request by transferring crypto to a customer that had been transferred to Prime by other customers.

65.    The diagram below provides an example of a transaction in which BTC transferred from Prime Omnibus Digital Wallet with a digital address ending in ~vk39 (represented by the green node below) (the "~vk39 Wallet"), as well as BTC transferred to Prime from six unique customers (each represented by different color nodes below) using multiple Deposit Digital Addresses, were swept together into a single transaction.  In this example, Customer A (represented by the yellow node below) requested a transfer of 16.56 BTC.  Prime swept UTXOs (representing various remaining amounts of BTC) from eleven Deposit Digital Addresses into the transaction, as reflected by the black diamond below which serves as a central point at which the UTXOs were aggregated and swept into the transaction.  Customer A received 16.56 BTC as requested, and the remaining BTC left over from the transaction became a single UTXO which was sent back to a Prime Omnibus Digital Wallet.  The combination of transactions reduced transaction fees for the next outgoing transfer request because twelve UTXOs (representing various amounts of BTC) from eleven Deposit Digital Addresses and one Prime Omnibus Digital Wallet were combined.



66.      In this single transaction depicted above and reflected in the chart below, although Prime swept BTC transferred from six different customers and the ~vk39 Wallet (totaling 12 UTXO amounts), only two digital wallets received BTC in this transaction: Customer A received 16.56 BTC to an external digital wallet ending in ~p2wu and Prime received the remaining 0.699 BTC to the ~vk39 Wallet, which is now one UTXO.

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.002 | 1 | 16.561 | 1 |
| Customer B | 0.0569 | 3 | 0 | 0 |
| Customer C | 0.0007 | 1 | 0 | 0 |
| Customer D | 2.9011 | 2 | 0 | 0 |
| Customer E | 0.1921 | 3 | 0 | 0 |
| Customer F | 5.5 | 1 | 0 | 0 |
| Prime Omnibus Digital Wallet ~vk39 | 8.6079 | 1 | 0.6997 | 1 |
| **Total** | **17.2607** | **12** | **17.2607** | **2** |

67.     As a result, the single UTXO remaining in the ~vk39 Wallet contained a combination of BTC transferred from six different customers in addition to BTC transferred from the ~vk39 Wallet.   Accordingly, for subsequent transactions involving the ~vk39 Wallet, it is practically impossible to distinguish which digital wallet the remaining 0.699 BTC originated from.

This example demonstrates how in a single transaction, BTC that Customer A transferred to Prime was commingled in a single transaction.  Prime conducted over one million BTC transactions, and therefore, commingled BTC extensively, rendering it impossible to differentiate between the BTC that each customer transferred to Prime from other BTC

### ii.     ETH Gas Fees (for ETH, USDT, and USDC Transactions)

68.     Similar to transfers of BTC between Prime's Vaults within Fireblocks, transfers of ETH, USDT, or USDC between Prime's Vaults within Fireblocks also occur on-chain.  Prime thus incurred gas fees when transferring ETH, USDT, or USDC between Vaults at Fireblocks.  Prime incurred ETH gas fees when transferring USDT and USDC because ETH is needed to pay for gas fees to transfer USDT and USDC on the Ethereum blockchain.

69.     Gas fees can be reduced by pooling transactions and performing them during off-peak hours when the blockchain network is less congested.  Thus, by pooling crypto in Omnibus Digital Wallets in Prime's Vaults at Fireblocks, Prime was able to conduct grouped transactions for the purpose of incurring reduced gas fees.

70.     To help pay for these gas fees, Prime set up additional digital wallets which it referred to collectively as "gas stations" ("Gas Stations").  Prime funded the Gas Stations from its other digital wallets (including Prime Omnibus Digital Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.

71.     Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to Prime by its various customers with Prime's own crypto.

72.     Within Prime's Fireblocks infrastructure, I have identified two Gas Stations (represented by the two bright green nodes in the below diagram):

(i)     Prime Gas Station ~6898

(ii)    Prime Gas Station ~575d

73.     These Gas Stations received ETH transferred from Prime's Omnibus Digital Wallets (represented by the green nodes at the top of the below diagram), customers' external digital wallets (represented by the pink, blue, red and yellow nodes in the below diagram), as well as several external digital wallets that do not appear to be attributable to Prime or its customers (represented by the gray nodes in the below diagram).



74.     I also have observed instances where Prime's operations personnel used fiat from one of Prime's commingled bank accounts to purchase ETH to refill the Gas Stations.

75.     For example, on April 26, 2022, a former Prime operations team employee submitted a request form for $4,290 "to purchase 1.5 ETH to refill the gas station" (the "April 26, 2022 Request

Form"), as shown below.  The April 26, 2022 Request Form sought to transfer funds from one Santander bank account, with the account name "Prime Trust Operating Account," to a different Signature bank account, with an account name "T&C WIRE Clearing."  Based on my review of bank records, this Signature bank account held commingled fiat transferred to Prime by customers and, as demonstrated by this request, also held fiat used for Prime's operations.



76.     The April 26, 2022 Request Form asked if the transfer required a "ledger update".  The Prime employee who completed the April 26, 2022 Request Form indicated "No", which indicates that the internal transfer of fiat between operating and customer bank accounts would not be recorded in Prime's Internal Ledger.

77.     The Gas Stations were funded by Prime's operational fiat, ETH from commingled Omnibus Digital Wallets (including the ~b2ea Wallet described above), ETH transferred by customers from external digital wallets, as well as ETH transferred by other external digital wallets.

78.     In several instances, the amount of ETH sent to Deposit Digital Addresses exceeded the amount of ETH required to pay the gas fees.  In those scenarios, Prime would either leave the excess ETH in the Deposit Digital Addresses to pay the gas fees for future crypto transfers or, in some instances, would send the excess amount of ETH back to the Omnibus Digital Wallets.

79.     As a result, Prime's operational crypto was commingled with crypto transferred to Prime by customers.

## IV.     Prime's Fiat Commingling

80.     Prime held and commingled fiat that customers transferred to it in omnibus bank accounts along with fiat transferred to it by thousands of Prime's other customers and fiat Prime generated from its business operations.

81.     Since fiat that customers transferred to Prime was commingled with fiat from other customers and fiat Prime generated from its business operations, Prime was forced to rely on its internal ledger (the "Internal Ledger") to keep track of transactions to identify how much Prime owed each of its customers.[12]  I was provided and reviewed Internal Ledger data.

82.     Prime also transferred funds between bank accounts that contained fiat transferred to Prime from customers and bank accounts that primarily contained fiat Prime generated from Prime's business activities.  These internal transfers further commingled fiat.

83.     According to the Internal Ledger, bank account statements, and bank reconciliation files I reviewed, Prime regularly made internal transfers between Prime's bank accounts.  Prime would move funds between its different bank accounts, regardless of the source of funds, on an as-needed basis to satisfy wire and Automated Clearing House ("ACH") requests.

---

[12]     Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████████."), 89: 19–25.

-22-

84.     Prime had numerous bank accounts at different banks depending on the time period. Based on my review of the bank statements, during a given period, certain bank accounts were primarily used depending on the type of transaction.  For example, Prime predominantly used one omnibus bank account at BMO ("BMO x3077"), for incoming and outgoing wire transfers during 2023.

85.     BMO x3077 contained commingled funds that had been transferred to it from Prime's other bank accounts as well as directly from Prime customers.

86.     A large volume of debits and credits occurred almost daily to and from BMO x3077. However, Prime's bank statements for BMO x3077 only include reference numbers regarding the movement of funds into or out of that account.  There are no other details within the bank statements. This makes it difficult to determine who was transferring funds into Prime and the recipients of outbound transfers.

87.     Prime also would regularly make internal transfers from BMO x3077 into a different omnibus bank account at BMO ("BMO x9934") to earn a higher rate of interest.  Most of the unused funds left in BMO x3077 at the end of each day would be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.  Transfers between the bank accounts were described in Prime's bank statements as "PC Transfers".

88.     It appears that the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred into BMO x9934 from the commingled BMO x3077 account. BMO x9934 also contained some funds that had been transferred into it from other commingled bank accounts held by Prime, such as CRB and Signature bank accounts.

-23-

89.     These CRB and Signature bank accounts operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers.

90.     For instance, "CRB x9892"  and "CRB x4453" were  omnibus bank accounts at CRB utilized by Prime.   These accounts were used primarily for internal transfers and payments via automated clearing house ("ACH").   Thus, during 2023, it appears that Prime primarily utilized either BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH.

91.     Due to the extensive commingling of funds within Prime's omnibus bank accounts, the funds held within these omnibus bank accounts cannot be attributed to specific customer deposits or withdrawals.

92.     Prime bank statements reflect the movement of funds between Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred.

93.     Transfers between Prime accounts usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  This suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity. This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.

94.     Based on my experience, numerous internal transfers amongst bank accounts without accurate recordkeeping can be indicative of fraud.  It also can suggest that an entity is facing cash shortfalls and is moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.

## V.   Prime's Inadequate Reconciliation Processes

95.   According to Prime's records and sworn testimony from former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[13]

96.   Reconciliation processes are critical internal controls.  They enable companies to identify potential errors or fraud so that their books and records are accurate.  They also permit companies to validate the amount of cash that the company holds.  Reconciliation processes typically consist of comparing transactions or other financial activities between the company's internal records and the bank records to verify the data and the proper amounts of account balances.

97.   For Prime's fiat, reconciliation processes generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger during a given time period with the bank account activity during that same time period.

98.   ███████ ("███████"), Prime's former SVP of Operations and Reconciliations, largely designed Prime's reconciliations processes.  ███████ explained:

> Q:   Okay.  And when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?
>
> A:   Prime Trust did not have reconciliation tools, essentially.   So my responsibility was in kind of designing the reconciliation tools.
>
> Q:   What's a reconciliation tool?
>
> A:   Somebody makes a request for a transaction: How can you basically reconcile that it occurred.  If that makes sense.
>
> Q:   Can you—can you expand a little bit?  So a customer says, I want to buy Bitcoin?

---

[13]   *See* Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "███ Dep."), 19:23 - 20:13.

A:    Yeah.  So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account. Can you confirm that it was received on the Ledger.

Q:    Okay.  So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

A:    In a way, yeah.  So it was assuming that if we had assets displayed, you know, do we actually have them.[14]

99.    ██████████ ("██████████"), Prime's former Chief of Regulatory Affairs, described "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held.  When I say assets, I'm talking about Fiat."[15]

100.    Both ██████████ and ██████████ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

101.    ██████████ testified: "Reconciliations were not being done in a timely manner."[16]

102.    ██████████ discussed Prime's reconciliations process both before and after March 2021:

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated . . .

. . .

Q:    Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?

A:    Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building

---

[14]    ██ Dep., 18:3–19:7.

[15]    ██., 16:4–9.

[16]    Id. at 38: 23–24.

it, and there were teams that were brought on to essentially do the reconciliation.[17]

103.    For crypto, Prime's reconciliation processes were in the beginning stages of being developed in early 2022 and generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger and Prime's Fireblocks environment.

104.    I also reviewed internal Prime communications concerning commingling of fiat and crypto as well as asset reconciliation.

105.    For example, on December 17, 2022, ████████ ("████████"), Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("Nevada FID") request for information regarding Prime's statement that it "invested in additional Ether[e]um using fiat currency from its omnibus accounts."[18]   Specifically, Nevada FID requested that Prime "[p]lease provide a list of clients impacted from the investment and which omnibus accounts were utilized."[19]

106.    On December 19, 2022, ████████ responded: "Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger?  If so, I don't believe any specific bank accounts were used, *as management considered all funds tangible in our omnibus model*.  In their decision, no bank movements were needed/done before the credits were requested to the ledger."[20]

---

[17]    ████ Dep., 19:25–20:5; 21:14–22:2.

[18]    ████ Dep., Ex. 28 (internal quotations omitted).

[19]    *Id.*

[20]    *Id.*

107.    On December 28, 2022, ███████████, former SVP and Head of Banking and Trust Operations, responded: "███████, and I met today.  We are in agreement that we are not able to specify what customer is out of the funds due to our omnibus structure."[21]

108.    Given the above testimony from former executives, it is clear that Prime did not perform regular or timely reconciliations, which demonstrates that Prime lacked critical internal controls.  Based on my experience, without such internal controls, companies cannot readily identify potential errors or fraud to verify and ensure that their data and records are accurate.  Therefore, Prime did not have adequate safeguards or processes in place to validate the amount of fiat and crypto that the company held and accurately attribute the proper balances to Prime customers.

## VI.    The 98f Wallet Caused Further Commingling of Fiat and Crypto

109.    The most notable example of Prime's commingling of both fiat and crypto and its failure to reconcile its Internal Ledger was when Prime used fiat transferred to it by its customers to make purchases of ETH to replace ETH that was locked in an inaccessible "multi-sig" digital wallet (the "98f Wallet").[22]

110.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer from Prime of 5,867.71 ETH (worth approximately $24,000,000.00 at the time[23]).  At this time, Prime realized that Abra had been

---

[21]    *Id.*

[22]    A "multi-sig" digital wallet requires digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

[23]    Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

transferring ETH into a forwarder digital wallet[24], which automatically had been forwarding the ETH into the inaccessible 98f Wallet.

111.    By December 2021, Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000.00 at the time[25]) into the 98f Wallet.

112.    Prime decided to satisfy Abra's December 2021 (and subsequent) ETH transfer requests by using fiat transferred to Prime by other customers to purchase replacement ETH from one of Prime's liquidity providers ("Liquidity Provider").

113.    Regarding this decision to use commingled fiat to purchase replacement ETH from Liquidity Provider, ████████ ("████████"), Prime's former Chief Operating Officer, testified as follows:

> Q:    So [Customer is] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?

---

[24]  A "forwarder digital wallet" is a type of digital wallet that automatically sends crypto that the digital wallet receives to another digital wallet.  This is often used by businesses to enhance security and streamline operations.

[25]  Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

A:      Funds from the fiat account.  Fiat omnibus account.  Is my understanding.
Once again, ▮▮▮ would know specifically.[26]

114.    Abra continued to request ETH transfers, meanwhile the ETH in the 98f Wallet remained inaccessible.  Between December 23, 2021 and March 30, 2022, Abra requested that Prime transfer a total of 48,034.57 ETH (worth approximately $145,000,000.00 at the time[27]).  Prime continued to use commingled fiat to purchase replacement ETH from Liquidity Provider.  During that same period, Prime recorded ten different wires to Liquidity Provider's account, which purportedly represented new fiat transferred into Liquidity Provider's account to cover the ETH purchased from Liquidity Provider, as shown in the table below.

| Date | USD Internal Ledger "Wire" Transfer[28] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250.00 |
| 1/6/2022 | $2,778,400 | 800.00 |
| 1/6/2022 | $7,293,300 | 2,100.00 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800.00 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000.00 |
| 3/29/2022 | $7,902,800 | 2,300.00 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

---

[26]    Deposition of ▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▮▮▮▮▮."), 92:25–93:18.

[27]    Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the time period..

[28]    Prime did not actually execute any of these wire transfers.  *See* ▮▮▮ Dep., 164:22–165:10.

115.    As Prime did not actually receive any new funds, Prime used the commingled fiat that

had been transferred to it by its customers to fund these replacement ETH purchases from Liquidity

Provider.

116.    The below diagram illustrates ten of the replacement ETH purchases that Prime made

from Liquidity Provider, which it ultimately used to satisfy the withdrawal requests of Abra.



117.    Because the ETH that Abra had originally transferred to Prime was (and still is to this

day) locked away in the inaccessible 98f Wallet, it is indisputable that the ETH that Prime transferred

to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally

transferred to Prime.  The ETH that Abra received was purchased by Prime using commingled fiat

that had been transferred to Prime by other customers.  Moreover, prior to Prime transferring ETH to

Abra, the ETH was commingled with other ETH (transferred to Prime by Abra, Liquidity Provider,

and other Prime customers) in the ~b2ea Wallet discussed above.  In short, (i) commingled fiat was

used to purchase ETH, (ii) this ETH was then commingled with ETH that other customers had

transferred to Prime, and (iii) commingled ETH was then transferred to Abra.

-31-

118.   Certain executives at Prime seem to have undertaken steps to corrupt Prime's internal records in connection with the replacement ETH purchases to make it appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.

119.   Specifically, Prime settled the ETH purchases from Liquidity Provider by "credit[ing]" the Liquidity Provider's customer account at Prime with fiat amounts equivalent to each ETH purchase.

120.   To "credit" Liquidity Provider's fiat customer balance with Prime, Prime had to input a "contribution" on Prime's Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime.  However, Liquidity Provider did not actually wire fiat to Prime in connection with the ETH purchases.

121.   ███████ testified on this subject as follows:

A:   So let me—let me make sure I understand what you said.  You said how to get money to [Customer].  You meant how to get money to [Liquidity Provider]; right?

A:   Sorry, yeah, that's what I meant.  [Liquidity Provider].

Q:   Okay.  So in order to credit [Liquidity Provider's] cash account at Prime, there needed to be a contribution on the internal Ledger; is that right?

A:   Correct.

Q:   And once there is a contribution to the internal Ledger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:   Correct.

Q:   There's not actually any more cash in the bank account; right?

A:   No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.[29]

---

[29]   ███ Dep., 155:11–156:9.

122.    This method of settlement of the ETH purchases from Liquidity Provider resulted in a discrepancy between the amount of fiat that Prime's Internal Ledger reflected and the actual amount of fiat that Prime held in its bank accounts:

Q:      [T]here's going to be cash reflected in [Liquidity Provider's] account, but that cash is not actually in the bank; is that right?

A:      Correct.  Correct.

Q:      And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:      Correct . . .

Q:      I see.  But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:      Exactly.

Q:      That's ultimately what happened; right?

A:      Yeah, that's exactly what happened.[30]

123.    The illustrative chart below[31] demonstrates that Prime's Internal Ledger falsely indicated that there were "incoming" wire transfers to Liquidity Provider between December 23, 2021 and March 30, 2022:

---

[30]    *Id.* at 144:11–20; 146:7–15.

[31]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data related to certain transactions that was pulled from Prime's Internal Ledger.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

124.     Prime's bank account statements do not reflect any of the above wire transfers ever occurring.

125.     For example, the above data reflects that Prime received the following incoming wire transfers: (i) $11,958,000.00 on December 23, 2021; and (ii) $12,158,250.00 on December 31, 2021. These transfers correspond with the first two replacement ETH purchases from Liquidity Provider. However, these wires are not reflected in Prime's relevant bank account statements.[32]

126.     ███████ confirmed that these purported incoming wire transfers would not be identifiable in any Prime bank account statements:

Q:      When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?

A:      Yes.

Q:      There were no wire transfers; right?

A:      Yes.

Q:      Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?

---

[32]   *See* Prime's December 23, 2021, and December 31, 2021, bank account statements from Signature Bank attached as **Exhibits 2 and 3**, respectively.

A:      Yes, there were no wire transfers . . .

Q:      And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?

A:      Correct.

Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?

A:      No wire transfers in.[33]

127.    As discussed herein, certain executives at Prime seem to have undertaken steps to corrupt Prime's internal record keeping.  The false entries to Prime's Internal Ledger further add to the difficulty in connecting transfers with specific transactions reflected on Prime's Internal Ledger.

## VII.    One World's Transfers During the Preference Period

128.    To analyze the fiat and crypto transactions between Prime and One World, I reviewed Prime's Internal Ledger, API log audit data, bank statements, bank reconciliations, and blockchain data.

129.    I identified One World's transactions recorded in Prime's Internal Ledger by searching for internal account names attributed to One World on the Internal Ledger.   These internal account names did not correspond with actual unique, segregated bank accounts.

130.    In my review of fiat and crypto transactions that occurred during the Preference Period,[34] I confirmed that there were outgoing transfers from Prime to or for the benefit of One World that totaled $163,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT (the "Transfers").

---

[33]    ▮▮ Dep., 164:22–165:10; 166:5–15.

[34]    Prime and certain of its affiliates filed the above-captioned Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's preference period occurred between May 16, 2023 and August 14, 2023 (the "Preference Period").

131.    All of the fiat transfers between Prime and One World during the Preference Period were transferred from BMO x3077.

132.    All of the crypto transfers during the Preference Period were transferred from the Omnibus Digital Wallets that commingled crypto.  I was able to review each of these transfers on the blockchain.

133.    I verified that each of the Transfers to or for the benefit of One World was directed by One World during the Preference Period based on API log audit data.[35]  Using API log audit data, I confirmed that Adriano Froes utilizing the email address, adriano@oneworldservicesllc.com, directed each of the Transfers for or on behalf of One World.[36,]

134.    I identified that One World transferred $86,000.00 of potential subsequent new value to Prime after receiving certain of the Transfers.  I thus calculated the preference claim against One World to be no less than $77,000.00, 0.44 BTC, 8.49 ETH, 230.59 Litecoin, and 717.52 USDT (the "Preference Claim").   My analysis evaluated the transaction date and time provided in the bank and API log audit data for each incoming and outgoing transfer during the Preference Period, and the date and time as recorded on-chain for each crypto transaction during the Preference Period.

* * *

135.    In sum, blockchain data, Prime's Internal Ledger, Prime's bank account data, Prime's repeated transfers of fiat between commingled omnibus bank accounts, Prime's repeated transfers of crypto between commingled Omnibus Digital Wallets in the Vaults at Fireblocks, Prime's use of fiat transferred to Prime by other customers to purchase ETH because Prime lost access to the 98f Wallet, Prime's falsified Internal Ledger wire transfer entries covering Prime's replacement ETH purchases,

---

[35]    API log audit data identifies which customer's email initiated a transaction providing an audit trail.

[36]    Attached to this Declaration as **Exhibit 4** is API log audit data for the Transfers.

and Prime's gross failures in fiat and crypto segregation, reconciliation processes, and inability to distinguish fiat or crypto transferred to Prime by certain customers from company fiat, or from fiat or crypto transferred to Prime by other customers, make it clear that One World and Prime:  (i) cannot identify the specific fiat or crypto that One World transferred to Prime; (ii) cannot identify which specific funds in Prime's commingled bank accounts were used for the fiat transfers from Prime to One World during the Preference Period; and (iii) cannot identify which specific crypto in the commingled Omnibus Digital Wallets were used for the crypto transfers from Prime to One World during the Preference Period.

Dated: August 11, 2025
      Jupiter, Florida

/s/ James P. Brennan
James P. Brennan
Senior Managing Director
J.S. Held, LLC

-37-

# Exhibit 1

# JP Brennan
Senior Managing Director, Global Investigations, Cryptocurrency



## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented in various forums as well as moderated multiple cryptocurrency related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



---

## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services, related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to: trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel.  Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.

- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.

- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.

- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curios Case of Crypto."

- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.

- Medium Article Contributor: https://medium.com/@james.p.brennan1.

- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.

- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.

- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.

- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.

- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.

- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, Country of New York.*

- *Paul Merkley v. Gemini Trust Company, LLC,* JAMS Arbitration.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

# Exhibit 2

*Signature*  | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI:  MAGUIEXPRESS SA AR QCCUSEGFZ26,MAGUIEXPRESS S A | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 236,562.50 |
| | REF#  20211222B6B7261F00311312221031FT01 | |
| | FROM: MARXSMITH LLC              ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF#  20211222B6B7261F00174112220801FT01 | |
| | FROM: DIOGO MONICA              ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF#  20211222B6B7261F00307712221027FT01 | |
| | FROM: PAXFUL USA INC              ABA:  026013356 | |
| | BANK: | |
| | OBI:  QCCUSK934, PAXFUL, INC 420003911352 | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 300,000.00 |
| | REF#  20211222B6B7261F00576012221506FT01 | |
| | FROM: ICHIOKA VENTURES LLC              ABA:  121000248 | |
| | BANK: | |
| | OBI:  FUNDS FOR REFERENCE QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 22 | ONLINE TRANSFER CREDIT | 60,000,000.00 |
| | ONLINE XFR FROM: XXXXXX6223 | |
| Dec 23 | INCOMING WIRE | 26.00 |
| | REF#  20211223B6B7261F00620912231555FT01 | |
| | FROM: CP CONSTRUCTION VENTURES LLC              ABA:  324377613 | |
| | BANK: | |
| | OBI:  QNCUS9QXJKZ | |
| | OBI: | |

# SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ▊6126          0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200.00 |
| | REF#  20211223B6B7261F00269412231010FT01 | |
| | FROM: GONZALO M ARAUJO CABARCAS      ABA:   31209536 | |
| | BANK: CITIBANK NA | |
| | OBI:  QNCUSV42DNZ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 400.00 |
| | REF#  20211223B6B7261F00562312231459FT01 | |
| | FROM: ASIAM RESOURCES LLC            ABA:   121000248 | |
| | BANK: | |
| | OBI:  QNCUSXZMYKW | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800.00 |
| | REF#  20211223B6B7261F00416212231232FT01 | |
| | FROM: SYNAPSE FINANCIAL TECHNOLOGIES   ABA:   084106768 | |
| | BANK: | |
| | OBI:  SIGNATURE BANK NEW YORK, NY, US 61C476A938BC7F2CA4985F | |
| | OBI:  B0/QCCUSYZX4, PINE GROVE CONSULTING, INC. 420056235618 | |
| | OBI:  ; @FREELANCEVZLA; SERVICES | |
| Dec 23 | INCOMING WIRE | 2,000.00 |
| | REF#  20211223B6B7261F00186112230813FT01 | |
| | FROM: 1/FBO MARC J GRELLA           ABA:   NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 23 | INCOMING WIRE | 2,675.00 |
| | REF#  20211223B6B7261F00419812231235FT01 | |
| | FROM: FRANK R DIPALMA               ABA:   021000021 | |
| | BANK: | |
| | OBI:  CUSCQNZ6H | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 4,545.00 |
| | REF#  20211223B6B7261F00399012231212FT01 | |
| | FROM: HERMANN, LLC                  ABA:   021000021 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H - THE COIN TRADING CO LLC420034051586 | |
| | OBI: | |

*Signature*  | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   142 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,000.00 |
| | REF#  20211223B6B7261F00529812231428FT01 | |
| | FROM: ANTHONY HENRY GONZALES          ABA:  321178158 | |
| | BANK: TULARE COUNTY FCU | |
| | OBI:  QCCUSAZ7HTHE COIN TRADING COMPANY, LLC420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,500.00 |
| | REF#  20211223B6B7261F00608112231544FT01 | |
| | FROM: TROY D GINGERICH               ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSFAVQME   COINMETRO | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 6,000.00 |
| | REF#  20211223B6B7261F00213512230900FT01 | |
| | FROM: LA GUACAMAYA LLC               ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 7,955.00 |
| | REF#  20211223B6B7261F00580912231515FT01 | |
| | FROM: BANK OF AMERICA               ABA:  026013576 | |
| | BANK: SIGNATURE BANK | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF#  20211223B6B7261F00029512230255FT01 | |
| | FROM: IGNACIO M BARTOLOME            ABA:  31209536 | |
| | BANK: CITIBANK NA | |
| | OBI:  QCCUSZ9EKRN, FINANLEADS S A | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF#  20211223B6B7261F00503712231401FT01 | |
| | FROM: TYLER WILSON                   ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ███████6126          0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 9,500.00 |
| | REF#  20211223B6B7261F00613612231549FT01 | |
| | FROM: PIM T VAN DEN BERGH          ABA:  121000248 | |
| | BANK: | |
| | OBI:  QCCUSZ9EKRN FINANLEADS SA | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,000.00 |
| | REF#  20211223B6B7261F00378112231153FT01 | |
| | FROM: BRIAN BILNOSKI OR DANA L BILNOSKI  ABA:  021000021 | |
| | BANK: | |
| | OBI:  QNCUSZRQ6C3 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,500.00 |
| | REF#  20211223B6B7261F00549512231446FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC     ABA:  102000021 | |
| | BANK: | |
| | OBI:  INVESTMENT ON SECURITIESQCCUSAZ7H, THE COIN TRADING CO | |
| | OBI:  MPANYLLC 420034051586 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 14,700.00 |
| | REF#  20211223B6B7261F00303312231045FT01 | |
| | FROM: MELODY HOGGE               ABA:  026009593 | |
| | BANK: | |
| | OBI:  SERVICES | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 19,782.95 |
| | REF#  20211223B6B7261F00275312231013FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE  ABA:  021201383 | |
| | BANK: VALLEYNATIONALBANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y MUNDUZ INTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,400.00 |
| | REF#  20211223B6B7261F00412412231228FT01 | |
| | FROM: TECC CONSULTING LLC         ABA:  121000248 | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ██████6126        0

| Date | Description | |
|---|---|---|
| | BANK: | |
| | OBI: QCCUSZTF2-LOGISTIC FAST | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,500.00 |
| | REF#  20211223B6B7261F00060312230603FT01 | |
| | FROM: SANDRA MARIE SWITZER          ABA:  026009593 | |
| | BANK: | |
| | OBI:  QNCUSHRDX | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF#  20211223B6B7261F00062512230608FT01 | |
| | FROM: ANTHONY K MCEAHERN            ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSH6VPFC | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF#  20211223B6B7261F00328112231113FT01 | |
| | FROM: BARBARA L MCEAHERN            ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSH6VPFC | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,080.00 |
| | REF#  20211223B6B7261F00156812230801FT01 | |
| | FROM: UR CHOICE DISTRUBUTOR INC.    ABA:  021000021 | |
| | BANK: | |
| | OBI:  REFERENCE # QCCUS3D46 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF#  20211223B6B7261F00244412230937FT01 | |
| | FROM: PND ADMINISTRATION SERVICES LLC  ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ████6126          0

| Date | Description | |
|---|---|---|
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF#  20211223B6B7261F00520312231416FT01 | |
| | FROM: INOVASUPERSTAR LLC                ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 45,561.25 |
| | REF#  20211223B6B7261F00699512231734FT01 | |
| | FROM: PRIZEOUT CORP                     ABA:  026009593 | |
| | BANK: | |
| | OBI:  REFERENCE ID QXCUS2KFAXD | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 46,883.81 |
| | REF#  20211223B6B7261F00395912231208FT01 | |
| | FROM: VIRTUAL ASSETS LLC               ABA:  071902399 | |
| | BANK: | |
| | OBI:  TRADE SETTLEMENT            QCCUSWHQFN7, STILLM | |
| | OBI:  AN DIGITAL LLC 420048617770 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 60,000.00 |
| | REF#  20211223B6B7261F00465612231322FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE    ABA:  061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 64,000.00 |
| | REF#  20211223B6B7261F00150112230801FT01 | |
| | FROM: WAAVE TECHNOLOGIES INC.          ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUS7VT4 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 83,836.50 |
| | REF#  20211223B6B7261F00280112231022FT01 | |
| | FROM: DIGITAL ASSET MANAGEMENT LIMIT   ABA:  026013576 | |
| | BANK: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|---|
| | OBI:  XACE LIMITED QCCUSQK4E | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 139,054.69 |
| | REF#  20211223B6B7261F00598012231532FT01 | |
| | FROM: PRIME TRUST, LLC AS AGENT FOR     ABA:  044000024 | |
| | BANK: | |
| | OBI:  PAYMENT | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 196,000.00 |
| | REF#  20211223B6B7261F00202212230840FT01 | |
| | FROM: MUNDUZ INTERNATIONAL INCORPORATED   ABA:  021000021 | |
| | BANK: | |
| | OBI:   REFERENCE CODE: QCCUS9 XF74Y -MUNDUZ INCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200,000.00 |
| | REF#  20211223B6B7261F00535712231433FT01 | |
| | FROM: EMBLAZE ONE INC.                 ABA:  021000021 | |
| | BANK: | |
| | OBI:   REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 212,500.00 |
| | REF#  20211223B6B7261F00686512231707FT01 | |
| | FROM: WESUPPLY SOLUTIONS, LLC       ABA:  043000096 | |
| | BANK: PNC BANK, N.A. | |
| | OBI:   QCCUS4JTVEP, ALTERPAY INTERNATIONALSOLUTIONS, LLC 4200 | |
| | OBI:   77366054 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 233,471.25 |
| | REF#  20211223B6B7261F00039812230442FT01 | |
| | FROM: NORTH AMERICAN CAPACITY INSURANCE   ABA:  026009593 | |
| | BANK: | |
| | OBI:  40802346 0011793370-08-1-2021 Q/CCUSRV6P, PROGLOBIX LL | |
| | OBI:  C 4200843321.67, INV-0571  MOLECULAR /INV-0571/.02021 | |
| | OBI:  1468290/MOLECULAR PATHOLOGY | |
| Dec 23 | INCOMING WIRE | 236,562.50 |

**Signature | SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|---|---|---|
| | REF#  20211223B6B7261F00284812231027FT01 | |
| | FROM: MARXSMITH LLC          ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 250,000.00 |
| | REF#  20211223B6B7261F00157312230801FT01 | |
| | FROM: DIOGO MONICA          ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 334,000.00 |
| | REF#  20211223B6B7261F00574112231508FT01 | |
| | FROM: YUMMY INC          ABA:  211075086 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 357,000.00 |
| | REF#  20211223B6B7261F00484612231338FT01 | |
| | BANK: M&T BANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 500,000.00 |
| | REF#  20211223B6B7261F00305612231049FT01 | |
| | FROM: DISTRIBUTED COMPUTING SYSTEMS          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800,000.00 |
| | REF#  20211223B6B7261F000080012230719FT01 | |
| | FROM: CB INTERNATIONAL BANK LLC          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUS3E2T, CB INTERNATIONAL BANK LLC 420030048263 | |
| | OBI: | |

# *Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                     8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,000,000.00 |
| | REF#  20211223B6B7261F00386012231158FT01 | |
| | FROM: DCG INTERNATIONAL INVESTMENTS LTD   ABA:  322286803 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUS3HRZQV, INFINITY VENTURES C1, L.P. 420 | |
| | OBI:  098750470 DCG INTERNATIONAL INVESTMENTS LTD. INVESTMEN | |
| | OBI:  T | |
| Dec 23 | INCOMING WIRE | 1,199,500.00 |
| | REF#  20211223B6B7261F00633012231607FT01 | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,298,000.00 |
| | REF#  20211223B6B7261F00633112231607FT01 | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1.00 |
| | REF#  20211224B6B7261F00284912241307FT01 | |
| | FROM: CP CONSTRUCTION VENTURES LLC    ABA:  324377613 | |
| | BANK: | |
| | OBI:  QNCUS9QXJKZ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134112240801FT01 | |
| | FROM: TUYETMAI THI NGUYEN          ABA:  021000021 | |
| | BANK: | |
| | OBI:  USD WIRE | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134312240801FT01 | |
| | FROM: TUYETMAI THI NGUYEN          ABA:  021000021 | |

# Exhibit 3

# *Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                     8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███6126        0

| Date | Description | |
|---|---|---|
| | BANK: M&T BANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 236,562.50 |
| | REF#  20211230B6B7261F00369212301046FT01 | |
| | FROM: MARXSMITH LLC          ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 312,000.00 |
| | REF#  20211230B6B7261F00644012301445FT01 | |
| | FROM: YUMMY INC             ABA:  211075086 | |
| | BANK: | |
| | OBI:  QCCUSYZX4 PINE GROVE CONSULTING INC | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 350,000.00 |
| | REF#  20211230B6B7261F00572312301350FT01 | |
| | FROM: PROGLOBIX LLC          ABA:  071000288 | |
| | BANK: | |
| | OBI:  QCCUSRV6P, PROGLOBIX LLC420084332167 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 1,918.00 |
| | REF#  20211231B6B7261F00225212310851FT01 | |
| | FROM: ECN OTC, LLC           ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSEH4VMF | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 2,105.00 |
| | REF#  20211231B6B7261F00405212311237FT01 | |
| | FROM: PRIME TRUST LLC        ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 2,500.00 |
| | REF#  20211231B6B7261F00462712311401FT01 | |
| | FROM: DAVID BRAND OR MICHAEL A BRAND   ABA:  021000021 | |

*Signature*  | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███6126          0

| Date | Description | |
|------|-------------|--|
| | BANK: | |
| | OBI: QNCUSVPCE42 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 4,618.97 |
| | REF# 20211231B6B7261F00531512311618FT01 | |
| | FROM: CHRISTOPHER A SULLY     ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSX3VPN9 KXUW9MAJCMPS | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 5,400.00 |
| | REF# 20211231B6B7261F00389512311214FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC     ABA:  102000021 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUSAZ7HTHE COIN TRADING COMPANY, LLC42003 | |
| | OBI:  4051586 | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 10,000.00 |
| | REF# 20211231B6B7261F00503012311506FT01 | |
| | FROM: REENA OBEDIAH     ABA:  121105156 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H, THE COIN TRADING COMPANY420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 15,000.00 |
| | REF# 20211231B6B7261F00336412311113FT01 | |
| | FROM: WILLIAM BEWLEY     ABA:  124003116 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 17,780.00 |
| | REF# 20211231B6B7261F00350612311129FT01 | |
| | FROM: DEREK LAFAYETTE JONES     ABA:  062005690 | |
| | BANK: | |
| | OBI:  REFERENCEQCCUSJRVZ UNITED COIN INC420030696060 | |
| | OBI: | |
| | OBI: | |

*Signature*  SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   174 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ▆▆▆▆6126        0

| Date | Description | |
|---|---|---|
| Dec 31 | INCOMING WIRE | 20,802.00 |
| | REF#  20211231B6B7261F00332812311108FT01 | |
| | FROM:                          ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 25,000.00 |
| | REF#  20211231B6B7261F005215123111552FT01 | |
| | FROM: LILY C CHAPIN            ABA:  121000248 | |
| | BANK: | |
| | OBI:  REFERENCE QCCUSZTF2 WESTCLIFFTECH | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 26,000.00 |
| | REF#  20211231B6B7261F005261123111603FT01 | |
| | FROM: INOVASUPERSTAR LLC       ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 28,500.00 |
| | REF#  20211231B6B7261F005443123111655FT01 | |
| | FROM: JAMES BUTLER DBA BUTLER HOME MAINT ABA:  114000093 | |
| | BANK: | |
| | OBI:  QNCUSJDYNRP | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 32,100.00 |
| | REF#  20211231B6B7261F005458123111700FT01 | |
| | FROM: TECC CONSULTING LLC       ABA:  121000248 | |
| | BANK: | |
| | OBI:  QCCUSZTF2-LOGISTIC FAST | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 35,630.00 |
| | REF#  20211231B6B7261F00225912310854FT01 | |
| | FROM: ROLAND J JOYAL           ABA:  043318092 | |
| | BANK: | |
| | OBI:  GEM PURCHASEREFERENCE CODE: QNCUSJ7GYQR | |
| | OBI: | |
| | OBI: | |

*Signature* | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page  175 of  426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126        0

| Date | Description | |
|---|---|---|
| Dec 31 | INCOMING WIRE | 70,000.00 |
| | REF# 20211231B6B7261F00437012311318FT01 | |
| | FROM: COIN TIME LLC                 ABA:  121000248 | |
| | BANK: | |
| | OBI:  REF QCCUSWHQFN7, STILLMAN DIGITAL LLC 420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 121,100.00 |
| | REF# 20211231B6B7261F00544812311655FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT     ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 3158304019 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 130,000.00 |
| | REF# 20211231B6B7261F00324512311058FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE     ABA:  061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 150,000.00 |
| | REF# 20211231B6B7261F00544912311656FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT     ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 2273120497 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 172,620.30 |
| | REF# 20211231B6B7261F00317612311048FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE MAR  ABA:  066015084 | |
| | BANK: APOLLO BANK | |
| | OBI:  REFERENCE CODENQCCUS9XF74Y MUNDUZINTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 236,562.50 |
| | REF# 20211231B6B7261F00258712310938FT01 | |
| | FROM: MARXSMITH LLC                 ABA:  026009593 | |
| | BANK: | |

**Signature** | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126          0

| Date | Description | |
|---|---|---|
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 300,000.00 |
| | REF#  20211231B6B7261F00271812310952FT01 | |
| | FROM: 1/DAVID THOMAS WENK         ABA:   NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 31 | INCOMING WIRE | 600,000.00 |
| | REF#  20211231B6B7261F00434912311317FT01 | |
| | FROM: EMBLAZE ONE INC.            ABA:   021000021 | |
| | BANK: | |
| | OBI:  REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,000,000.00 |
| | REF#  20211231B6B7261F00348512311127FT01 | |
| | FROM: COMPASS MINING INC          ABA:   026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,450,000.00 |
| | REF#  20211231B6B7261F00099312310800FT01 | |
| | FROM: PRIME TRUST LLC             ABA:   021000021 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 6,500,000.00 |
| | REF#  20211231B6B7261F00096112310751FT01 | |
| | FROM: YUCHEN SUN                  ABA:   026013576 | |
| | BANK: | |
| | OBI:  CREDIT TO: PRIME TRUST, LLC REFERENCE: QCCUSW47D, POLO | |
| | OBI:   DIGITAL ASSETS, INC. 420062543280 PURPOSE: FUNDING | |
| | OBI: | |

Withdrawals and Other Debits
| Dec 01 | OUTGOING WIRE | 5.00 |
|---|---|---|
| | REF#  20211201B6B7261F005566 | |
| | TO:   1/LUKE TRAYFOOT            ABA:   021000021 | |
| | BANK: JPMORGAN CHASE BANK, NA         ACCT# GB40REVO009970 | |
| | OBI:  20211124B6B7261F00196511240801FT03 | |

# Exhibit 4

| asset_transfers. settled_date | organizations.label | accounts.number | asset_transfers. unit_count | assets.label | asset_transfer_metho ds.transfer_direction | activities.user_email | activities.user_name |
|---|---|---|---|---|---|---|---|
| 6/16/2023 | One World Services LLC | 5139 | -11.25781077 | Litecoin | outgoing | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/15/2023 | One World Services LLC | 5139 | -0.44088636 | Bitcoin | outgoing | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/14/2023 | One World Services LLC | 0316 | -717.521132 | Tether USD | outgoing | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/14/2023 | One World Services LLC | 0316 | -8.48958 | Ether | outgoing | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/14/2023 | One World Services LLC | 0316 | -219.3274 | Litecoin | outgoing | adriano@oneworldservicesllc.com | Adriano Froes |

| cash_transactions.settled_date | cash_transactions.id | organization.label | account.number | cash_transactions.funds_transfer_type | cash_transactions.amount | incoming_or_outgoing | cash_transactions.currency_type | funds_transfers.settlement_details | activities.user_email | activities.user_name |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/24/2023 | 85b95f6d- | One World | 0316 | wire | (66,000.00) | Outgoing | USD | BMO3077-05/24/2023 | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/1/2023 | b638705a- | One World | 0316 | wire | (20,000.00) | Outgoing | USD | BMO3077-06/01/2023 | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/16/2023 | 68ebfa20- | One World | 0316 | wire | (27,000.00) | Outgoing | USD | BMO3077-06/16/2023 | adriano@oneworldservicesllc.com | Adriano Froes |
| 6/20/2023 | 8ec546bf- | One World | 0316 | wire | (50,000.00) | Outgoing | USD | BMO3077-06/20/2023 | adriano@oneworldservicesllc.com | Adriano Froes |

**BMO Harris Bank**

**Treasury Services Agreements**

# We're here to help.

## About Your Business

**Company Legal Name: PRIME TRUST, LLC**

## Your Service Summary

**Services Selected:**
Note: Refer to the Service Descriptions for details.

Wire Transfer
Online Bill Payment
Check Imaging
Multicurrency Account
Online Banking for Business



## Treasury Services Master Agreement

This Treasury Services Master Agreement (this "Master Agreement") is made as of the date appearing on the signature page of the Bank representative signing this Master Agreement, between PRIME TRUST, LLC ("Client") and BMO Harris Bank N.A. ("Bank"). This Master Agreement includes the terms and conditions pursuant to which Bank will provide to Client its treasury and payment solutions products and services (the "Services"). Any reference in any existing or future agreement between Client and Bank to a "Global Treasury Management Services Master Agreement" or any other prior services agreement for treasury and payment solutions products and services shall be deemed to be a reference to this Master Agreement.

In consideration of the mutual promises herein, Client and Bank agree as follows:

1.  **Services**

    Bank will make available to Client the Services selected by Client and described on the Service Selection Form, which is part of this Master Agreement (as updated or amended from time to time, the "Service Selection Form"). By completing and signing the Service Selection Form for a particular Service or Services, Client selects that Service or Services and agrees to the terms and conditions of the related service description, including any appendices (the "Service Description"), and other Services Documentation (as defined below) for that Service. Client may add Services by submitting to Bank an executed copy of the Service Selection Form for the new Service. Any other services or features Bank provides in connection with a Service which are not listed in the Service Selection Form are also considered "Services" and are subject to this Master Agreement and any related Service Documentation. Other than as expressly set forth herein or in the Service Documentation for a particular Service, the Services are only available for commercial cash management banking purposes and may not be used for personal or consumer banking purposes of any kind.

    Upon acceptance and approval by Bank of this Master Agreement and the Service Selection Form for the Services Client requests, and the completion of any required setup process, Bank will make the requested Services available to Client. If Client does not execute the Service Selection Form for a particular Service, but nevertheless use that Service in any manner, Client's first such use constitutes Client's agreement to the Service Documentation for that Service, including the applicable Service Description, in the form Bank presented to Client.

2.  **Governing Agreements and Documentation**

    (a)  *Service Documentation.* Client's use of the Services is governed by this Master Agreement and the following documents (collectively, the "Service Documentation"), all of which are incorporated by reference into this Master Agreement (as applicable):

    - Service Descriptions;

    - Service Selection Forms;

    - setup and security instructions and procedures; and

    - user guides, questionnaires, and other instructions and manuals for Services provided by Bank (as updated from time to time, "User Guides").



If there is any conflict between any term or provision of the Service Documentation for a particular Service and the terms and provisions of this Master Agreement, the Service Documentation will control with respect to such Service to the extent of such conflict. If there is any conflict among the Service Documentation for a particular Service, the Service Description will control to the extent of the conflict. Terms which are defined in this Master Agreement have the given meaning when used in the Service Documentation unless otherwise specified. All deposit account(s) that are enrolled in the Services (the "Accounts") will remain subject to the applicable deposit account agreement ("Account Agreement") and Client's use of the Services will also be governed by such Account Agreement, which is incorporated by reference in this Master Agreement. If there is any conflict between the applicable Account Agreement and this Master Agreement or any Service Documentation, then this Master Agreement or the Service Documentation controls. Capitalized terms used herein and not otherwise defined shall have the meaning given in the applicable Account Agreement.

(b) *Service Changes.* Bank may from time to time add to, discontinue or modify the Services and may update or make changes in the Service Documentation relating to a Service. Bank will give Client notice of any material change and such change will be effective as of the date specified in the notice sent to Client. Bank reserves the right to notify Client of changes and updates electronically or by Internet posting, mailing, or other means permitted by law. The right to change fees and charges and the right to change the terms of this Master Agreement are addressed in Section 12.

(c) *Authorized Individuals; Contact Information.* Before accessing any Service, Client must provide to Bank (or there must be on file with Bank) a signed and completed Certificate of Account Resolutions in the form provided by Bank or other form acceptable to Bank ("Account Resolutions"). The Account Resolutions evidence the proper authority of the persons ("Authorized Individuals") signing this Master Agreement, the Service Selection Form, and any authorization forms, and provide Bank with any contact information that Bank may require in connection with Client's use of a Service. Bank is entitled to rely on such authorization and contact information according to its terms until Bank receives properly authorized written notice in the form provided by Bank or other form acceptable to Bank that the existing authorization and/or contact information is changed or terminated and Bank has a reasonable opportunity to act on such notice. If Client instead chooses to communicate changes to Bank by some other means, Bank is entitled (but not obligated) to rely on such communications and the changes as having been duly authorized by Client if Bank in good faith believes the communications came from someone authorized by Client to deliver it. Bank will not be responsible for losses if Client fails to timely and properly notify Bank of changes in authorization and/or contact information. Client must also promptly notify Bank in writing of any change to Client's name or address.

3. **Obligations and Acknowledgments**

(a) *Account Statements and Reconciliation.* At Client's election, Bank will either provide to Client electronically through Bank's Online Banking for Business Service ("OLBB") or by mail periodic statements, notices, canceled checks, and other information regarding the Accounts and Account activity, including any activity resulting from Services. Client agrees to promptly examine each such statement, notice, canceled check, and other information (whether originals, images, copies, or in other formats) and to promptly notify Bank of any erroneous charges, payments, missing or incorrect deposits, credits, debits, or other entries to Accounts ("errors") or other Account problems, including a forged or unauthorized signature or alteration, or unauthorized or missing endorsement, in accordance with the requirements and procedures, including time frames, provided in the applicable Account Agreement. If Client fails to notify Bank as described above, Bank will not be obligated to re-credit or refund the amount of the error or Account problem and Client will be precluded from asserting the error or Account problem against Bank. If Client makes a claim for an error or problem, Client agrees to cooperate with Bank in the investigation of the situation (including providing an appropriate affidavit as Bank may request) and any effort by Bank to recover funds on Client's or Bank's behalf.



Unless Bank has otherwise agreed in the Service Documentation for any Service Bank provides to Client, funds transfers to and from Accounts will be reflected on the periodic statements Bank sends or makes available to Client or the applicable Account owner.

(b)  *Electronic Information.* Some Services allow Client to view and receive information about Account balances, activity, transactions, and other cash management information electronically, via the Internet through one of Bank's access Services, or by other electronic means. Account information changes frequently and is subject to updating, verification, and correction. Since the information may change during the delay between when the information was last sent to Client or posted by Bank and when Client receive or access the information, Bank assumes no responsibility for Client's reliance on such information which is subsequently updated, verified, or corrected.

(c)  *Client's Vendors.* If Client engages any third party in connection with any Service ("Vendor"), the Vendor is Client's agent. Client is solely responsible for ensuring that Client's Vendor complies with Client's obligations under this Master Agreement and the Service Documentation (including Security Procedures, as defined below, relating to the Services). Client is bound by all information, Orders (as defined herein), entries, or other instructions provided on Client's behalf by Vendors all as though such information, Orders, entries, or other instructions were provided by Client. Client confirms that Client grants authority to Vendors to legally bind Client with respect to their use of the Services. Client is liable for (i) any Vendor's failure to comply with any of Client's obligations under this Master Agreement and the Service Documentation, (ii) all fees, costs, and expenses owed to each Vendor for its services on Client's behalf, and (iii) any claims, damages, costs, and expenses incurred by Client or Bank as a result of any Vendor's failure to perform, or delay or error in performing its services on Client's behalf.

(d)  *Use of Third Parties by Bank.* Bank may use the services, software, hardware or equipment of third parties to provide or facilitate all or any portion of the Services, including call centers, Website hosts, contractors, processors, and the like. Client agrees that Bank may disclose to any such third party any information regarding Client necessary to provide the Service and related support to Client.

(e)  *Money Laundering and Funding of Terrorism.* Client acknowledges that transactions made on Client's behalf may be subject to federal and state laws and regulations governing transactions in currency and other monetary instruments relating to money laundering activities and the funding of terrorism and that such laws and regulations may impose severe criminal penalties on those who participate or assist in such activities or in structuring of such activities to avoid reporting requirements. Client acknowledges that Bank may monitor transactions for compliance with such laws and regulations. Client agrees that Client will not engage in any transaction which would violate, or result in a payment in violation of, federal or state laws or regulations, including, without limitation, the federal laws and regulations administered by bank regulatory agencies and the Office of Foreign Assets Control ("OFAC") relating to money laundering and the funding of terrorism.

(f)  *Right of Setoff and Security Interest.* In addition to its other rights under this Master Agreement and the Account Agreement, Bank and each of its Affiliates may exercise the right of set-off against any or all of Client's Accounts and deposits and Client grants Bank a first priority security interest in all Accounts maintained by Client now or in the future with Bank or any of Bank's Affiliates to secure payment of any and all obligations regarding Services provided under this Master Agreement and the Service Documentation, whether direct or indirect, absolute or contingent, due or to become due, whether now existing or hereafter arising, and whether several, joint or joint and several. For purposes of this Master Agreement, "Affiliate" means any corporation, limited liability company, or other legal entity that controls, is controlled by, or is under common control with another legal entity.



4. **Security Procedures**

(a) *Verification.* Bank requires that the authenticity of any payment order, Automated Clearing House ("ACH") entry, entry data, batch release, electronic data or transmission, or other instruction to transfer or pay funds or pay, return, or issue checks (collectively, "Orders") issued to Bank in Client's name in connection with any Service be verified pursuant to security procedures as provided in this Master Agreement or in the applicable Service Documentation ("Security Procedures"). Bank may also require that other instructions Client issues to Bank be delivered and accepted in compliance with Security Procedures.

(b) *Acceptance of Security Procedures.* Client should carefully review the Security Procedures in light of the size, amount, and frequency of Client's transactions. Client's use of each Service indicates Client's agreement that the Security Procedures for the Service are commercially reasonable. If instead of accepting and following the Security Procedures Bank offers, Client chooses to communicate to Bank pursuant to some other procedure, Client is refusing the Security Procedures Bank recommends as commercially reasonable and Client will be bound by any Order or other instruction issued in Client's name and accepted by Bank in compliance with the procedure Client chooses.

(c) *Security Procedure Limitations.* Client acknowledges that the Security Procedures are used to verify the authenticity of, but not to detect errors in, any Order transmitted by Client or in Client's name. From time to time Bank may at its option use additional procedures to verify or authenticate Orders. The Security Procedures do not verify the actual identity of the users of the Services and do not monitor the actions of the users to determine whether their Orders exceed the scope of their authority. The Security Procedures are in addition to, and do not limit, revoke, or affect the authority of any Authorized Individual to transmit Orders or any agreement now or hereafter existing between Client and Bank relating to Orders. Bank may continue to rely upon such authority and agreements and Bank is authorized to act upon Orders received from persons acting pursuant to such authority or agreements.

5. **Confidentiality and Security**

(a) *Confidential Service Information.* Client agrees that it is Client's responsibility to maintain the security and strict confidentiality of all account numbers, codes, and identification data, such as customer identification numbers ("Customer IDs") and passwords ("Customer Passwords") and user identification numbers ("User IDs") and passwords ("User Passwords"), provided to or used by Client in connection with any Service ("Identification Data") as well as information concerning access to any Service or Account, including the Security Procedures ("Confidential Service Information"). Client should disclose the Identification Data and the Confidential Service Information only to Authorized Individuals and Vendors who need to know the information in order to carry out their responsibilities with respect to the Services. Client also agrees to maintain the confidentiality of all Service Documentation, software, and other proprietary information regarding the Services which Bank provides to Client.

(b) *Effective Policies and Procedures.* Client represents and warrants to Bank that Client has in place, and will maintain and enforce, effective policies and procedures to prevent unauthorized access to the Accounts, the Identification Data, the Confidential Service Information, and the Services, including unauthorized and erroneous transmission of Orders and other communications to Bank. Client agrees to take all steps necessary to ensure the security, accuracy, authenticity, confidentiality, and legitimacy of all communications to Bank and all access to the Services.

(c) *Notification of Loss.* If at any time any Identification Data or Confidential Service Information has been lost, stolen, or misused, or Client believes that the security of communications between Client and Bank may be or has been compromised or is in any way insecure, Client must notify Bank immediately (with confirmation in writing) and assist Bank in investigating and remedying the situation. Client's notice will not affect any action taken by Bank, including transfers made or instructions carried out prior to the time Bank has received the notice and has had a reasonable opportunity to act on it.



(d) *Obligations of Bank Regarding Confidential Information.* Except as otherwise provided herein or in any Service Documentation, Bank will maintain the confidentiality of the information Client provides to Bank in connection with the Services in accordance with its normal procedures for safeguarding commercial customer information, and Bank agrees to use such information only to provide the Services to Client and as otherwise required by law or permitted in any agreement between Client and Bank. Bank may disclose information (i) which is or becomes public other than as a result of disclosure by Bank in violation of this Section, (ii) which was or becomes available to Bank on a non-confidential basis from a third-party who is not known by Bank to be bound by a confidentiality agreement with Client with respect to such information, (iii) which is developed by Bank separate and apart from any disclosure by Client, (iv) to Affiliates of Bank, or to companies who provide services to Bank as described in Section 3(d), (v) as permitted under the Account Agreement or any other agreement between Client and Bank, (vi) in connection with any litigation involving, or the enforcement of its rights and remedies under or in connection with, this Master Agreement or any other agreement between Client and Bank, and (vii) to the extent required by applicable laws, regulations, or rules, including, where applicable, the rules of NACHA – The Electronic Payments Association® or other funds transfer systems used in connection with a funds transfer (collectively, "Applicable Law"), or court orders or other legal process (including in connection with examinations by banking authorities or to comply with subpoenas, summonses, search warrants, or requests from government agencies).

(e) *Use of Confidential Service Information.* All uses of the Services in accordance with the Security Procedures will be deemed to be authorized by and binding on Client or the applicable Account owner. Client's failure to protect Identification Data and Confidential Service Information may allow an unauthorized party to (i) use the Service(s), (ii) access electronic communications and financial data, and (iii) send Orders and communications to Bank or receive information from Bank. To the maximum extent permitted by law, Bank shall have no responsibility or liability whatsoever for any loss due to any unauthorized Order, instruction or other communication from Client, Client's Vendor, or any Authorized Individual to Bank, except to the extent that such loss is determined by an arbitrator in accordance with Section 16 or by a court of competent jurisdiction by a final and non-appealable order to have resulted from Bank's gross negligence or willful misconduct.

(f) *Unencrypted Messages.* Client recognizes that unencrypted messages including email are not secure. If Client chooses to communicate with Bank by email, Client acknowledges that Bank may rely on the contents of the email as having been authorized by Client, if Bank accepts and acts on it in good faith. Client agrees that Bank may reply to Client in an email with the requested information. Client assumes the entire risk for any such unencrypted electronic communications.

6. **Events of Default**
The occurrence of any of the following shall constitute an "Event of Default":

(a) *Failure to Pay or Perform.* If Client fails to pay when due any amount payable, fails to satisfy any condition Client is required to satisfy, or fails to observe or perform any agreement or obligation, under this Master Agreement, any Service Documentation, or any other agreement between Client and Bank;

(b) *Incorrect or Misleading Statements.* If any representation or warranty made by Client in this Master Agreement, any Service Documentation, or any other agreement between Client and Bank, or any certificate or statement of fact or any other communication from Client to Bank, is found to have been incorrect or misleading on or as of the date made in any respect Bank considers material;



(c) *Insolvency,* etc. If Client is or becomes insolvent or bankrupt or is dissolved, liquidated or wound up; or any substantial assets of Client are seized or otherwise attached pursuant to legal process or other means; or any step or proceeding is taken by or against Client under or in respect of any bankruptcy, insolvency, reorganization or other similar law affecting creditors' rights, including a resolution passed by Client's directors, partners, managers, or members; or any assignment is made for the benefit of Client's creditors; or in the good faith opinion of Bank the financial condition of Client has become impaired;

(d) *Judgments.* If one or more judgments, decrees, or orders is rendered against Client for the payment of money and any of such judgments, decrees or orders would, in Bank's opinion, have a material adverse effect and continue unsatisfied and in effect for a period of more than ten (10) business days without being vacated, discharged, satisfied or stayed pending appeal; or

(e) *Unenforceable Provisions.* If any provision of this Master Agreement Bank considers material is determined by an arbitrator in accordance with Section 16 or a court of competent jurisdiction to be unenforceable.

## 7. Termination

(a) This Master Agreement will continue in full force and effect until all Services have been terminated. Any Service may be terminated at any time by either Client or Bank upon at least thirty (30) days' prior written notice to the other party. Only the Service specified in such notice will be terminated, and no other Services will be affected.

(b) Bank may, at its option, terminate this Master Agreement or any or all Services immediately upon the occurrence and during continuance of an Event of Default.

(c) Upon termination of any Services under this Master Agreement:

- Client will immediately return to Bank or destroy the originals and all copies (in all formats and media) of software programs Bank licensed to Client, all User Guides, and all security and access devices with respect to those terminated Services.

- Any licenses granted by Bank to Client with respect to those terminated Services under the applicable Service Documentation will automatically terminate.

(d) Even if this Master Agreement or any or all Services are terminated, this Master Agreement shall continue in full force and effect as to all transactions that Bank began processing before such termination and the provisions of Sections 5, 8, 9, 10, 13, and 16 will survive any termination of this Master Agreement and the relevant Service.

## 8. Indemnity

Client agrees to indemnify Bank, Bank's Affiliates, and each of their respective officers, directors, employees, agents, and service providers (collectively, "Indemnified Parties") for, and defend and hold harmless each of the Indemnified Parties from and against, any and all actions, losses, damages, claims, demands, liabilities, costs, or expenses, including court costs and reasonable attorneys' fees and expenses (collectively "Claims"), resulting directly or indirectly from Bank's performance under this Master Agreement or Bank's provision of any Service (including, without limitation, any and all Claims in connection with complying with or responding to subpoenas, summonses, search warrants, or requests or demands from government agencies), except to the extent that such Claims are determined by an arbitrator in accordance with Section 16 or a court of competent jurisdiction by a final and non-appealable order to have resulted from Bank's gross negligence or willful misconduct.



### 9. Limitation of Liability

IN NO EVENT UNDER ANY THEORY SHALL BANK, OR ANY OTHER INDEMNIFIED PARTY HAVE ANY LIABILITY TO CLIENT OR ANY OTHER PERSON OR COMPANY FOR ANY CLAIM OR DAMAGE OF ANY KIND (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF, OR RELATING TO, BANK'S PERFORMANCE UNDER THIS MASTER AGREEMENT OR BANK'S PROVISION OF ANY SERVICE, EXCEPT TO THE EXTENT THAT SUCH CLAIMS OR DAMAGES ARE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH SECTION 16 OR A COURT OF COMPETENT JURISDICTION BY A FINAL AND NON-APPEALABLE ORDER TO HAVE RESULTED FROM BANK'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED THAT IN NO EVENT SHALL BANK OR ANY OF ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, OR SERVICE PROVIDERS, HAVE ANY LIABILITY TO CLIENT OR ANY PERSON OR COMPANY FOR INDIRECT LOSSES, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST BUSINESS, PROFITS, OR REVENUE, GOODWILL, OR ANTICIPATED SAVINGS, EVEN IF BANK OR ANY SUCH OTHER PARTY IS AWARE OF THE POSSIBILITY OF, OR COULD REASONABLY FORESEE, SUCH DAMAGES. TO THE EXTENT THAT PROVISIONS OF APPLICABLE LAW PROHIBIT AN AGREEMENT TO DISCLAIM A BANK'S RESPONSIBILITY FOR ITS FAILURE TO EXERCISE ORDINARY CARE, BANK'S RESPONSIBILITY TO CLIENT UNDER THIS MASTER AGREEMENT AND THE SERVICE DOCUMENTATION IS LIMITED TO THE EXERCISE OF ORDINARY CARE IN PROVIDING THE SERVICES TO CLIENT. ORDINARY CARE IS TO BE EVALUATED BASED ON REASONABLE COMMERCIAL BANKING STANDARDS PREVAILING IN BANK'S INDUSTRY AND LOCATION FOR SIMILARLY SITUATED COMMERCIAL BANKS.

Bank's cumulative liability for all loss or damage arising from or relating to this Master Agreement and any Service, regardless of the form of action, is limited to direct losses attributable to Bank's gross negligence or willful misconduct and limited to an amount not to exceed twelve (12) times the fees paid by Client during the month immediately preceding the month in which the loss or damage was incurred.

Bank is not liable for any failure or delay in carrying out any of its obligations under this Master Agreement or any Service Documentation if such failure or delay results from Bank acting in accordance with requirements of Applicable Laws or from acts of God, strike or stoppage of labor, power or equipment failure, disruptions in telecommunications systems or the financial markets, adverse weather conditions, or any other cause beyond its control. Bank has no responsibility and will incur no liability for any act or failure to act by any other financial institution, intermediary, or any other third party including any failure, delay or error by any Federal Reserve Bank or other intermediary bank in timely presenting data or checks to Bank.

### 10. Fees and Charges

Client agrees to pay fees and other charges for each Service as Bank establishes from time to time or maintain compensating balances as Bank may permit. Bank may amend its fees and charges from time to time in accordance with Section 12 below. Client authorizes Bank to access any one or more Accounts to debit fees and other charges, even if doing so creates an overdraft.

Bank may provide Client with monthly compensation statements indicating the fees owing by Client and debited from one or more Accounts for the Services and the interest paid or charged to Client. Client will verify the statements and notify Bank in writing of any errors, irregularities or omissions within (a) 30 days of the mailing of the compensation statement to Client, or (b) if not mailed, within 30 days of the delivery or availability of the compensation statement to Client. At the end of the 30-day period it will be conclusively settled between Client and Bank that the compensation statement is accurate, all fees and amounts charged as set out in the compensation statement are properly chargeable, and Client will not be entitled to be credited with any sum not credited in the compensation statement.

Notwithstanding the foregoing, Bank has the right at any time to make adjustments for any amounts improperly credited and any alleged errors, irregularities, or omissions or to charge back items for which payment has not been received.

Bank may assess finance charges on any amount due to Bank under this Master Agreement that is not paid by Client within thirty (30) days of receipt of Client's statement or an invoice showing the amount due.



## 11. Notices

Except as may be otherwise specified in the Service Documentation for a particular Service, all notices and other communications by Client or Bank relating to this Master Agreement and/or any Service Documentation generally shall be in writing and:

- if to Client, addressed to Client's primary address as shown on Bank's records or, if permitted by law, delivered electronically;

- if to Bank, addressed to Documentation Analysis and Control at: BMO Harris Bank N.A., Documentation Analysis and Control, 111 West Monroe Street 9 Center, Chicago, Illinois 60603, or at such other address as Bank may specify in writing.

Any notice or communication to Bank will be effective when it is actually received and Bank has had a reasonable time to act on it. Bank is entitled to rely on any written notice or other communication that Bank believes in good faith to be genuine and to have been signed, sent, or authorized by Client's authorized representative. Bank is permitted, at its sole discretion, to act on email notices from Client sent to gtmus.clients@harrisbank.com or otherwise, although Bank shall be under no obligation to do so. Bank reserves the right to give notices and communications to Client in such form or medium as Bank considers reasonable and by such means as are permitted by Applicable Law.

## 12. Amendments

Bank may amend this Master Agreement or the fees and charges applicable to a particular Service by written notice sent to Client in accordance with Section 11, above. Except as specifically provided in the Service Documentation for any Service, any amendment to this Master Agreement (including changes in fees and charges) will be effective thirty (30) days after notice of the amendment is sent to Client. This paragraph does not apply to the changes and updates described in Section 2 of this Master Agreement under "Service Changes".

## 13. Representations and Warranties; Agreement to Provide Information

(a) *Representation and Warranties of Client.* In addition to any other representations and warranties herein or in the Service Documentation, Client represents and warrants to Bank, and agrees with Bank, that:

    (i) its execution, delivery, and performance of this Master Agreement has been duly and properly authorized by all necessary corporate or other organizational action and governmental action and does not violate any provision of law, its certificate or articles of incorporation, by-laws or other organizational agreement, or any material agreement binding upon it;

    (ii) the person or persons signing this Master Agreement on its behalf are authorized to do so;

    (iii) this Master Agreement is its valid, legal and binding obligation enforceable against it in accordance with its terms; and

    (iv) the establishment and maintenance of the Accounts with Bank and Client's use of the Services are for legitimate business purposes only and comply fully with Applicable Law.

(b) *Representations and Warranties of Bank.* Bank represents and warrants to Client, and agrees with Client that:

    (i) its execution, delivery, and performance of this Master Agreement has been duly and properly authorized by all necessary corporate or other organizational action and governmental action and does not violate any provision of law, its charter or by-laws or other organizational agreement, or any material agreement binding on it;

    (ii) the person or persons signing this Master Agreement on its behalf are authorized to do so; and



(iii)    this Master Agreement is its valid, legal, and binding obligation enforceable against it in accordance with its terms.

EXCEPT AS EXPRESSLY PROVIDED ELSEWHERE IN THIS MASTER AGREEMENT OR IN ANY SERVICE DOCUMENTATION, BANK MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, OF ANY KIND WITH RESPECT TO ANY SERVICE OR BANK'S PERFORMANCE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANT-ABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NO DESCRIPTIONS OR SPECIFI-CATIONS CONSTITUTE REPRESENTATIONS OR WARRANTIES OF ANY KIND.

(c)    *Agreement to Provide Information.* Client agrees that Client shall promptly furnish to Bank such information respecting Client's business and financial condition, in such form and manner, as Bank may reasonably request from time to time. Client represents and warrants to Bank that all such information is true, complete, and correct in all material respects.

### 14. Affiliates

If Client has one or more Affiliates, Bank may upon request provide one or more Services to that Affiliate under this Master Agreement. If Bank agrees to allow an Affiliate to access a Service under this Master Agreement, the Affiliate and Client must execute and deliver to Bank an addendum to this Master Agreement or other appropriate documentation required by Bank. Any such Affiliate using Services becomes a party to this Master Agreement, the relevant Service Selection Form and Service Documentation on a joint-and-several basis as "Client".

### 15. Other Provisions

(a)    This Master Agreement and the Service Documentation constituting a part of this Master Agreement together with the Account Agreement constitute the entire agreement between Client and Bank with respect to the Services and supersedes and replaces any previously made proposals, representations, warranties or agreements, express or implied, either oral or in writing.

(b)    Client may not assign this Master Agreement or any of Client's rights hereunder without Bank's prior written consent. Bank may not assign this Master Agreement without Client's prior written consent, except that Bank may assign this Master Agreement, in whole or in part, without such consent to any of Bank's Affiliates or in connection with the merger, consolidation, reorganization or acquisition of substantially all the assets of Bank. Any purported assignment of this Master Agreement by Client without Bank's written consent is void.

(c)    No party's failure or delay in exercising any right or remedy under this Master Agreement will operate as a waiver of such right or remedy; and no single or partial exercise by a party of any right or remedy under this Master Agreement will preclude any additional or further exercise of such right or remedy or the exercise of any other right.

(d)    If a provision of this Master Agreement is held to be invalid, illegal, or unenforceable, the validity, legality, or enforceability of the other provisions of this Master Agreement will not be affected or impaired by such holding.

(e)    This Master Agreement is binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns. Except as explicitly provided herein, this Master Agreement is not for the benefit of any other person and no other person shall have any right against Client or Bank hereunder.

(f)    Where appropriate, terms defined in this Master Agreement in the singular shall be deemed to include the plural and those defined in the plural shall be deemed to include the singular.



(g)   This Master Agreement may be executed in multiple counterparts with the same effect as if Client and Bank had executed the same document, and all counterparts must be construed together as one instrument. Delivery of an executed counterpart by facsimile or other electronic means is effective as delivery of a manually signed counterpart.

(h)   This Master Agreement is governed by and must be construed in accordance with the laws of the State of Illinois, including the Uniform Commercial Code as in effect in the State of Illinois from time to time (the "UCC"). The parties acknowledge that certain provisions of the UCC contain provisions which by the express terms of the UCC may not be varied by agreement of the parties (a "Non-variable Obligation"). To the extent that any provision of this Master Agreement purports to vary such Non-variable Obligation, the parties acknowledge that their respective rights and obligations under this Master Agreement are subject to the Nonvariable Obligation.

## 16.  Claims Subject to Arbitration

Bank and Client agree to arbitrate all disputes or claims between them arising out of or relating in any way to the Services, this Master Agreement, any applicable Service Descriptions, any other agreement related to the Services, or any transactions arising hereunder or thereunder, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory. This arbitration provision is intended to be broadly interpreted and to cover, without limitation, any claims that arose before the effective date of this Master Agreement or any prior services agreement (including, but not limited to, claims relating to advertising, promotions, or disclosures) and any claims that may arise after the termination of this Master Agreement. This arbitration provision will survive the termination of the Services and/or this Master Agreement.

This Master Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., governs the interpretation and enforcement of this provision. An American Arbitration Association ("AAA") arbitrator will decide the substance of all Claims in accordance with all Applicable Law, including recognized principles of equity and statutes of limitations, and will honor all claims of privilege recognized by law.

Unless both Client and Bank agree otherwise, each party must bring all related or similar Claims in a single arbitration proceeding. If Client or Bank later initiates a subsequent arbitration asserting Claims that are related or similar to ones that were raised by such party in an earlier-filed arbitration, the AAA or the arbitrator will either: (i) consolidate the subsequent arbitration with the earlier proceeding if it is ongoing or (ii) dismiss the subsequent arbitration if it raises Claims that would be barred by Applicable Law if brought in court.

(a)   *Notice of Dispute and Arbitration Procedures.* A party who intends to pursue a Claim must first send to the other a letter describing the Claim and containing the information described below (a "Notice of Dispute"). Any Notice of Dispute sent to Bank should be addressed to:

BMO Harris Bank N.A.
Documentation Analysis and Control
111 West Monroe Street 9 Center
Chicago, IL 60603



Any Notice of Dispute sent to Client by Bank will be sent to the address in Bank's records that is associated with Client's Account at the time the Notice of Dispute is sent. The Notice of Dispute must (a) describe the nature and basis of the Claim; (b) set forth the specific relief sought; (c) set forth the name and address of the claimant; and (d) include the Services and/or the provision of the applicable agreement to which the Claim relates. If Bank and Client do not reach an agreement to resolve the Claim described in the Notice of Dispute within forty-five (45) days after the Notice of Dispute is received, Client or Bank may commence an arbitration proceeding with the AAA. If Client or Bank attempts to commence arbitration proceedings before providing the requisite Notice of Dispute, the other party may inform the AAA of this agreement and direct it to refrain from commencing administration of arbitration proceedings until the requisite time period for notice has passed. Neither Client nor Bank will disclose to the arbitrator the existence, amount, or terms of any settlement offers made by either party until after the arbitrator issues a final award resolving the Claim.

The arbitration will be governed by the AAA's Commercial Dispute Resolution Procedures, as amended from time to time (the "AAA Rules") as modified by this Agreement, and will be administered by the AAA.

The arbitrator is bound by the terms of this Master Agreement. All issues are for the arbitrator to decide, except that, issues relating to the arbitrability of Claims or the scope, and enforceability of this arbitration provision, including the interpretation of the prohibition of class and representative actions and nonindividualized relief, are for the court to decide. The right to a hearing will be determined by the AAA Rules. Any in-person arbitration hearing will take place in Chicago, Illinois. Regardless of the manner in which the arbitration is conducted, the arbitrator, upon the request of either party made prior to the closing of the hearing (or, if there is no oral hearing, prior to or along with submission of final documents to the AAA), will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award, if any, is based. Unless otherwise agreed by Client and Bank, any award will be rendered by the arbitrator not later than fourteen (14) days from the date of the closing of the hearing or, if there is no oral hearing, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator in accordance with the AAA Rules.

(b)   *Prohibition of Class and Representative Actions and Non-Individualized Relief.* The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief necessitated by that party's individual claim; any injunctive relief must be individualized in nature and cannot affect individuals other than the claimant. CLIENT AND BANK AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN CLIENT'S OR BANK'S INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING, OR AS A PRIVATE ATTORNEY GENERAL OR ON BEHALF OF THE GENERAL PUBLIC. Further, unless both Client and Bank agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If a court decides that any part of this arbitration provision (other than the prohibition of class or representative actions and/or consolidation) is invalid or unenforceable, the other parts of this arbitration provision will still apply. However, if a court decides that this paragraph's prohibition of class or representative actions and/or consolidation is invalid or unenforceable, then the entirety of this arbitration provision will be null and void.

(c)   *Access to Government Agencies.* This arbitration provision does not preclude Client from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against Bank on Client's behalf.

(d)   *Other Remedies.* This arbitration provision and the exercise of any of the rights Client and Bank have under this provision will not prohibit Client or Bank from exercising any lawful rights either Client or Bank have to use other remedies available to preserve, foreclose or obtain possession of real or personal property or exercise self-help remedies, including set-off rights as described in this Master Agreement.



## Treasury Services Master Agreement - Service Selection Form

This Service Selection Form ("Service Selection Form") is a part of the Treasury Services Master Agreement (as amended from time to time "Master Agreement") between PRIME TRUST, LLC ("Client") and BMO Harris Bank N.A. ("Bank"). Capitalized terms used but not defined in this Service Selection Form have the meanings given in the Master Agreement.

### Service Selection

Client hereby elects to receive and requests from Bank the Services identified below in this Service Selection Form. Bank will provide to Client the Service(s) selected by Client upon Bank's acceptance and approval of this Service Selection Form and the completion of any required setup process.

### Services Selected:

Wire Transfer
Online Bill Payment
Check Imaging
Multicurrency Account
Online Banking for Business

### Representations and Warranties

In addition to the terms and conditions included in the Master Agreement:

(a)     Client represents and warrants to Bank that Client has received and read the Service Documentation for the Services Client selects and Client agrees to be bound by all terms, conditions and procedures included in the Master Agreement, this Service Selection Form, and all applicable Service Documentation.

(b)     The person executing this Service Selection Form on Client's behalf certifies to Bank that he or she is an Authorized Individual, and/or is otherwise authorized to act on Client's behalf, as provided in Client's authorizing documents, with full power and authority to execute this Service Selection Form on Client's behalf.

### Designated Personnel

Client acknowledges and agrees that when Client specifies to Bank a person as a Corporate Administrator, Designated Contact, or otherwise, that person has the requisite authority to perform the duties of the position as described in the Master Agreement and/or the relevant Service Documentation on Client's behalf.

### Changes

If Client wishes to change any of the features or service options for a Service already selected, including changing designated personnel for a particular Service, Client may do so by having an Authorized Individual complete and execute a setup form provided by Bank, or some other form acceptable to Bank. If Client chooses to communicate a change to Bank by any other means, Bank is entitled (but not obligated) to rely on the change communicated to Bank if Bank in good faith believe it was communicated to Bank by someone authorized to do so on Client's behalf.

### Additional Services

If Client wishes to add a Service, Client must complete a new Service Selection Form for the additional Service and any other setup documentation Bank may require.

## Agreement and Consent

Please Read the Following Important Agreement and Sign Where Indicated

In the following agreement, "you" means each person who signs below.

▪        You and Bank agree to the terms and conditions set forth in this Treasury Services Master Agreement, effective as of the date set forth in the space provided under Bank's signature below.



## Agreement and Consent (cont'd)

- You select the Services indicated above in the Service Selection Form and certify that you have received, read and agree to the terms and conditions of the Service Documentation for the selected Services.

PRIME TRUST, LLC

Authorized Designator

███████████████████

1/18/2022
Date

Title: PRESIDENT OF FINANCIAL OPERATIONS

Authorized Designator

Signature                                            Date

Full Name:

Title:

Tax Identification Number: 812 23 6823

## Bank Representative

BMO HARRIS BANK N.A.

Signature          **Dawn**      Digitally signed        Date
                   **Mahn**      by Dawn Mahn
                                 Date:
Full Name:                       2022.01.20
                                 16:28:08 -06'00'
Title:

## Contact Us

**BMO Harris Bank N.A.**                 **Client Services Response Centre**
111 W. Monroe                            Tel.: 1-877-895-3278
Chicago, IL 60603                        Visit: bmoharris.com

Banking products and services are provided by BMO Harris Bank N.A. and are subject to bank and credit approval. BMO Harris Bank N.A. **Member FDIC.**
® The Electronic Payments Association is a trademark of National Automated Clearing House Association.



TPSUS001 (Jan 2022)                      January 14, 2022                      Page 14 of 14

 **BMO** | **Beneficial Ownership Certification**

# Certification Regarding Beneficial Owners of Legal Entity Customers
(all information is required)

## Person Certifying Beneficial Ownership Information

| Name (First, Middle, Last) | Title |
|---|---|
| ▇▇▇▇▇ | Assistant Secretary |

## Legal Entity for Which Beneficial Ownership is Being Provided

**Name**

Prime Trust, LLC

**Address (Number, street and apartment/suite number. P.O. Box is not acceptable.)**

330 S. Rampart Blvd, STE 260

| City | State/Province | Country | Zip Code |
|---|---|---|---|
| Las Vegas | Nevada | U.S.A. | 89145 |

## Control Prong  (only one individual)

An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer).

| Name (First, Middle, Last) | Title | Ownership % (if applicable) |
|---|---|---|
| ▇▇▇▇▇ | Chief Executive Officer | N/A |

**Residential/Business Street Address (number, street, and apartment or suite number)**

▇▇▇▇▇

| City | State/Province | Country | Zip Code |
|---|---|---|---|
| Las Vegas | Nevada | U.S.A. | 89145 |

| Date of Birth (mm/dd/yyyy) | Occupation (Optional) |
|---|---|
| ▇▇▇▇▇ | |

For a U.S. Person: Social Security Number | For a Non-U.S. Person: Social Security or Passport Number and Country of Issuance or Similar ID*1

▇▇▇▇▇

### Identity Verification

- **For Non-U.S. Person** – attach photocopies or other reproductions of a Passport, Valid National ID or other unexpired primary government ID or two secondary IDs (see Appendix for list of acceptable forms of primary government ID or two secondary IDs)
* **For U.S. Person** – BMO reserves the right to request copies or other reproductions of unexpired government photo ID

Does the individual currently serve, or has the individual previously served, in a high position in a U.S./State/local or foreign government/entity?   [X] No   [ ] Yes

Does the individual have a family member or close associate who currently occupies, or has previously served in, a high position in a U.S./State/local or foreign government/entity?   [X] No   [ ] Yes

# Ownership Prong  (up to four individuals)

Each individual, if any, who owns, directly or indirectly, 25 % or more of the equity interests of the legal entity customer (e.g., natural person that owns 25% or more of the shares of a corporation).

Are there any owners that meet the above criteria?    [x] No    [ ] Yes

| Name (First, Middle, Last) | Ownership % (if applicable) |
|---|---|
| | |

**Residential/Business Street Address (number, street, and apartment or suite number)**

| City | State/Province | Country | Zip Code |
|---|---|---|---|
| | | | |

| Date of Birth (mm/dd/yyyy) | Occupation (Optional) |
|---|---|
| | |

For a U.S. Person: Social Security Number | For a Non-U.S. Person: Social Security or Passport Number and Country of Issuance or Similar ID[*1]

### Identity Verification

- **For Non-U.S. Person** – attach photocopies or other reproductions of a Passport, Valid National ID or other unexpired primary government ID or two secondary IDs (see Appendix for list of acceptable forms of primary government ID or two secondary IDs)
* **For U.S. Person** – BMO reserves the right to request copies or other reproductions of unexpired government photo ID

Does the individual currently serve, or has the individual previously served, in a high position in a U.S./State/local or foreign government/entity?    [ ] No    [ ] Yes

Does the individual have a family member or close associate who currently occupies, or has previously served in, a high position in a U.S./State/local or foreign government/entity?    [ ] No    [ ] Yes

## Additional Legal Entities for Which Accounts are Being Opened

Are there any legal entities with identical equity ownership as noted above entering into a relationship with BMO?    [x] No    [ ] Yes

## Foreign Customer Supplemental Question (Applicable only to legal entities incorporated outside of the U.S.)

Has the **legal entity** issued or does it have the ability to issue Bearer Shares[*]?    [ ] No    [ ] Yes

*A bearer share is a negotiable instrument that accords ownership in a legal entity to the person who possesses the physical bearer share.

## Certification[2]

I hereby certify, to the best of my knowledge, that the information provided above is complete and correct.

███████████                                              11/12/2021
Signature                                                Date

**BMO** 🏠 **Harris Bank**                                    **Commercial Account Agreement**

## We're here to help.

## Terms and Conditions

This Commercial Account Agreement (the "Agreement") applies to each commercial deposit account established by you with BMO Harris Bank N.A. or BMO Harris Central N.A. previously, at this time, or in the future, except for deposit accounts governed by the Deposit Account Agreement for Personal and Business Accounts. In this Agreement, the terms "you" and "your" refer to the owner(s) of an applicable commercial deposit account (the "Account") and to authorized representatives as appropriate. The terms "us," "we," and "our" refer to BMO Harris Bank N.A. or BMO Harris Central N.A., as applicable. This Agreement replaces any prior agreement between you and us regarding the Account. By signing a signature card, signing corporate account resolutions, or using the Account after the receipt of this Agreement, you accept and agree to all terms and conditions in this Agreement as may be modified by us from time to time. This Agreement incorporates the Funds Availability Policy attached hereto. The Account may be used for business purposes only and not for personal, family, or household purposes of any kind.

1. **Authorization Forms**

   We require separate account authorization forms which designate the person or persons authorized to access the Account and conduct banking business with us and the limitations, if any, on their authority. We will honor such authorization according to its terms until we receive properly authorized written notice that the existing authorization is changed or terminated and we have a reasonable opportunity to act on such notice. We will not be responsible for any losses if you fail to timely and properly notify us of changes in authorization or authorized individuals. You must also promptly notify us in writing of any change in the name of your company or your address.

   If you allow Items to be written and presented before we receive properly completed authorization forms, we may either refuse to pay the Items (even though there are funds in the Account) or elect to pay the Items, in which event you bear sole responsibility for such Items. Regardless of our election, we will not be liable to you with respect to such Items or our handling of the Items.

2. **TIN**

   You must provide us with your Taxpayer Identification Number ("*TIN*"), certify its authenticity, and provide us with other requested identification information before the Account is opened. If we have not received your certified TIN and the other requested information, we may refuse to accept your initial deposit, pay interest on your balances, or permit withdrawals or transfers, and may close the Account. Any interest paid prior to receipt of your certified TIN is subject to back-up withholding under IRS regulations.

3. **USA Patriot Act**

   To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or business entity which opens an Account.

   When you open an Account with us, you must provide us with your name, principal and local (if different) address, date of establishment, employer identification number, and other information. You must also provide us with your organizational documents when requested. We may also seek identification information about individuals who will have authority over the Account, initially and in the future. You agree that we may seek information about you from third parties to confirm

your identity and for other Account related purposes. You represent and warrant to us that the information provided to us by you or on your behalf is true and correct. You understand that we will maintain a record of this information.

**4.   Separate Agreements**

The provisions of this Agreement are in addition to, and not in place of, any separate service or other agreement between us and you covering your use of banking services for the Account. If there is a conflict between the provisions of this Agreement and a separate service or other agreement, the separate service or master agreement controls for that service.

**5.   Fees and Charges; Finance Charges**

You agree to pay fees and other charges in connection with the Account as established by us from time to time. You also agree to pay us our costs and hourly fees for complying with subpoenas or other legal orders and your requests. You authorize us to debit or otherwise deduct the fees and other charges, and costs from the Account, even if it creates an overdraft. We may assess finance charges on any amount due us under this Agreement that is not paid by you within thirty (30) days of receipt of your statement or an invoice showing the amount due.

**6.   Deposits**

Deposits made before the applicable cut-off time on a Business Day are considered made on the day of your deposit. Deposits made after the applicable cut-off time or on a day which is not a Business Day, are considered made on the next Business Day. All transactions including deposits (even those for which we have provided a receipt) are subject to final verification by us. The amount we credit you for a deposit, regardless of our Funds Availability Policy, is provisional and subject to verification and reversal or adjustment at any time without notice to you if we determine it to be incorrect for any reason. You agree that we may make adjustments to the Account to reflect the correction of errors at any time.

We reserve the right to (i) refuse to accept deposits or specific Items for deposit; (ii) establish or modify a minimum or maximum balance that may be maintained in the Account; and (iii) limit the number of deposits and Items deposited. We will not be liable to you even if such action causes Items to be dishonored and returned.

We will rely on the account number in a deposit record even if it identifies a party different from the entity named in the record. We are not obligated to identify any inconsistency in identification.

We may from time to time make available night deposit boxes at one or more of our branch locations. Deposits made at a night deposit box will be retrieved and verified by us once at the beginning of each Business Day. Therefore, if you use a night deposit box during the day, the deposit will not be considered received by us until the next Business Day when we retrieve it and process it. You agree that risk of loss of any deposit to a night deposit box does not pass to us until after we have retrieved it and processed it. Our records as to the amount of any deposit to a night deposit box shall be final and binding, and shall be conclusive evidence of the amount of the deposit. The risk of any loss or shortage is expressly assumed by you.

**7.   Returned or Fraudulent Items**

We have the right to charge the Account for the amount of any deposited Item that is returned to us for any reason unpaid, or paid and later returned, or is the subject of a breach of warranty claim, or we have reason to suspect is fraudulent, counterfeit, or invalid for any reason (and reverse or recover any associated interest or earnings credit), even if you have withdrawn any of the funds or an overdraft in the Account is created or increased. This right to charge the Account is not affected by expiration of any applicable midnight deadline. We may also impose a service charge. We may, in our discretion present an unpaid Item for payment again without notice to you. You agree to immediately repay any overdraft

**Terms and Conditions (Cont'd)**

caused by any such charge to the Account.

8. **Acts and Omissions of Other Banks**

If you cash or deposit an Item with us, we act as your collecting agent to collect the Item. We will use reasonable care in selecting collection banks, but we are not responsible for errors they make including loss of Items in transit. You have the risk of loss for Items lost, mishandled or destroyed in the collection process. We may charge back or debit the Account (or any other account of yours with us) for, or otherwise obtain a refund of, the amount of any credit we gave you for the deposited Item, if the Item is lost, or destroyed or returned unpaid. You agree to assist us in collecting lost, destroyed or returned Items. You also understand that we are not responsible for the insolvency or neglect, or any action or failure to act, of any other bank or intermediary in the collection process.

9. **Foreign Currencies**

Except as provided in any multi-currency agreement or arrangement between us, we may accept deposits in the Account of Items payable in foreign currencies which are convertible to U.S. dollars. We will credit the Account when we receive proceeds in U.S. dollars, and you will bear exchange rate exposure until that time. We will convert foreign currencies to U.S. dollars in accordance with our customary practices. You agree that an Item drawn on a financial institution in a foreign country may be accepted on a collection basis even after we have taken physical possession of such Item, in which case the Funds Availability Policy does not apply to such Items. The actual credit for Items payable in foreign currency will be at the exchange rate in effect at the time of final collection in U.S. dollars and will be net of any fees payable in connection with the currency conversion.

10. **Warranties; Remotely Created Checks**

For each Item you deposit with us, or which we cash for you or otherwise give consideration, you make the following warranties to us in addition to any other warranties under applicable law: all necessary signatures and endorsements have been placed on the Item and are authorized and genuine, the Item has not been materially altered, you have good title to the Item, and no defense of any party to the Item is good against you. If any such warranty is breached, we may deduct the amount of the Item from the Account or otherwise collect from you this amount plus our related fees and expenses.

You agree not to deposit a remotely created check (i.e. a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn) into the Account. We reserve the right to reject remotely created checks from any deposit and reduce the amount of the deposit accordingly or post debit adjustments for the value of any remotely created checks. If you nevertheless deposit a remotely created check and we accept such remotely created check for deposit, you warrant and guarantee that the person on whose account the remotely created check is drawn authorized the issuance of the check in the amount stated on the check and to the payee stated on the check. If any such warranty is breached, we may deduct the amount of the Item from the Account or otherwise collect from you this amount plus our related fees and expenses. You agree to maintain, at our request, a balance in a non-interest bearing account with us in the amount we determine based on a percentage of the amount of remotely created checks you deposit and the return history of such deposits. You further agree to maintain such balance in such account for a period of at least ninety (90) days after the date of the last remotely created check deposited prior to closure of the Account to pay us for any amounts due hereunder.

## Terms and Conditions (Cont'd)

**11. Funds Availability Policy**

Funds from your deposits will be available for withdrawal as provided in our Funds Availability Policy which is a part of, and included with, this Agreement. The Funds Availability Policy may change from time to time without prior notice to you.

**12. Check Endorsement Requirements**

Our Funds Availability Policy also describes our check endorsement requirements. You agree to abide by our endorsement requirements and agree that we have no responsibility for your failure to comply with our endorsement requirements. You agree to indemnify us for and defend and hold us harmless from and against any and all actions, losses, damages, claims, demands, liabilities, costs, or expenses, including court costs and reasonable attorneys' fees and expenses (collectively, "*Claims*"), we may suffer as a direct or indirect result of your failure to comply with our endorsement requirements. You understand that we may refuse to accept Items not properly endorsed by you. We may, however, supply a missing endorsement on an Item we accept for deposit or cash.

**13. Funds Transfers**

The following terms and conditions are in addition to and do not replace any other agreements that we have with you governing electronic transfers.

(a) *System Rules.* Except to the extent conflicting with this Agreement (in which event this Agreement will control to the extent legally permitted), funds transfers (payment orders and ACH entries) to or from the Account are subject to the rules then in effect for the funds transfer system through which the transfers are made, including, for ACH transactions, the rules of NACHA – The Electronic Payments Association®, and for transfers through the funds transfer system of the Federal Reserve Banks, the applicable laws and regulations of the Board of Governors of the Federal Reserve System and related operating circulars.

(b) *Credits.* Unless we have otherwise agreed in writing, the periodic statements we provide will notify you of funds transfer payments and credits received by us for credit to the Account. All credits to the Account for funds transfers that we receive are provisional until we receive final settlement for the funds except where otherwise required by applicable law or rule. If we do not receive final settlement, you agree that we are entitled to a refund (through reversal debit or otherwise) of the amount credited to the Account for that transfer, together with any associated interest or credit. We have the right to charge the Account for the amount of any funds transfer credit that we have reason to suspect is fraudulent, erroneous, or invalid for any other reason (and reverse or recover any associated interest or earnings credit), even if you have withdrawn any of the funds or an overdraft in the Account is created or increased. You agree to immediately repay any overdraft caused by any such charge to the Account.

(c) *Transfers.* You are responsible for the contents of each funds transfer instruction and entry sent to us by you or on your behalf. In the absence of specific written instruction, we will choose the funds transfer system and intermediary banks, as necessary to complete your funds transfer. You acknowledge and agree that we and any bank or intermediary are entitled to rely on the account number and bank identification number which appear on any payment order issued by you or on your behalf, without any obligation to look at the name of the receiving customer or bank which may also appear on the payment order.

(d) *ACH.* You authorize us to debit or credit the Account for ACH entries to or from the Account. ACH entries must be transmitted to us in accordance with the applicable rules and our policies and procedures. You are responsible for all entries authorized by you and entries transmitted to, and accepted by, us in accordance with the ACH procedures, including the security procedures.

**14. Dates and Instructions**

You agree not to issue or present incomplete, post-dated or conditional Items. You agree that we may, without inquiry or liability, accept or pay an Item drawn on the Account even though (a) it is received prior to the date of the Item or contrary to special instructions identified on the Item (whether or not we are aware of such date or special instructions), or (b) the Item is undated or the date on the Item is more than six months old. If you do not want us to honor an Item, you must give us a stop payment order.

**15. Payment of Items**

**The order in which you make withdrawals from the Account will not necessarily be the same as the order in which we post these transactions to the Account, and this posting order may affect whether you incur service fees and costs associated with overdrafts, as set forth in Section 17 below. You have no right to tell us the order to use when posting Items or other transactions to the Account.**

The Account may be debited on the day an Item is presented by any means, including, for example, electronically, or at an earlier time based on notification we receive that an Item drawn on the Account has been presented for payment or collection.

At the end of each Business Day, we will process and post transactions to the Account in the following order, by category and within each category:

(a)  Credits - Any deposits and other credits we receive, prior to the identified cutoff times, will be posted to the Account Credits for interest will be handled in accordance with category (e) below.

(b)  Certain Other Debits - Outgoing wires, most internal transfers to other Accounts with us, transfers to other accounts initiated through our Online Banking for Business service, cash withdrawals, and checks which were cashed by us, will be processed based on the amount of the transaction, from lowest to highest.

(c)  ACH transactions – All ACH transactions will be processed based on the amount of the transaction from lowest to highest. If you use a check which is electronically converted by the payee, it will be processed as an ACH transaction.

(d)  Checks – All check transactions will be processed based on the number of the check, from lowest to highest, regardless of the date on which the check was originally written or the amount of the check. This includes checks created through a bill payment service, which may have a number that is not in sequence with other checks you write from your checkbook. If a check number is not available, all numbered checks will be processed first, any remaining checks will be processed based on the amount of the check, from lowest to highest.

(e)  Bank generated transactions – such as fees that are owed to us and interest credits will generally be processed as they occur.

The description of the Items above is intended to be representative of the most common types of transactions within each category. Other Items may be debited from the Account even though not specifically listed above.

We may, as a condition of withdrawal, require you to provide identification or information acceptable to us.

**16. Checks Presented Over the Counter**

If a check you have written is presented to us "*over-the-counter*" by someone who is not our customer, we may require proper identification and may charge a fee. We may dishonor the check if the person refuses to pay the required fee or provide proper identification.

**17. Overdrafts/Insufficient Funds**

You agree to limit all withdrawals and transfers from the Account to the amount of the Available Balance in the Account at the time the withdrawal or transfer is made or initiated. We may, at our option and without notice to you, pay or refuse to pay Items, and may accept or reject payment orders if there is or would be an insufficient Available Balance in the Account without regard to whether we may have previously honored Items or accepted payment orders in similar circumstances. If we honor an Item or accept the payment order and create an overdraft, you agree to be liable for, and immediately repay any Account deficit resulting from, charges or overdrafts to the Account, however arising, together with our service fee and the costs we incur to collect the deficit, including, to the extent not prohibited by law, our reasonable attorneys' fees. We may also place a hold for the amount of the overdraft on the Account. We may, without notice to you, refuse to pay Items, honor payment orders or permit withdrawals against uncollected funds.

**18. Check and Form Specifications**

All checks, withdrawal forms, deposit slips, and other forms used in connection with the Account must be on forms obtained from us or approved by us. You agree that we may refuse to accept for deposit or process any forms presented in a form that cannot be processed on equipment used in our normal business operations.

**19. Signature Requirements; Forgeries and Alterations**

You understand that we process Items using high speed automated equipment based on information encoded on such Items, and we are not required to examine each Item drawn against the Account for dates, signatures, legends, or indorsements. You agree that we will have no liability to you for failing to detect a forged or missing signature on, or an alteration of, an Item provided that we exercise ordinary care in the processing of such Item, and you agree that our use of electronic processing and automated payment of Items without manual verification of signature, or other examination, is a procedure that does not vary unreasonably from general banking usage and constitutes ordinary care by us in processing Items. We may collect your signature in connection with the opening or maintenance of the Account, but this does not create any responsibility on our part to verify signatures on Items and other charges to the Account.

We will have no responsibility for reviewing the number or combination of signatures on an Item drawn against the Account. Even if you have indicated that more than one signature is required in connection with an Item drawn on the Account, whether on the Item itself or otherwise, or there are two or more lines on an Item for signature, these are solely for your internal control purposes and are not binding on us, and you authorize us to honor or pay an Item or transaction through the Account contrary to the signature requirements you have specified.

**20. Facsimile or Mechanical Signatures/Automatic Check Writing Device**

You agree that if you use a facsimile or other mechanical signature (including a stamp) to sign or indorse Items, or if you use a computer or other device to create and/or sign or indorse Items you have the sole responsibility for securing such device and the entire risk of unauthorized use, and we may conclusively rely on that signature as your authorized signature without regard to when, by whom, or by what means such signature may have been made or affixed to an Item. If you use a facsimile or other mechanical signature (including a stamp) to sign or indorse Items, or if you use a computer or other device to create and/or sign or indorse Items, we may also conclusively treat as authorized any signature that

reasonably resembles your facsimile or mechanical signature whether such indorsement was affixed by you or by someone having no authority to supply your indorsement.

### 21. Protection Against Unauthorized Items, etc.

You acknowledge that the Account is susceptible to losses from unauthorized, altered, or counterfeit Items and other types of fraud. We offer a variety of products and services, such as "*positive pay*" and account blocks and filters, designed to detect and deter fraud. If you decline to use or fail to implement any of these products and services, or you fail to follow the procedures necessary for proper use of these products or services, or you fail to follow other precautions reasonable for your particular circumstances, you understand that there is a substantially greater risk of loss from fraud, and you agree that (a) you will be treated as having assumed the risk of those losses, (b) you will be precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent Item that such product, service, or precaution was designed to detect or deter, and (c) we will not be required to re-credit the Account or otherwise have any liability for paying such Items.

### 22. Internal Controls

You acknowledge that you share responsibility for preventing the fraudulent or unauthorized use of the Account. You agree to institute and maintain reasonable and effective procedures to ensure the security of your checks and check stock, access to the Account, and your internal procedures.

### 23. Lost Checks or Devices

You agree to notify us promptly, both orally and in writing, at the telephone number and address listed on your statement, of any suspected loss, theft, or unauthorized use of your checks or any card, code, or device permitting access to, or evidencing the Account. Until we have a reasonable opportunity to act on such notice, we may maintain debits and honor transactions effected on the Account (except as otherwise provided by law) through the use of any such checks, card, code or device. We may close the Account, permit withdrawals by you, or issue new evidence of an Account on such conditions as we may require.

### 24. Stop Payment Orders

You may instruct us to stop payment on a check that has not been paid. We will not have a duty to stop payment until you have given us all of the information that we require, including the proper Account name, Account number, check number and date, the payee and the amount of the check, and we have had a reasonable opportunity to take action prior to us paying, accepting, cashing, certifying or otherwise acting with respect to, or becoming obligated on, the check. We reserve the right to require additional information. All of the required information must be correct for the stop order to be effective. A written order is effective for twelve months unless we agree in writing to a different period. A stop payment order may be renewed for additional periods as permitted by our procedures and policies then in effect (subject to an overall maximum of six years) by submitting a written request with the required information prior to expiration of the then-effective stop payment order. An oral order is effective for no more than 14 days, unless confirmed by you in writing within that period. We may pay a check after the stop payment order expires or if required by law. Stop payment orders received after regular banking hours (or a later time as specified by us for a particular service) or on a day which is not a Business Day are deemed received at the opening of business on the next Business Day. If you have preauthorized us to make payments out of an Account, stop payment orders must be received by us at least three Business Days before the payment is scheduled to be made. You may not issue stop payment orders for cashiers checks, certified checks, or other bank obligations. By placing a stop payment order, you agree to indemnify us for and defend and hold us harmless from and against any and all Claims incurred by us due to our refusal to pay the Item. You also agree to pay our fees for stop payment orders.

## 25. Interest

Except with respect to CDs as described in Section 35 or as otherwise agreed to by us in writing, interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion and that are calculated and compounded by such methods as we may establish and change from time to time in our discretion. The interest rate may be dependent upon the balance in the Account. Unless governing law or regulations specify otherwise, we reserve the right to pay interest only on Available Balances, not to pay interest on an Account open for less than 90 days or an inactive Account, and not to pay interest accrued but not credited at the time an Account closes. We will not pay interest on an Account that does not meet eligibility requirements established by law.

## 26. Checking Subaccounts

For various accounting purposes, the Account (and, for eligible customers, your NOW account) may consist of two sub-accounts: a transaction sub account and a money market sub-account. The account will still be treated as a single account for most other purposes including determining any fees, charges, earnings credits, interest calculations and Available Balances and for information reporting and statement purposes. All deposits or credits to the account will be credited to your transaction sub-account, and all of your checks, transfers, withdrawals and other debits (collectively, "Debits") will be deducted from your transaction sub-account. Balances above a threshold level set by us are periodically transferred into your money market sub-account. As funds in your money market sub-account are needed to pay Debits and maintain the threshold balance, they are transferred back to your transaction sub-account. Transfers to your transaction sub-account will be made up to the maximum number of times per period permitted for MMDAs hereunder. The last permitted transfer will include the transfer of the entire balance of your money market sub-account into your transaction sub-account. We set the threshold balance and may change it at any time in our discretion. Generally, we will allow withdrawals from your money market sub-account at any time without prior notice from you. However, in accordance with Federal Regulation D, we reserve the right to require at least seven (7) calendar days' prior notice that a withdrawal is going to be made.

## 27. Statements and Notices; Responsibility

(a)    *General.* At your election, we will either provide to you electronically through our Online Banking for Business service (the "Website") or by mail at your current address in our files periodic statements ("Statements"), notices and other information regarding the Account ("Regulatory Disclosures"). In either case, we may assess charges for such service, as determined by us from time to time. You acknowledge that you are in the best position to discover the payment of an Item charged to the Account which is unauthorized (e.g., because of a forgery, alteration, or unauthorized or missing signature) or altered, as well as erroneous charges, debits, or other entries to the Account (collectively, "errors"). You agree to promptly examine each statement, record, notice, canceled check and other Items provided or made available to you (whether originals, images, copies or in other formats) and to promptly notify us of any error or problem. You must notify us of a forged or unauthorized signature, alteration, any other error or account problem, including an erroneous statement entry, unauthorized or missing indorsement, discrepancy or improper charge or entry, within a reasonable time under the circumstances (not to exceed 14 days) after we send or otherwise make available to you your statement, your checks (whether originals, images, copies or in other formats), or information identifying the transactions or indicating the error or problem. Such notifications are to be made by calling us or writing to us at the telephone number or address listed on your statement. If you fail to notify us promptly within the timeframes described above, we will not be obligated to re-credit or refund the amount of the error or account problem and you will be precluded from asserting the error or account problem against us. If you make a claim for an error or problem, you agree to cooperate with us as we may request (including providing an appropriate affidavit) in the investigation of the situation and any effort by us to recover funds on your or our behalf.

(b)     *Consent to Electronic Statements.* If you elect to receive Statements and Regulatory Disclosures electronically through the Website pursuant to Section 27(a) above, you hereby consent to the receipt of such Statements and Regulatory Disclosures electronically in lieu of paper Statements; provided, however, we may provide paper Statements at any time.

(c)     *Unencrypted Email Communication.* You recognize that unencrypted messages, including email, are not secure. If you choose to communicate with us by email, you acknowledge that we may rely on the contents of the email as having been authorized by you, if we accept and act on it in good faith. You agree that we may reply to you in an email with the requested information. You assume the entire risk for unencrypted electronic communications.

## 28. Indemnity and Limitations

IN NO EVENT UNDER ANY THEORY SHALL WE OR ANY OF OUR AFFILIATES, OR ANY OF OUR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, OR SERVICE PROVIDERS, HAVE ANY LIABILITY TO YOU OR ANY OTHER PERSON OR COMPANY FOR ANY CLAIM OR DAMAGE OF ANY KIND (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF, OR RELATING TO, OUR PROVIDING THE ACCOUNT OR ANY SERVICES RELATED TO THE ACCOUNT, EXCEPT TO THE EXTENT THAT SUCH CLAIMS OR DAMAGES ARE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH SECTION 46 OR A COURT OF COMPETENT JURISDICTION BY A FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED THAT IN NO EVENT SHALL WE OR ANY OF OUR AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS HAVE ANY LIABILITY TO YOU OR ANY PERSON OR COMPANY FOR INDIRECT LOSSES, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST BUSINESS, PROFITS OR REVENUE, GOODWILL, OR ANTICIPATED SAVINGS, EVEN IF WE ARE AWARE OF THE POSSIBILITY OF, OR COULD REASONABLY FORESEE, SUCH DAMAGES.

To the extent that provisions of applicable law prohibit an agreement to disclaim a bank's responsibility for its failure to exercise ordinary care, our responsibility to you under this Agreement is limited to the exercise of ordinary care in providing the Account and any services related to the Account. Our ordinary care is to be evaluated based on reasonable commercial banking standards prevailing in our industry and location for similarly situated commercial banks.

You agree to indemnify us and our affiliates and each of our respective directors, officers, employees, agents, and service providers (the "Indemnified Parties") from, and defend and hold harmless each of the Indemnified Parties from and against, any and all Claims directly or indirectly arising out of or relating to our providing the Account or services related to the Account (including, without limitation, any and all Claims in connection with complying with or responding to subpoenas, summonses, search warrants, or requests or demands from government agencies), except to the extent that such Claims are determined by binding arbitration in accordance with Section 46 or a court of competent jurisdiction by a final and non-appealable judgment to have resulted from our gross negligence or willful misconduct.

## 29. Transfer and Assignment Restrictions

You are prohibited from transferring or assigning your rights to, or granting a security interest in, the Account without our prior written consent. You agree to indemnify us for and defend and hold us harmless from and against all claims, losses, liabilities and expenses incurred by us if you transfer, assign or grant a security interest in the Account (whether or not we consented to such security interest). Any assignment or pledge of the Account is subject to our prior security interest and right of set-off.

## 30. Privacy and Disclosure of Information

We protect the confidentiality of your financial information. We do not disclose information about the Account or transactions in the Account except as follows: (a) to third parties where it is necessary for completing transfers or tracing transactions, or resolving errors or claims; (b) to credit bureaus or to verify or disclose the existence, amount, or condition

of the Account for third parties, such as merchants, or other financial institutions; (c) pursuant to court orders and other legal process; (d) in connection with examinations by banking authorities or to comply with subpoenas, summonses, search warrants, or requests from government agencies; (e) to companies affiliated with us; (f) to companies who provide services to us, such as check printers and data processors; (g) in connection with any litigation involving, or the enforcement of our rights and remedies under or in connection with, this Agreement or any other agreement between us; (h) whenever required by law, regulation, or rules, including, where applicable, the rules of NACHA – The Electronic Payments Association® or other funds transfer systems used in connection with a funds transfer; (i) as permitted under any other agreement between you and us; and (j) with your consent.

### 31. No Internet Gambling Transactions

We are subject to the Unlawful Internet Gambling Enforcement Act (the "*UIGEA*"). You represent and warrant and agree that you are not engaged in the business of betting or wagering (as such terms are defined in the UIGEA). You acknowledge and agree that this Account will be subject to closure in the event that you, at any time, engage in the business of betting or wagering.

### 32. Termination

We reserve the right to close the Account, with or without cause, at any time. You may, at any time, close the Account after we have received written notice and have had a reasonable opportunity to act on it. The existence of a zero balance in the Account does not itself terminate the Account. Our rights under this Agreement will survive the closing or termination of the Account.

### 33. Pre-Authorized Debits for Loan Payments

Unless other arrangements for loan payments have been agreed upon in writing, you authorize us to charge to the Account any unpaid amounts or other extensions of credit which may be outstanding at any time. We will attempt to give you notice prior to debiting the Account, but we are not obligated to do so.

### 34. Provisions for our Corporate Money Market Deposit Account ("MMDA")

(a) *Interest Earnings.* The daily Collected Balance in the MMDA will earn interest as described in Section 25. However, no interest will accrue for any day on which the daily Collected Balance falls below our minimum balance requirement for this type of account. If the average daily Collected Balance for a statement month falls below the minimum, no interest will accrue for that month.  "Collected Balance" means the total of currency deposits made to the MMDA plus the total amount of checks and other Items deposited which have become available to you according to our Funds Availability Policy, plus all interest credited to the Account minus all withdrawals and other debits charged to the MMDA. This balance is calculated daily and is applied to the posted interest rate for that day. Accrued daily interest earnings will be credited to the MMDA on the last day of the month.

(b) *Deposits.* After opening the MMDA with the minimum initial deposit, you can make additional deposits at any time. Generally, your additional deposit may be in any amount, but we reserve the right to refuse or limit the amount of additional deposits to the MMDA.

(c) *Withdrawals.* We may, at our option, limit you to no more than a combined total of six (6) transfers and withdrawals from an MMDA per month, or monthly statement period or cycle, to another account of yours with us or to a third party, by means of a preauthorized or automatic transfer, telephonic, facsimile, or computer generated order or instruction, or check, draft, debit card, or other similar order made payable to a third party. The following transfers would not be subject to, or included in, such six (6) transfer or withdrawal limitation: (i) transfers from an

MMDA to repay loans originated or serviced by us and associated expenses, (ii) transfers from an MMDA to another Account, and (iii) withdrawals from an MMDA, in each case when such transfers or withdrawals are made by mail, messenger, ATM, or in person or when such withdrawals are made by telephone via a check mailed to you.

We may, at our option, decline any withdrawal or transfer that exceeds these limits or we may charge a fee for any withdrawal that exceeds these limits. If you exceed these withdrawal limitations, we reserve the right to change the MMDA to another type of deposit account that pays a lower rate of interest or no interest, but has more flexible withdrawal capabilities, or we may close the Account.

(d) *Notice of Withdrawal.* Generally, we will allow withdrawals from the MMDA at any time without prior notice. However, in accordance with Federal Regulation D, we reserve the right to require at least seven (7) calendar days' prior written notice that a withdrawal is going to be made.

(e) *Closing.* Either you or we may close the MMDA at any time. The MMDA may continue to earn interest upon closing. Any accrued interest may be credited to the Account.

## 35. Certificate of Deposit (Time Deposit) Accounts

This section applies to certificate of deposit (time deposit) Accounts ("CDs"). If there are any conflicts between the provisions of this section and any other provisions of this Agreement insofar as they relate to CDs, the provisions of this section shall control. We will provide you with a Certificate of Deposit Account Disclosure describing certain specific terms and conditions of each CD, such as the maturity date, interest rate, interest payment terms, interest computation method, renewal provisions, and early withdrawal terms, including any applicable early withdrawal fees. Unless otherwise provided in the Certificate of Deposit Account Disclosure, the rate of interest paid, interest computation method, renewal provisions, and early withdrawal terms of the CD will not change during its term. CDs are not eligible for check transactions or funds transfer and other treasury management services. Periodic statements will not be provided for CDs.

## 36. Security Interest; Set-off

(a) *Security Interest.* You grant us and each of our Affiliates a first priority security interest in all Accounts owned by you, now or in the future, with us or any of our Affiliates, to secure payment of any or all obligations (including for service fees and charges) you may have to us or any of our Affiliates, whether direct or indirect, absolute or contingent, due or to become due, whether now existing or hereafter arising, and whether several, joint or joint and several, regardless of whether another party is also liable for such obligations or such obligations relate to the Account, a credit agreement, or other circumstances. For purposes of this Agreement, "Affiliate" means any corporation, limited liability company, or other legal entity that controls, is controlled by, or is under common control with another legal entity.

(b) *Set Off.* In addition to our rights under this Agreement or otherwise, we and each of our Affiliates may exercise the right of set-off against any or all of your Accounts and deposits except as prohibited by applicable law. If you have any obligation to us or any of our Affiliates, under this Agreement or otherwise, whether or not then due, we can use the funds or balances from any Account you have with us or any of our Affiliates to pay or satisfy the obligation or may set off against any amount we owe you in order to obtain payment of such obligation. Except as may be restricted by applicable law, this right may be exercised at any time and without prior notice, regardless of whether it creates an overdraft or results in subsequent dishonor of checks or request to transfer funds. If the law imposes conditions or limits on our ability to take or setoff funds in your Accounts, to the extent that you may do so by contract, you waive those conditions and limits and you authorize us to apply funds in any or all of your Accounts to obligations you owe us or our Affiliates.

(c) *Claims on the Account*. You also grant us the right to terminate or place a hold on, and dishonor all Items drawn on the Account that you have assigned or in which you have granted a security interest to any third party (whether or not we consented to such security interest). Upon receipt of oral or written notice from any party of a claim regarding the Account, we may place a hold on the Account. You agree to indemnify us for and defend and hold us harmless from and against our failure or refusal to honor any Item drawn on a pledged or encumbered Account or any other withdrawal instruction.

### 37. Legal Process

We may comply with any writ of attachment, adverse claim, execution, judgment, garnishment, tax levy, citation to discover assets, turnover or restraining order, subpoena, warrant or other legal process, however served or made which we believe to be valid. Any such legal process is subject to our security interest and rights of set-off. We may, in our sole discretion, respond to legal process by placing a hold on funds in the Account subject to such legal process, close the Account, or interpleaded the funds. You agree to pay us all of our fees and expenses, including reasonable attorneys' fees in responding to any such legal process, which fees and expenses may be charged against the Account even if an overdraft is created. We may also create a hold on the Account in anticipation of such fees and expenses. We will have no liability for complying with such legal process, or if there are insufficient funds available in or another restriction on the Account because of actions we take in response to such legal process. We may also place a hold on the Account and conduct an investigation if we suspect there to be fraud or illegal activity associated with the Account.

### 38. Accounts That May Be Eligible for Pass-Through Deposit Insurance

This section applies as of the compliance date of the FDIC's Rules and Regulations for Recordkeeping for Timely Deposit Insurance Information, 21 CFR Part 370. If you have opened an Account on behalf of the beneficial owner(s) of the funds in the Account (for example as an agent, nominee, guardian, executor, custodian or in some other capacity for the benefit of others), the Account may be eligible for "pass-through" deposit insurance from the FDIC. This means the Account could qualify for more than the standard maximum deposit insurance amount. For such Accounts, in order for us to comply with §370.5(a) of the FDIC's Rules and Regulations, if the Account has transactional features (such as check writing capability and/or the use of Debit Cards) as defined in § 370.2(j) of the FDIC's Rules and Regulations, you must agree to provide a record of the interests of the beneficial owner(s) in accordance with the FDIC's requirements as specified below. Following these procedures may minimize the delay that these beneficial owner(s) may face when accessing their FDIC-insured funds in the event of a bank failure. Section 370 of the FDIC's Rules and Regulations can be accessed on the FDIC's website at https://www.fdic.gov/regulations/laws/rules/2000-9200.html.

The FDIC has published a guide that describes the process to follow and the information you will need to provide in the event the bank fails. In addition, the FDIC has published an addendum as section VIII of the guide (the "Addendum"), which is a good resource to understand the FDIC's alternative recordkeeping requirements for pass-through deposit insurance. The Addendum sets forth the FDIC's expectations for demonstrating eligibility for pass-through deposit insurance coverage for deposit accounts, including those with transactional features. The Addendum also describes the records you should keep on the beneficial owner(s) of the funds and the format in which to provide the records to the FDIC in the event the bank fails. The Addendum can be accessed on the FDIC's website at https://www.fdic.gov/deposit/deposits/brokers/part-370-appendix.html.

You agree to cooperate fully with us and the FDIC in connection with determining the insured status of funds in the Account at any time. In the event the bank fails and the FDIC is appointed as its receiver, you agree to provide the FDIC with the information described above in the required format within 24 hours of bank failure for all Accounts with transactional features and any other Accounts to which you need rapid access. As soon as the FDIC is appointed, a hold or freeze may be placed on the Account so that the FDIC can conduct the deposit insurance determination. That hold or freeze will not be released until the FDIC obtains the information required to enable the FDIC to calculate the deposit insurance. You

understand and agree that your failure to provide the required information to the FDIC may result in a delay in receipt of insured funds by the beneficial owner(s) and legal claims against you from the beneficial owner(s). This Agreement survives after the FDIC is appointed as our receiver, and as a result, the FDIC shall be entitled to enforce the terms of this section.

**39. Governing Law**

This Agreement, the Account, and transactions in the Account are subject to the laws and regulations of the United States and of the State of Illinois (including the Illinois Uniform Commercial Code, as in effect from time to time), and applicable rules and regulations. To the extent any such laws, rules or regulations may be modified or supplemented by agreement of the parties and the provisions of this Agreement or any other agreement or document applicable to the Account or transactions have done so, you and we agree to such modifications and supplements. To the extent any term or condition in this Agreement is inconsistent with such laws, rules or regulations it will be deemed modified and applied in a manner consistent with such laws, rules or regulations.

**40. Certain Instructions**

If you ask us to follow instructions which we believe expose us to potential liability or claims, we may refuse to follow your instructions, or we may require a surety bond or other protections satisfactory to us, such as your indemnity, before we follow the instructions.

**41. Inactive Accounts**

If an Account has had no withdrawal or deposit activity, and we have had no contact from you regarding the Account for eighteen (18) months, we may consider the Account inactive and stop sending Account statements. Service fees and other terms applicable to active accounts will apply to the Account while it is inactive except where prohibited by law. An inactive Account may be subject to additional fees. You understand that under state abandoned property laws, we must turn over to the state the Account if it has been inactive for a specified period of time as prescribed by applicable law.

**42. Relationship**

The relationship created by any deposit is that of debtor and creditor and otherwise the relationship between us is that of independent contractor. No fiduciary or other special relationship exists except as required by law.

**43. Recording**

You authorize us to monitor, record, and retain telephone calls, electronic messages and other data transmissions at any time without notice for any reason including to provide a record of instructions with respect to the Account, but we are not obligated to do so.

**44. Miscellaneous**

If any provision of this Agreement is determined to be invalid, illegal, or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement will not be affected or impaired as a result. We may waive any provision of this Agreement, but the waiver will apply only to that provision and on that occasion. In no event is any waiver or series of waivers to be construed as creating or requiring a waiver of any provision in the future.

**Terms and Conditions (Cont'd)**

**45. Facsimilies and Email**

We may, in our discretion, accept facsimiles of Account documentation and related matters as originals. Email communications from you, including instructions, are not binding on us and do not constitute notice to us as contemplated by this Agreement unless we otherwise expressly agree in writing.

**46. Claims Subject to Arbitration**

We and you agree to arbitrate all disputes or claims between you and us arising out of or relating in any way to the Account or this Agreement, any other agreement related to the Account, or any transactions arising hereunder or thereunder, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory. This arbitration provision is intended to be broadly interpreted and to cover, without limitation, any claims that arose before the effective date of this Agreement or any prior agreement governing the Account (including, but not limited to, claims relating to advertising, promotions, or disclosures) and any claims that may arise after the termination of this Agreement.

This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., governs the interpretation and enforcement of this provision. An American Arbitration Association ("AAA") arbitrator will decide the substance of all Claims in accordance with all applicable law, including recognized principles of equity and statutes of limitations, and will honor all claims of privilege recognized by law.

Unless both you and we agree otherwise, each party must bring all related or similar Claims in a single arbitration proceeding. If you or we later initiate a subsequent arbitration asserting Claims that are related or similar to ones that were raised by such party in an earlier-filed arbitration, the AAA or the arbitrator will either: (i) consolidate the subsequent arbitration with the earlier proceeding if it is ongoing or (ii) dismiss the subsequent arbitration if it raises Claims that would be barred by applicable law if brought in court.

(a) *Notice of Dispute and Arbitration Procedures.* A party who intends to pursue a Claim must first send to the other a letter describing the Claim and containing the information described below (a "Notice of Dispute"). Any Notice of Dispute sent to us should be addressed to:

BMO Harris Bank N.A.
Documentation Analysis and Control
111 West Monroe Street 9 Center
Chicago, IL 60603

Any Notice of Dispute sent to you by us will be sent to the address in our records that is associated with the Account at the time the Notice of Dispute is sent. The Notice of Dispute must (a) describe the nature and basis of the Claim; (b) set forth the specific relief sought; (c) set forth the name and address of the claimant; and (d) include the Account numbers and/or the provision of the applicable agreement to which the Claim relates. If we and you do not reach an agreement to resolve the Claim described in the Notice of Dispute within forty-five (45) days after the Notice of Dispute is received, you or we may commence an arbitration proceeding with AAA. If you or we attempt to commence arbitration proceedings before providing the requisite Notice of Dispute, the other party may inform the AAA of this agreement and direct it to refrain from commencing administration of arbitration proceedings until the requisite time period for notice has passed. Neither you nor we will disclose to the arbitrator the existence, amount, or terms of any settlement offers made by either party until after the arbitrator issues a final award resolving the Claim.

The arbitration will be governed by the AAA's Commercial Dispute Resolution Procedures, as amended from time to time (the "AAA Rules") as modified by this Agreement, and will be administered by the AAA.

The arbitrator is bound by the terms of this Agreement. All issues are for the arbitrator to decide, except that issues relating to the arbitrability of Claims or the scope, and enforceability of this arbitration provision, including the interpretation of the prohibition of class and representative actions and non-individualized relief, are for the court to decide. The right to a hearing will be determined by the AAA Rules. Any in-person arbitration hearing will take place in Chicago, Illinois. Regardless of the manner in which the arbitration is conducted, the arbitrator, upon the request of either party made prior to the closing of the hearing (or, if there is no oral hearing, prior to or along with submission of final documents to the AAA), will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award, if any, is based. Unless otherwise agreed by you and us, any award will be rendered by the arbitrator not later than fourteen (14) days from the date of the closing of the hearing or, if there is no oral hearing, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator in accordance with the AAA Rules.

(b) *Prohibition of Class and Representative Actions and Non-Individualized Relief*. The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief necessitated by that party's individual Claim; any injunctive relief must be individualized in nature and cannot affect individuals other than the claimant. YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING, OR AS A PRIVATE ATTORNEY GENERAL OR ON BEHALF OF THE GENERAL PUBLIC. Further, unless both you and we agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If a court decides that any part of this arbitration provision (other than the prohibition of class or representative actions and/or consolidation) is invalid or unenforceable, the other parts of this arbitration provision will still apply. However, if a court decides that this paragraph's prohibition of class or representative actions and/or consolidation is invalid or unenforceable, then the entirety of this arbitration provision will be null and void.

(c) *Access to Government Agencies*. This arbitration provision does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf.

(d) *Other Remedies*. This arbitration provision and the exercise of any of the rights you and we have under this provision will not prohibit you or us from exercising any lawful rights either you or we have to use other remedies available to preserve, foreclose or obtain possession of real or personal property or exercise self-help remedies, including set-off rights as described in this Agreement.

### 47. Amendment

From time to time, we may amend, add to or change (an "amendment") the provisions of this Agreement. Amendments will be communicated by notice given to you by mail or if permitted by law, electronic notice, and will be effective on the date indicated in the notice. If an effective date is not indicated, the effective date will be ten (10) Business Days from the date the notice was sent. If you do not wish to be bound by an amendment, you may close the Account before the effective date of the amendment. Your continued use of the Account after the effective date is deemed your agreement to the amendment. Any other amendment will be effective only if it is in writing and signed by our duly authorized officer. A change in our interest rates, fees or service charges, funds availability or operating procedures does not constitute an amendment of this Agreement and we may effect such changes without prior notice to you.

### 48. Entire Agreement

This Agreement, including our Funds Availability Policy and information specifically referred to in this Agreement, and any separate service or master agreement in effect constitutes the entire agreement between us regarding the subject matter

## Terms and Conditions (Cont'd)

of this Agreement and supersedes any and all prior representations, warranties, understandings and proposals. There are no oral agreements between us. You acknowledge that you have not relied on any representation or warranty, express or implied, or other understanding or proposal not contained in this Agreement, the Funds Availability Policy or information specifically referred to in this Agreement, or any separate service or master agreement in effect. This Agreement is binding upon and for the benefit of the account owners, their permitted successors and assigns, and us and our successors and assigns. This Agreement also applies to each of your subsidiaries and affiliates which have an Account with us or have access to the Account as if it were a party to this Agreement. You represent and warrant to us that you have the authority to act for and bind such subsidiaries and affiliates to this Agreement, and agree to be responsible for any unpaid fees, charges or other obligations of such subsidiaries or affiliates. Otherwise, except as expressly provided in this Agreement, this Agreement is not for the benefit of any other person, and no other person will have any right against you or us in connection with this Agreement.

### 49. Cash Withdrawals

If you request to withdraw large amounts in cash, we may place reasonable restrictions on the time and place of your withdrawal based on our security and operational considerations.

### 50. Defined Terms

**Available Balance** — means the most current record we have about the balance in the Account that is available for withdrawal from the Account.

**Business Day** — means every day except Saturdays, Sundays or federal holidays.

**Item** — includes a check, draft, demand draft, preauthorized draft, or other order or instruction for the payment, transfer, or withdrawal of funds (including a withdrawal slip), and electronic transactions (including ACH, ATM and POS).

## General Funds Availability Policy Commercial Checking Accounts

Our general policy for Commercial Checking Accounts (including Commercial Checking, Commercial NOW and Commercial Money Market) is to make the funds from your wire transfers and electronic direct deposits available to you on the Business Day we receive the deposit. Funds from cash deposits will be made available to you on the day of deposit. Funds from check deposits will be made available to you according to the Availability Schedule assigned to your check deposits. The length of delay varies depending on the type and method of deposit, and is explained below. Once the funds are available, we will use the funds to pay checks you have written or you can withdraw the funds in cash.

**Determining Availability**
For purposes of this Funds Availability Policy, every day is a "Business Day" except Saturdays, Sundays and federal holidays. If you make a deposit before our cut-off time on a Business Day that we are open, we will consider that day to be the day of your deposit. The cut-off time for deposits made at a branch is the closing time of the branch where the deposit is made. Deposits made at a night drop location or night depository will be retrieved and verified by us once at the beginning of each Business Day. Therefore, if you use a night drop during the day, that deposit will not be considered received by us until the next Business Day when we retrieve it and process it. The cut-off time for deposits made in connection with certain banking services that we offer may vary; the earliest cut-off time is 4:00 p.m. Central Time (except with respect to certain vault services, for which cut-off times range between 1:00 p.m. ET and 5:00 p.m. PT). Please review the service agreements that govern these banking services to determine the applicable cut-off times. If you make a deposit after our cut-off time or on a day that we are not open, we will consider that the deposit was made on the next Business Day we are open.

**Immediate Availability**
Cash deposited at branches or through the mail before the cut-off times listed above will be available for immediate use on the day that we receive the deposit. Because we cannot process deposits made until we receive them, we strongly recommend that you do not send cash deposits through the mail. Cash deposited after the cut-off times will be available on the next Business Day after we receive the deposit.

**Same Day Availability**
Funds from the following types of deposits will generally be available on the Business Day we receive the deposit:

- Federal Reserve Bank wire transfers
- Preauthorized electronic credits

**Next Day Availability**
Funds from the following types of deposits will generally be available on the next Business Day after the day we receive the deposit:

- U.S. Treasury checks
- Checks drawn on and drafts payable through us.
- Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders
- State and local government checks
- Checks drawn on banks located inside the United States of America

**Other Check Deposits**
Subject to Section 9 of the Commercial Account Agreement, funds from all other checks will generally be available no later than the second Business Day after the day of your deposit. The first $225 of these deposits, however, will be available on the first Business Day after the day of your deposit.

**Cashing a Check Not Drawn On Us**
If we cash a check that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your checking account or another account you have with us (or one of our affiliates). Those funds will be available at the time funds from the check we cashed would have been available had you deposited it.

**Longer Delays May Apply To Some Deposits**
In some cases, we will not make all of the funds that you deposit by check available to you as described above. In these cases, funds will generally be available on the second Business Day after we receive your deposit; however, the first $225 of your deposit, will still be available on the first Business Day. If we are going to delay availability, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly through one of our employees, or if we decide to take this action after you leave the premises, we will mail you the notice no later than the day after we receive your deposit. We will also tell you when the funds will be available. If your deposit is not made directly through one of our employees, or if we decide to take this action after you leave the premises, we will mail you the notice no later than the day after we receive your deposit.

If you will need the funds from a deposit immediately, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:
- If we believe a check deposited will not be paid
- If deposited checks total $5,525 or more on any one day
- If you redeposit a check that has been returned unpaid
- If you have overdrawn your account repeatedly in the last six months
- If there is an emergency situation such as a failure of communications or computer equipment, or severe weather

We will attempt to notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. Funds will generally be available no later than the seventh Business Day after the day of your deposit.

**Additional Information Concerning Your Accounts**

**Endorsement Requirements**
Payee endorsements are restricted by federal law to an area up to 1.5 inches from the trailing edge of a check. The trailing edge is defined as the left side of the check when looking at it from the front. The endorsement area reserved for the bank of first deposit is the area 3.0 inches from the leading edge of the check and 1.5 inches from the trailing edge of the check. The leading 3.0 inches is the area designated for endorsements of subsequent collecting banks. While checks may vary in size, the size of the areas designated for payee endorsement will always be as described above.

**Legibility of Endorsements**
Endorsements or other writing or markings on the reverse side of checks by issuers, payees, or endorsers should be limited to the space reserved for the payee's endorsement as described above. Otherwise, the endorsement of the depository bank may be obscured, and this may delay the return of the check or the notice of nonpayment. You shall be liable for any loss or damages arising from this condition.

**Sufficient Balances**
While funds will be made available based on the preceding time frames, you remain responsible for ensuring that sufficient ledger balances and Available Balances are kept or deposited to cover all withdrawals and other charges against the Account. If a deposited check is returned unpaid, we retain the right to charge that item back to the Account even though the funds for that check were made available. You remain responsible to immediately repay any overdrafts.

## General Funds Availability Policy Commercial Checking Accounts (Cont'd)

If you have any questions regarding this policy, or about the availability of any deposit you make, please contact the Client Response Center at 1-877-895-3278.

**International Items**
All international items should be directed to:

| **Mailing Address:** | **Overnight / Courier:** |
|---|---|
| BMO Harris Bank | BMO Harris Bank |
| Naperville Operations Center | Naperville Operations Center |
| Attn: Foreign Collections | Attn: Foreign Collections |
| PO Box 5731 | 1200 E. Warrenville Road |
| Carol Stream, IL 60197 | Naperville, IL 60593 |

Availability Schedules are subject to change without notice.

**_Signature_** | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|---|---|---|
| | OBI:  MAGUIEXPRESS SA AR QCCUSEGFZ26,MAGUIEXPRESS S A | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 236,562.50 |
| | REF#  20211222B6B7261F00311312221031FT01 | |
| | FROM: MARXSMITH LLC          ABA:   026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF#  20211222B6B7261F00174112220801FT01 | |
| | FROM: ████████████          ABA:   021000021 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF#  20211222B6B7261F00307712221027FT01 | |
| | FROM: PAXFUL USA INC          ABA:   026013356 | |
| | BANK: | |
| | OBI:  QCCUSK934, PAXFUL, INC 420003911352 | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 300,000.00 |
| | REF#  20211222B6B7261F00576012221506FT01 | |
| | FROM: ICHIOKA VENTURES LLC          ABA:   121000248 | |
| | BANK: | |
| | OBI:  FUNDS FOR REFERENCE QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 22 | ONLINE TRANSFER CREDIT | 60,000,000.00 |
| | ONLINE XFR FROM: XXXXXX6223 | |
| Dec 23 | INCOMING WIRE | 26.00 |
| | REF#  20211223B6B7261F00620912231555FT01 | |
| | FROM: CP CONSTRUCTION VENTURES LLC          ABA:   324377613 | |
| | BANK: | |
| | OBI:  QNCUS9QXJKZ | |
| | OBI: | |

**SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: 1█████6126          0

| Date | Description | |
|------|-------------|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200.00 |
| | REF#  20211223B6B7261F00269412231010FT01 | |
| | FROM: ██████████████        ABA:  31209536 | |
| | BANK: CITIBANK NA | |
| | OBI:  QNCUSV42DNZ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 400.00 |
| | REF#  20211223B6B7261F00562312231459FT01 | |
| | FROM: ASIAM RESOURCES LLC       ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSXZMYKW | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800.00 |
| | REF#  20211223B6B7261F00416212231232FT01 | |
| | FROM: SYNAPSE FINANCIAL TECHNOLOGIES   ABA:  084106768 | |
| | BANK: | |
| | OBI:  SIGNATURE BANK NEW YORK, NY, US 61C476A938BC7F2CA4985F | |
| | OBI:  B0/QCCUSYZX4, PINE GROVE CONSULTING, INC. 420056235618 | |
| | OBI:  ; @FREELANCEVZLA; SERVICES | |
| Dec 23 | INCOMING WIRE | 2,000.00 |
| | REF#  20211223B6B7261F00186112230813FT01 | |
| | FROM: 1/FBO ██████████        ABA:  NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 23 | INCOMING WIRE | 2,675.00 |
| | REF#  20211223B6B7261F00419812231235FT01 | |
| | FROM: ████████         ABA:  021000021 | |
| | BANK: | |
| | OBI:  CUSCQNZ6H | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 4,545.00 |
| | REF#  20211223B6B7261F00399012231212FT01 | |
| | FROM: HERMANN, LLC        ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H - THE COIN TRADING CO LLC420034051586 | |
| | OBI: | |

*Signature* | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   142 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,000.00 |
| | REF# 20211223B6B7261F00529812231428FT01 | |
| | FROM: ██████████    ABA: 321178158 | |
| | BANK: TULARE COUNTY FCU | |
| | OBI: QCCUSAZ7HTHE COIN TRADING COMPANY, LLC420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,500.00 |
| | REF# 20211223B6B7261F00608112231544FT01 | |
| | FROM: ████████    ABA: 121000248 | |
| | BANK: | |
| | OBI: QNCUSFAVQME   COINMETRO | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 6,000.00 |
| | REF# 20211223B6B7261F00213512230900FT01 | |
| | FROM: LA GUACAMAYA LLC    ABA: 021000021 | |
| | BANK: | |
| | OBI: QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 7,955.00 |
| | REF# 20211223B6B7261F00580912231515FT01 | |
| | FROM: BANK OF AMERICA    ABA: 026013576 | |
| | BANK: SIGNATURE BANK | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF# 20211223B6B7261F00029512230255FT01 | |
| | FROM: ███████    ABA: 31209536 | |
| | BANK: CITIBANK NA | |
| | OBI: QCCUSZ9EKRN, FINANLEADS S A | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF# 20211223B6B7261F00503712231401FT01 | |
| | FROM: ███████    ABA: 021000021 | |
| | BANK: | |
| | OBI: QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |

_Signature_ | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126        0

| Date | Description | |
|------|-------------|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 9,500.00 |
| | REF#  20211223B6B7261F00613612231549FT01 | |
| | FROM: ████████████    ABA:   121000248 | |
| | BANK: | |
| | OBI:  QCCUSZ9EKRN FINANLEADS SA | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,000.00 |
| | REF#  20211223B6B7261F00378112231153FT01 | |
| | FROM: ████████████████    ABA:   021000021 | |
| | BANK: | |
| | OBI:  QNCUSZRQ6C3 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,500.00 |
| | REF#  20211223B6B7261F00549512231446FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC    ABA:   102000021 | |
| | BANK: | |
| | OBI:  INVESTMENT ON SECURITIESQCCUSAZ7H, THE COIN TRADING CO | |
| | OBI:  MPANYLLC 420034051586 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 14,700.00 |
| | REF#  20211223B6B7261F00303312231045FT01 | |
| | FROM: ██████████    ABA:   026009593 | |
| | BANK: | |
| | OBI:  SERVICES | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 19,782.95 |
| | REF#  20211223B6B7261F00275312231013FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE    ABA:   021201383 | |
| | BANK: VALLEYNATIONALBANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y MUNDUZ INTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,400.00 |
| | REF#  20211223B6B7261F00412412231228FT01 | |
| | FROM: TECC CONSULTING LLC    ABA:   121000248 | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | | |
|------|-------------|---|---|
| | BANK: | | |
| | OBI: QCCUSZTF2-LOGISTIC FAST | | |
| | OBI: | | |
| | OBI: | | |
| Dec 23 | INCOMING WIRE | | 23,500.00 |
| | REF# 20211223B6B7261F00060312230603FT01 | | |
| | FROM: ██████████ | ABA:  026009593 | |
| | BANK: | | |
| | OBI:  QNCUSHRDX | | |
| | OBI: | | |
| | OBI: | | |
| Dec 23 | INCOMING WIRE | | 25,000.00 |
| | REF# 20211223B6B7261F00062512230608FT01 | | |
| | FROM: ██████████ | ABA:  121000248 | |
| | BANK: | | |
| | OBI:  QNCUSH6VPFC | | |
| | OBI: | | |
| | OBI: | | |
| Dec 23 | INCOMING WIRE | | 25,000.00 |
| | REF# 20211223B6B7261F00328112231113FT01 | | |
| | FROM: ██████████ | ABA:  121000248 | |
| | BANK: | | |
| | OBI:  QNCUSH6VPFC | | |
| | OBI: | | |
| | OBI: | | |
| Dec 23 | INCOMING WIRE | | 25,080.00 |
| | REF# 20211223B6B7261F00156812230801FT01 | | |
| | FROM: UR CHOICE DISTRUBUTOR INC. | ABA:  021000021 | |
| | BANK: | | |
| | OBI:  REFERENCE # QCCUS3D46 | | |
| | OBI: | | |
| | OBI: | | |
| Dec 23 | INCOMING WIRE | | 33,000.00 |
| | REF# 20211223B6B7261F00244412230937FT01 | | |
| | FROM: PND ADMINISTRATION SERVICES LLC | ABA:  021000021 | |
| | BANK: | | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | | |
| | OBI: | | |
| | OBI: | | |

# Signature

SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   145 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                       8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126          0

| Date | Description | |
|------|-------------|--|
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF# 20211223B6B7261F00520312231416FT01 | |
| | FROM: INOVASUPERSTAR LLC          ABA: 021000021 | |
| | BANK: | |
| | OBI: QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 45,561.25 |
| | REF# 20211223B6B7261F00699512231734FT01 | |
| | FROM: PRIZEOUT CORP               ABA: 026009593 | |
| | BANK: | |
| | OBI: REFERENCE ID QXCUS2KFAXD | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 46,883.81 |
| | REF# 20211223B6B7261F00395912231208FT01 | |
| | FROM: VIRTUAL ASSETS LLC          ABA: 071902399 | |
| | BANK: | |
| | OBI: TRADE SETTLEMENT             QCCUSWHQFN7, STILLM | |
| | OBI: AN DIGITAL LLC 420048617770 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 60,000.00 |
| | REF# 20211223B6B7261F00465612231322FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE   ABA: 061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI: QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 64,000.00 |
| | REF# 20211223B6B7261F00150112230801FT01 | |
| | FROM: WAAVE TECHNOLOGIES INC.      ABA: 021000021 | |
| | BANK: | |
| | OBI: QCCUS7VT4 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 83,836.50 |
| | REF# 20211223B6B7261F00280112231022FT01 | |
| | FROM: DIGITAL ASSET MANAGEMENT LIMIT   ABA: 026013576 | |
| | BANK: | |

_Signature_ | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI:  XACE LIMITED QCCUSQK4E | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 139,054.69 |
| | REF#  20211223B6B7261F00598012231532FT01 | |
| | FROM: PRIME TRUST, LLC AS AGENT FOR      ABA:  044000024 | |
| | BANK: | |
| | OBI:  PAYMENT | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 196,000.00 |
| | REF#  20211223B6B7261F00202212230840FT01 | |
| | FROM: MUNDUZ INTERNATIONAL INCORPORATED    ABA:  021000021 | |
| | BANK: | |
| | OBI:   REFERENCE CODE: QCCUS9 XF74Y -MUNDUZ INCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200,000.00 |
| | REF#  20211223B6B7261F00535712231433FT01 | |
| | FROM: EMBLAZE ONE INC.                 ABA:  021000021 | |
| | BANK: | |
| | OBI:   REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 212,500.00 |
| | REF#  20211223B6B7261F00686512231707FT01 | |
| | FROM: WESUPPLY SOLUTIONS, LLC        ABA:  043000096 | |
| | BANK: PNC BANK, N.A. | |
| | OBI:  QCCUS4JTVEP, ALTERPAY INTERNATIONALSOLUTIONS, LLC 4200 | |
| | OBI:  77366054 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 233,471.25 |
| | REF#  20211223B6B7261F00039812230442FT01 | |
| | FROM: NORTH AMERICAN CAPACITY INSURANCE    ABA:  026009593 | |
| | BANK: | |
| | OBI:  40802346 0011793370-08-1-2021 Q/CCUSRV6P, PROGLOBIX LL | |
| | OBI:  C 4200843321.67, INV-0571  MOLECULAR /INV-0571/.02021 | |
| | OBI:  1468290/MOLECULAR PATHOLOGY | |
| Dec 23 | INCOMING WIRE | 236,562.50 |
| | INCOMING WIRE | |

# SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███6126        0

| Date | Description | |
|---|---|---|
| | REF#  20211223B6B7261F00284812231027FT01 | |
| | FROM: MARXSMITH LLC             ABA:   026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 250,000.00 |
| | REF#  20211223B6B7261F00157312230801FT01 | |
| | FROM: ███████       ABA:   021000021 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 334,000.00 |
| | REF#  20211223B6B7261F00574112231508FT01 | |
| | FROM: YUMMY INC                 ABA:   211075086 | |
| | BANK: | |
| | OBI:   QCCUSYZX4, PINE GROVE CONSULTING,INC. | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 357,000.00 |
| | REF#  20211223B6B7261F00484612231338FT01 | |
| | BANK: M&T BANK | |
| | OBI:   REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 500,000.00 |
| | REF#  20211223B6B7261F00305612231049FT01 | |
| | FROM: DISTRIBUTED COMPUTING SYSTEMS      ABA:   026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800,000.00 |
| | REF#  20211223B6B7261F000080012230719FT01 | |
| | FROM: CB INTERNATIONAL BANK LLC      ABA:   026013576 | |
| | BANK: | |
| | OBI:  QCCUS3E2T, CB INTERNATIONAL BANK LLC 420030048263 | |
| | OBI: | |

*Signature* | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   148 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126        0

| Date | Description | |
|------|-------------|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,000,000.00 |
| | REF#  20211223B6B7261F00386012231158FT01 | |
| | FROM: DCG INTERNATIONAL INVESTMENTS LTD   ABA:  322286803 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUS3HRZQV, INFINITY VENTURES C1, L.P. 420 | |
| | OBI:  098750470 DCG INTERNATIONAL INVESTMENTS LTD. INVESTMEN | |
| | OBI:  T | |
| Dec 23 | INCOMING WIRE | 1,199,500.00 |
| | REF#  20211223B6B7261F00633012231607FT01 | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,298,000.00 |
| | REF#  20211223B6B7261F00633112231607FT01 | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1.00 |
| | REF#  20211224B6B7261F00284912241307FT01 | |
| | FROM: CP CONSTRUCTION VENTURES LLC   ABA:  324377613 | |
| | BANK: | |
| | OBI:  QNCUS9QXJKZ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134112240801FT01 | |
| | FROM: ██████████          ABA:  021000021 | |
| | BANK: | |
| | OBI:  USD WIRE | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134312240801FT01 | |
| | FROM: ██████████          ABA:  021000021 | |

*Signature*   |   SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   172 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126         0

| Date | Description | |
|------|-------------|--:|
| | BANK: M&T BANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 236,562.50 |
| | REF#  20211230B6B7261F00369212301046FT01 | |
| | FROM: MARXSMITH LLC          ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 312,000.00 |
| | REF#  20211230B6B7261F00644012301445FT01 | |
| | FROM: YUMMY INC            ABA:  211075086 | |
| | BANK: | |
| | OBI:  QCCUSYZX4 PINE GROVE CONSULTING INC | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 350,000.00 |
| | REF#  20211230B6B7261F00572312301350FT01 | |
| | FROM: PROGLOBIX LLC         ABA:  071000288 | |
| | BANK: | |
| | OBI:  QCCUSRV6P, PROGLOBIX LLC420084332167 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 1,918.00 |
| | REF#  20211231B6B7261F00225212310851FT01 | |
| | FROM: ECN OTC, LLC          ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSEH4VMF | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 2,105.00 |
| | REF#  20211231B6B7261F00405212311237FT01 | |
| | FROM: PRIME TRUST LLC        ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 2,500.00 |
| | REF#  20211231B6B7261F00462712311401FT01 | |
| | FROM: ██████  OR  ██████       ABA:  021000021 | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126         0

| Date | Description | |
|------|-------------|--|
| | BANK: | |
| | OBI:  QNCUSVPCE42 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 4,618.97 |
| | REF#  20211231B6B7261F00531512311618FT01 | |
| | FROM: ████████████         ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSX3VPN9 KXUW9MAJCMPS | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 5,400.00 |
| | REF#  20211231B6B7261F00389512311214FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC         ABA:  102000021 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUSAZ7HTHE COIN TRADING COMPANY, LLC42003 | |
| | OBI:  4051586 | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 10,000.00 |
| | REF#  20211231B6B7261F00503012311506FT01 | |
| | FROM: ████████         ABA:  121105156 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H, THE COIN TRADING COMPANY420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 15,000.00 |
| | REF#  20211231B6B7261F00336412311113FT01 | |
| | FROM: █████████         ABA:  124003116 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 17,780.00 |
| | REF#  20211231B6B7261F00350612311129FT01 | |
| | FROM: ████████████         ABA:  062005690 | |
| | BANK: | |
| | OBI:  REFERENCEQCCUSJRVZ UNITED COIN INC420030696060 | |
| | OBI: | |
| | OBI: | |

**SIGNATURE BANK**

Statement Period
From December 01, 2021
To   December 31, 2021
Page   174 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| Dec 31 | INCOMING WIRE | 20,802.00 |
| | REF#  20211231B6B7261F00332812311108FT01 | |
| | FROM:                            ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 25,000.00 |
| | REF#  20211231B6B7261F00521512311552FT01 | |
| | FROM: ████████              ABA:  121000248 | |
| | BANK: | |
| | OBI:   REFERENCE QCCUSZTF2 WESTCLIFFTECH | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 26,000.00 |
| | REF#  20211231B6B7261F00526112311603FT01 | |
| | FROM: INOVASUPERSTAR LLC          ABA:  021000021 | |
| | BANK: | |
| | OBI:   QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 28,500.00 |
| | REF#  20211231B6B7261F00544312311655FT01 | |
| | FROM: ████████ DBA BUTLER HOME MAINT ABA:  114000093 | |
| | BANK: | |
| | OBI:   QNCUSJDYNRP | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 32,100.00 |
| | REF#  20211231B6B7261F00545812311700FT01 | |
| | FROM: TECC CONSULTING LLC          ABA:  121000248 | |
| | BANK: | |
| | OBI:   QCCUSZTF2-LOGISTIC FAST | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 35,630.00 |
| | REF#  20211231B6B7261F00225912310854FT01 | |
| | FROM: ████████              ABA:  043318092 | |
| | BANK: | |
| | OBI:   GEM PURCHASEREFERENCE CODE: QNCUSJ7GYQR | |
| | OBI: | |
| | OBI: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ■■■■6126        0

| Date | Description | |
|---|---|---|
| Dec 31 | INCOMING WIRE | 70,000.00 |
| | REF#  20211231B6B7261F00437012311318FT01 | |
| | FROM: COIN TIME LLC                ABA:  121000248 | |
| | BANK: | |
| | OBI:  REF QCCUSWHQFN7, STILLMAN DIGITAL LLC 420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 121,100.00 |
| | REF#  20211231B6B7261F00544812311655FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT    ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 3158304019 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 130,000.00 |
| | REF#  20211231B6B7261F00324512311058FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE    ABA:  061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 150,000.00 |
| | REF#  20211231B6B7261F00544912311656FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT    ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 2273120497 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 172,620.30 |
| | REF#  20211231B6B7261F00317612311048FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE MAR  ABA:  066015084 | |
| | BANK: APOLLO BANK | |
| | OBI:  REFERENCE CODENQCCUS9XF74Y MUNDUZINTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 236,562.50 |
| | REF#  20211231B6B7261F00258712310938FT01 | |
| | FROM: MARXSMITH LLC                ABA:  026009593 | |
| | BANK: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███6126        0

| Date | Description | |
|---|---|---|
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 300,000.00 |
| | REF#  20211231B6B7261F00271812310952FT01 | |
| | FROM: 1/███████        ABA:   NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 31 | INCOMING WIRE | 600,000.00 |
| | REF#  20211231B6B7261F00434912311317FT01 | |
| | FROM: EMBLAZE ONE INC.        ABA:   021000021 | |
| | BANK: | |
| | OBI:  REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,000,000.00 |
| | REF#  20211231B6B7261F00348512311127FT01 | |
| | FROM: COMPASS MINING INC        ABA:   026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,450,000.00 |
| | REF#  20211231B6B7261F00099312310800FT01 | |
| | FROM: PRIME TRUST LLC        ABA:   021000021 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 6,500,000.00 |
| | REF#  20211231B6B7261F00096112310751FT01 | |
| | FROM: YUCHEN SUN        ABA:   026013576 | |
| | BANK: | |
| | OBI:  CREDIT TO: PRIME TRUST, LLC REFERENCE: QCCUSW47D, POLO | |
| | OBI:   DIGITAL ASSETS, INC. ███████3280 PURPOSE: FUNDING | |
| | OBI: | |

Withdrawals and Other Debits

| Dec 01 | OUTGOING WIRE | 5.00 |
|---|---|---|
| | REF#  20211201B6B7261F005566 | |
| | TO:   1/███████        ABA:   021000021 | |
| | BANK: JPMORGAN CHASE BANK, NA        ACCT# GB40REVO009970 | |
| | OBI:  20211124B6B7261F00196511240801FT03 | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,1 | Case No. 23-11161 (JKS) |
| Debtor. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| vs. | |
| One World Services LLC and OWS Brasil Intermediacao LTDA, | Adv. No. **Refer to Summons** |
| Defendant. | |

### NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The use of these services are often productive and effective in settling disputes. The purpose of this Notice is to furnish general information about ADR.

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral."

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision. If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

Dated:  August 13, 2025

       _/s/ Stephen L. Grant, Sr._
       *Clerk of Court*

---

1     The Debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.